**UNITED STATES of America,**
**Plaintiff,**

v.

**HANGAR ONE, INC. (formerly known as Southern Airways Company),**
**Defendant.**

**No. CA-74-H-646-S.**

United States District Court,
N. D. Alabama, S. D.

Aug. 4, 1975.

Raymond E. Hopkins, Fraud Section, Civ. Div., Dept. of Justice, Washington, D. C., Donald A. Cockrill, Wayman G.

Sherrer, U. S. Atty., N. D. Ala., Charles D. Stewart, Asst. U. S. Atty., Birmingham, Ala., for plaintiff.

Harry R. Teel, Bradley, Arant, Rose & White, Allen Poppleton, Joseph W. Spransy, Birmingham, Ala., for defendant.

## MEMORANDUM OF DECISION

HANCOCK, District Judge.

This action, filed by the United States of America under the False Claims Act (31 U.S.C. §§ 231–235) and for fraudulent breach of contract, is before the Court for decision on defendant's motion for summary judgment.

Those acting for plaintiff in the premises represent this action to be a completely justified effort (a) to recover damages allegedly sustained from a series of covert, surreptitious and fraudulent activities by the defendant over an extended period of time and (b) to impose upon defendant certain civil penalties provided by law for such activities. As viewed by defendant, the action is but another scene in a drama of planned harassment of defendant pursuant to which persons acting for the plaintiff in the premises, by repeatedly raising in litigation issues that are known to them to be baseless, have set about to break defendant financially so that defendant cannot pursue litigation whereby wrongdoing of persons for whose conduct plaintiff is responsible will be exposed and established.[1] While it cannot be said that there are no facts in this record from which inferences supportive of defendant's view can be drawn, or that, if confronted squarely with the question, the court would not so find, the court, in the present posture of the action, prefers to proceed on an assumption that the action is the

---

1. Plaintiff has twice heretofore put defendant in the posture of having to litigate about essentially the same issues that are involved in this civil action—once by means of the criminal indictment that is hereinafter discussed and the other time by means of a motion (Exhibit I to defendant's Motion For Application Of Sanctions Under Rule 37 [the "Motion for Sanctions"], filed September 24, 1974) to dismiss two administrative appeals (ASBCA Nos. 19460 and 19461). As is hereinafter shown, defendant was found not guilty of the charges made in said indictment. The said motion to dismiss was overruled.

result of an inability (or refusal) of those acting for plaintiff to recognize that a contract can be subject to more than one reasonable construction and that a party to a contract by pursuing a course of action predicated upon his own reasonable construction of the contract does not thereby subject himself to liability for fraud.

For the convenience of the parties, there is attached to this Memorandum of Decision (a) as Appendix A, a list of acronyms and similar abbreviated designations used herein, with a brief description of each, (b) as Appendix B, a list of names of persons who are referred to herein, with a short identifying statement about each such person, and (c) as Appendix C, a table reflecting the nature and location of exhibits which are referred to herein.

Three contracts between defendant (whose name has been changed from Southern Airways Company ["Southern"] to Hangar One, Inc. since the execution of the contracts) and plaintiff, one dated October 3, 1966, one dated December 22, 1967, and one dated February 14, 1969, provide the background. In essence, insofar as this civil action is concerned, in these plaintiff-drawn contracts (herein sometimes collectively referred to as the "Supply Contracts" and individually referred to as the "1966 Supply Contract", the "1967 Supply Contract" and the "1969 Supply Contract"), the parties agreed that, during calendar years 1967 to 1969, inclusive, defendant would tender for delivery to plaintiff, and that plaintiff would accept and pay defendant a fixed price for, more than

2,000,000 [2] 155 mm HE M107 Howitzer metal parts ("shell") [3] which, when subjected to inspections pursuant to specified inspection procedures, had properly passed such inspections. Defendant, before delivering any lot of shell, was required by such procedures to make two types—(a) a "one hundred percent [an every unit] inspection" for each of the characteristics that the Supply Contracts classified as a "critical" defect and (b) a "sampling plan inspection" (an inspection of sample units randomly drawn from the lot) for each of the characteristics that the Supply Contracts classified as "major" or "minor" defects.

The gist of the action is plaintiff's claim that, during the course of the performance of the 1967 and 1969 Supply Contracts, defendant produced and delivered a total of approximately 18,000 shell (about one-half of that number under each of those two contracts) that plaintiff claims defendant knew to be "defective" and that circumstances appertaining to the inspections made before delivery thereof necessarily amount to fraud on the part of defendant (i. e., as alleged in paragraph 8 of the original complaint, that defendant "returned, or caused to be returned, *defective* shells to the production line" and that defendant "failed to perform the *required* inspections for defects" [emphasis supplied]). The 18,000 "defective" shell were delivered in twenty-four of the 153 [4] separate production lots (each of which contained approximately 16,000 shell) that were delivered throughout the said contract periods.[5]

---

2. 612,232, 1,003,000 and 660,000 under the respective contracts.

3. Shell are component parts of high explosive projectiles which are munitions of war that are useful only for the waging of war and the training of troops.

4. The 153 lots were numbered DFP–1–1 to DFP–1–153, inclusive. The prefix DFP–1 distinguishes shell made by defendant from those made by other suppliers whose lots of shell were similarly numbered but with another prefix. For convenience the prefix is

sometimes hereinafter omitted in references to lots of shell made by defendant.

5. As shown by plaintiff's answer to Interrogatory 57, plaintiff claims that the 18,000 "defective" shell that are a subject of this action were contained in the following twenty-four lots: Lots DFP 1–86 to 93, inclusive, which were delivered under the 1967 Supply Contract; and Lots DFP 1–133 to 138, inclusive, and 144 to 153, inclusive, which were delivered under the 1969 Supply Contract.

Plaintiff charges that defendant's invoices to plaintiff for the production lots, in which plaintiff claims these 18,000 "defective" shell were contained, constitute violations of the False Claims Act, 31 U.S.C. §§ 231–235. Plaintiff also charges defendant with breaches of contract, alleging that the breaches consisted of the same acts and omissions (which in this aspect are characterized as "fraud *or* such gross mistakes as amount to fraud"[6]) upon which its False Claims Act charges are predicated. More particularly plaintiff's charges, stripped of their formality, are that defendant (a) breached the 1967 and 1969 Supply Contracts because defendant employed or used the "sampling plan inspection" (rather than the "one hundred percent inspection" process) to inspect for the presence of two defects which plaintiff claims (and defendant denies) are classified by the Supply Contracts as "critical" defects and (b) violated the False Claims Act because defendant obtained payment for such shell by submitting invoices therefor which were supported, respectively, by a document containing a representation (by a government official) that the shell so invoiced had been subjected to and had passed the inspections that defendant was required to make by the particular Supply Contract under which they were delivered.

As is hereinafter shown, there exist disputes as to the proper interpretation of contractual language (*i. e.*, as to whether two characteristics are classified by the contractual language as "critical" defects or as "minor" defects) between Frankford Arsenal[7] ("FA, the agency by which plaintiff drafted the contractual language that gives rise to the part of the dispute here under discussion) and Ammunition Procurement Supply Agency ("APSA", the agency by which plaintiff entered into the Supply Contracts containing that language), on the one hand, and defendant *and* Defense Contract Administration Services ("DCAS", the agency by which plaintiff administered the Supply Contracts), on the other hand.

DCAS, in administering the Supply Contracts for plaintiff, as aforesaid, (a) approved the inspection plans utilized by defendant in its performance of the Supply Contracts, (b) exercised continuing surveillance over defendant's performance of the Supply Contracts by, *inter alia*, monitoring defendant's inspection activities, (c) determined the acceptability of, and accepted or rejected, shell tendered by defendant for acceptance under the Supply Contracts, and (d) received, determined the propriety of, and paid,[8] the invoices of which plaintiff here complains. No claim has been made herein at any time by plaintiff that any DCAS personnel have been guilty of any failure to perform any duty, or of any collusion, or of any exercise of bad faith in or about the performance of any of that agency's duties in the premises.

At the respective times that each of the 153 lots produced by defendant under the Supply Contracts was tendered to, and accepted by,[9] plaintiff (which

---

6. "Gross mistakes as amount to fraud" refer to a situation in which government acceptance of defective work was induced by (a) a major mistake so serious as not to be expected by a responsible contractor, *plus* (b) a misrepresentation (by words, conduct or silence) of a material fact which was made *without* the intent to deceive. *Catalytic Engr. & Mfg. Corp.*, 72–1 BCA ¶ 9342.

7. The agency of the government that is responsible for the technical design of metal parts for all calibers of ammunition.

8. Plaintiff, acting by and through APSA, intercepted and is withholding (as an offset to any damages to which plaintiff may be entitled on account of the matters that are a subject of this civil action) the voucher that DCAS authorized to be issued in payment of invoice submitted by defendant for Lots DFP 1–151, 152, and 153. Payment was in fact made for all other of said 153 lots. Payment in fact is not an essential element of a False Claims Act violation. *United States v. Ridglea State Bank*, 357 F.2d 495 (5th Cir. 1966).

9. Each of the Supply Contracts contained provisions reading (see *e. g.*, Part 2 of Article XVII of the 1967 Supply Contract):

acted in the premises by and through DCAS), the QARIC,[10] a DCAS employee, or his authorized representative, signed and delivered to defendant a certificate in the form of that set forth in Form DD 250 (the hereinafter discussed government form that was used to evidence the government's acceptance of purchased material) reading:

> ACCEPTANCE of the listed items [the shell in lot in question] has been made by me or under my supervision and they conform to contract . .[11]

About once each two weeks during all times that it was engaged in performing the Supply Contracts, defendant, in accord with the Supply Contracts, applied for and was paid a "progress payment". In connection with each application by defendant for such a payment, the QARIC, or his authorized representative, also signed a certificate thereon reading:

> The contractor's Quality System is acceptable and in accordance with contract requirements. The quality of the items produced is acceptable.

Roland Smith was QARIC at defendant's Sylacauga facility until mid-August 1969 when he was succeeded as such by W. E. Snider. Snider was QARIC until defendant completed its performance of the Supply Contracts. F. B. Mayes was Assistant QARIC at that facility throughout the entire time that defendant was engaged in its performance of the Supply Contracts. With respect to the two kinds of certificates mentioned

next above, an affidavit by each of these officials reads, in substance:

> In my judgment each of the two kinds of certificates . . . that were signed during my tenure . . [as such officer] are true and correct. Nothing has come to my attention at any time that has caused me to suspect that anyone of them is or may be erroneous in any respect. I now affirm that it is now my judgment that said lots which were accepted for the Government . . . [during my tenure] met all of the quality requirements of the . . . [Supply] contracts as I understood and applied those requirements while I was . . [QARIC or Assistant QARIC as the case may be] at said facility.[12]

 The authority by which DCAS administered the Supply Contracts for plaintiff is derived from the Armed Services Procurement Regulations ("ASPR"), 32 CFR 1.100, *et seq.* These regulations have the force and effect of federal law. *Paul v. United States,* 371 U.S. 245, 255, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963). The court, therefore, takes judicial notice of them. *Tucker v. Texas,* 326 U.S. 517, 519, 66 S.Ct. 274, 90 L.Ed. 274, 276 (1946); *Carter v. American Tel. & Tel Co.,* 365 F.2d 486, 491 (5th Cir. 1966), *cert. denied,* 385 U.S. 1008, 87 S. Ct. 714, 17 L.Ed.2d 546 (1967).

ASPR Section XIV deals with "Procurement Quality Assurance" ("PQA"). A review of some of the pertinent parts

---

· "2. The inspection for acceptance will be conducted at: The manufacturer's plant (Sylacauga, Alabama)."

10. The acronym that designates a person who heads a staff of plaintiff's quality assurance representatives such as that of the "staff" that is the subject of the allegation in paragraph 6 of the original complaint reading: "Plaintiff maintained a staff of Government quality assurance representatives at defendant's manufacturing facility."

11. The applicable forms DD250 show that Lots 86 to 93, inclusive, (the lots here pertinent that were delivered *under the 1967 contract*) were accepted and billed for during

the period August 27 to October 23, 1968, inclusive, on or before October 23, 1968 and that Lots 133 to 138, inclusive and 144 to 153, inclusive (the lots here pertinent that were *delivered under the 1969 contract*), were accepted and billed for during the period July 8 to December 12, 1969, inclusive, on or before December 18, 1969.

12. These affidavits by Smith, Mayes and Snider (the "Smith affidavit", the "Mayes affidavit" and the "Snider affidavit", respectively) dated January 3, 1975, December 30, 1974, and December 31, 1974, respectively, were filed herein on January 9, 1975.

of that section of ASPR reveals just how significant is the fact that DCAS agrees with defendant, as aforesaid.

ASPR Section 14–203(a) provides in pertinent part:

. . . [T]he contract administration office cognizant at a plant is responsible for the performance of Government procurement quality assurance. actions. The contract administration office shall *verify* that the contractor has fulfilled contract quality requirements.[13] It is the contract administration office responsibility to develop and apply effective and efficient procedures for Government procurement quality assurance. [Emphasis supplied.]

"Acceptance" is defined in ASPR Section 14–001–6:

Acceptance means the act of an authorized representative of the Government whereby the Government assumes for itself . . . ownership of existing and identified supplies tendered . . . as . . . partial or complete performance of the contract on the part of the contractor.

ASPR Section 14–305.1 provides in pertinent part:

Each contract shall designate the place or places where the Government reserves the right to perform those procurement quality assurance actions that it considers necessary to determine that supplies and services conform to contract requirements.

Each of the Supply Contracts here contained provisions to the effect that the procurement quality assurance actions would be "at source." See, *e. g.,* the last paragraph of Article XIV of the 1969 Supply Contract:

The Government Procurement Quality Assurance Actions . . . will be conducted at: The manufacturer's plant . . ..

ASPR Section 14–305.2(c) provides in pertinent part:

Where the contract provides for the performance of Government quality assurance actions at source, these actions shall be taken at such times and places (including any stage in the manufacturing process . . .) as may be necessary to determine conformance to contract requirements.

ASPR Section 14–403(a) provides as follows:

Determination of conformance to contract quality requirements shall be made on the basis of objective evidence of quality. In determining the acceptability of supplies or services, the contract administration office shall make optimum use of quality data generated by contractors. To the extent that contractor quality data are available and reliable, *as determined by the contract administration office,* such data shall be used to adjust the amount of Government procurement quality assurance to a minimum consistent with proper assurance that the supplies or services accepted conform to contract quality requirements. [Emphasis supplied.]

ASPR Section 14–403(c) lists the specific actions DCAS will take to determine conformance to contract:

The following basic actions shall be taken to determine the contractor's compliance with the contract quality requirements:

(i) review and evaluation of the contractor's inspection procedures;

(ii) review and evaluation of the contractor's selection, calibration, maintenance, and use of gauges and measuring and test equipment;

(iii) review and evaluation of the contractor's quality records; and

(iv) performance of product verification inspection by the Government.

---

13. To "verify that the contractor has fulfilled contract quality requirements", DCAS, *inter alia,* performed a MIL–STD–1235 "sampling plan", "verification inspection" at the rate of "frequency f or oftener." That MIL and the terms quoted in this note are defined or explained hereinafter (*e. g.,* notes 22 and 29).

From the above, it is obvious that DCAS had the responsibility to administer defendant's contracts and perform the procurement quality assurance functions necessary to assure contract conformance. The final act by DCAS was acceptance. Under these contracts acceptance was at defendant's plant. See *e. g.*, Article XVIII of the 1969 Supply Contract:

Acceptance will be at Contractor's Plant

ASPR Section 14–306(b) provides that acceptance is to be signified by the execution of a particular form:

. . . Acceptance shall ordinarily be evidenced by execution of an acceptance certificate on the applicable inspection and receiving report form (DD Form 250 . . .). When acceptance is accomplished at a point other than destination, supplies cannot be reinspected at destination for acceptance purposes.

ASPR Appendix I describes the DD Form 250 and its use. ASPR App. I–101(a) and (b) provide:

(a) This appendix sets forth procedures and instructions for the use, preparation, and distribution of the Material Inspection and Receiving Report (MIRR) (DD Forms 250 Series) . . . used to evidence Government Procurement Quality Assurance (PQA).

(b) MIRRs are used to document Procurement Quality Assurance, Acceptance of supplies and services, and shipments . . . .

ASPR App. I–103(a)(i) sets forth the effect of the DD Form 250:

The DD Form 250 is a multi-purpose report used for:

PQA—*to provide evidence* of acceptance at origin or destination [Emphasis supplied.]

Finally, ASPR Section 14–306(b) provides for the situation where, as here, one agency (DCAS) is carrying out the procurement quality assurance functions for another agency (APSA):

Acceptance of supplies and services is the responsibility of the activity to which the function is assigned by the purchasing office. When a Government activity uses services of another Government activity or department for the purposes of acceptance, *acceptance by the other activity or department is binding upon the activity for which the services are performed.* Unless there are valid reasons to the contrary, acceptance shall be at origin . . . . . [Emphasis supplied.]

■ From the foregoing review of pertinent ASPR sections and contract language, the court holds that DCAS, not FA and not APSA, had the authority to determine for plaintiff whether defendant was performing its contractual obligations and producing a product that conformed to contract requirements. It is undisputed, and the court so holds, that plaintiff, acting by and through DCAS (a) approved the inspection plans utilized by defendant in its performance of the Supply Contracts; (b) exercised continuing surveillance over defendant's performance of the Supply Contracts by, *inter alia,* continually taking action to "verify" defendant's inspection activities; (c) determined the acceptability of, and accepted or rejected, shell tendered by defendant for acceptance under the Supply Contracts; and (d) received, determined the propriety of, and paid, the invoices of which plaintiff here complains.

In addition to such knowledge as plaintiff already had, or with which it is chargeable, by reason of the actual knowledge thereof that DCAS has continuously had from the inception of defendant's shellmaking venture, plaintiff, by reason of investigations conducted in 1968 by APSA and FA, was, or should have been, then alerted to the fact that defendant was openly pursuing the course of conduct that plaintiff now contends was fraudulent. As is hereinafter shown, any problems that occasioned such 1968 investigations by APSA and FA, as well as those which subsequently arose, if not caused by, in all probability were magni-

fied by, a group of dissatisfied individuals who were then employees and former employees of defendant. Extensive investigations by the Army (the "other Army investigations") and the Federal Bureau of Investigation (the "FBI") were initiated from time to time. Plaintiff claims that these investigations disclosed the existence in said twenty-four lots of the "18,000 defective shells, more or less."[14]

After the mentioned investigations had been underway a number of months, the Secretary of the Army conducted his own investigation (the "Fox and Krohn investigation") which was participated in by John Krohn, Procuring Contracting Officer, APSA. While the position taken by the plaintiff in this action in large measure is dependent upon the results of the other Army investigations, it is significant to point out that the position plaintiff is asserting in this action is not only completely at odds with the results of the Fox and Krohn investigation, as hereinafter stated, but also is at odds with the views of DCAS, the agency by which plaintiff administered the Supply Contracts, as aforesaid. For example, on March 31, 1970, Assistant Secretary of the Army, J. Ronald Fox, stated in a letter (the "Fox-Chesarek letter," Exhibit 219 to the deposition of John W. Krohn [the "Krohn Deposition"[15]]) to General F. J. Chesarek, Commanding Officer, Army Materiel Command ("AMC"), that it had been determined by the Fox and Krohn investigation that the shell classified as containing "critical" defects in the inspections that were made in the other Army investigations had been so classified by the application of criteria which were *not* a part of the Supply Contracts and that, if the correct criteria had been applied, in at least the majority of the cases, the defects in question would properly have been classified as "minor". Moreover, it was also determined in that investigation that, when tested by the same criteria which were used in the other Army investigations, the quality of shell made by the other four suppliers of such shell was no better than (and, in some cases, including Sperry Rand Corporation ["Sperry Rand"], not as good as) that of the lots about which complaint is here made. Further in this connection, Exhibit 226 to the Krohn deposition shows that Richard Porter, then an attorney in the office of the General Counsel for the Department of Defense, which office investigated the matter for Secretary Fox, also mentioned in a report to Fox that the FBI reports of its investigative interviews with government personnel who made the "critical" classification on which plaintiff now relies, state that, when they were asked by the interviewing FBI agents to define the nature of the critical defects they reportedly had observed, such government personnel usually described one or more of the "surface finish improper" characteristics that are expressly classified in the Supply Contracts as "minor" defects. Also W. C. McCain, who, at all material times, was Chief, Quality Assurance Division, DCAS Birmingham District ("DCAS–B'ham", in which district the shell in question were made) had his staff investigate the charges that large numbers of "criticals" had been delivered and, on the basis of that investigation (which was conducted in 1969 after de-

14. These 18,000 (and other) shell were first so set aside and classified in inspections made by Sperry Rand Corporation as a part of the said other Army investigations. Because of its part in this drama, that company is now the defendant in a civil action (the "antitrust action") pending in this court wherein defendant has charged it with malicious interference with a business relationship and with violations of the antitrust laws (conspiracy in restraint of trade, monopoly, and attempting to monopolize the shell manufacturing business in the southeastern part of the United States). Some of said dissatisfied former employees and certain civilian Army personnel are named as co-conspirators (but not as defendants) in that civil action. A copy of the complaint in the antitrust action is attached as Exhibit III to defendant's Motion to Transfer, filed on April 16, 1974.

15. The Krohn deposition was taken herein by defendant on March 18, 19 and 20, 1975.

fendant had made its last delivery of shell), found that the shell theretofore reported as "criticals" on the basis of inspections made in the other Army investigations had been classified as such by the use of criteria other than that specified in the Supply Contracts, as that criteria were uniformly understood and applied by him, his staff, the QARIC and defendant.[16] The absence of an unambigous and monolithic interpretation of the governing documents is an important substantive deficiency in plaintiff's case. That deficiency is discussed hereinbelow.

■ Neither party will dispute the fact that representatives of both parties to this action have continually made oral and written references, including oral references by counsel in colloquies with the court, to the previously terminated criminal action in this same court that is hereinafter discussed.[17] On the basis thereof and from its own notice and consideration of this Court's own record of the proceedings in said criminal action,[18] the court is satisfied (in this instance, as it is in the case of the other factual matters respecting that criminal action that are stated elsewhere in this decision) that, in 1970, substantially the same version which plaintiff here asserts to be the factual background of the fraud charged in this action, was presented to a grand jury empanelled by this Court.

During the April, August and November 1970 sessions of that grand jury, attorneys from the Washington office of the Department of Justice ("WDJ attorney[s]") and the office of the local United States Attorney (the "United States Attorney") caused evidence to be presented to that grand jury, *inter alia*, as to the said results of the other Army investigations without directing to the witnesses who testified about such results questions which would have caused that grand jury to know, or certainly to suspect, that the credibility of the testimony of those witnesses as to the quality of the shell in question might be, or was, questionable by reason of the investigations that are the subjects, respectively, of the Fox-Chesarek letter and of the FBI investigative reports that were mentioned, as aforesaid, by Porter;[19] and, on November 24, 1970, that grand jury, on the basis, *inter alia*, of such evidence, returned an indictment (Exhibit 62 in the Addendum) against defendant and twelve individuals for alleged violations of 18 U.S.C. § 371 and 18 U.S.C. § 1001. Pretrial issues were strongly contested, and much pretrial discovery (some of which is hereinafter discussed) was undertaken by defendant in the criminal action. Because of delays incident to resolution of such matters (occasioned primarily by extensive remodeling of the federal building in which those matters were resolved), it was not until January

16. Affidavit of W. C. McCain, (the "McCain affidavit") dated December 19, 1974, and filed December 20, 1974.

17. For example, in opposing defendant's Motion to Dismiss or, in the Alternative for a More Definite Statement, plaintiff, in a brief submitted on April 26, 1974, stated in part material:

"Lest there remain any doubt in defendant's mind on the matter, the instant civil action concerns the same facts and issues involved in the criminal trial of defendant and its employees on charges of conspiracy and fraud against the Government in the delivery of defective shells to plaintiff. The '18,000 defective shells, more or less' referred to in . . . the complaint are the same shells in issue at the defendant's criminal trial."

18. When it appears that the same facts, issues and parties were involved in a previous action before a court, that court may take judicial notice of its own records in the previous action. *Shuttlesworth v. Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Life Music, Inc. v. Broadcast Music, Inc.*, 41 F.R.D. 16 (S.D.N.Y.1966).

19. Deposition (the "Chandler deposition") of L. C. Chandler (QARIC, Louisiana Army Ammunition Plant, "LAAP") taken herein by defendant on February 28, March 2, and May 21 and 22, 1975, pp. 347–352; and deposition (the "Fairburn deposition") of Charles Fairburn (Quality Assurance Specialist, FA), taken herein by defendant on February 26 and 27, 1975, pp. 241–248.

23, 1973, that the criminal trial began; and, on March 6, 1973, after over six weeks of trial, jury verdicts of not guilty were returned as to defendant and six of such individuals. During the trial, motions for judgments of acquittal were granted as to three other of said individuals and shortly afterwards, on motion of the United States, the indictment was dismissed as to the remaining individuals indicted.

On February 27, 1974, approximately a year after the conclusion of the criminal action, and (aside from such earlier knowledge as it had or with which it was chargeable, by reason of said actual knowledge of DCAS) at least four or five years after the said factual background of defendant's alleged illegal conduct was known to plaintiff by reason of the other Army investigations, but in only a matter of days after service on Sperry Rand of the complaint in the antitrust action that is a subject of note 14, *supra,* this civil action was initiated in the United States District Court for the Northern District of Georgia which, on motion of defendant, transferred it to this Court in June of 1974.[20]

■■ For plaintiff to be entitled to a recovery under the False Claims Act aspect of this action, it must allege and prove that, in seeking or obtaining pay-

ment for the "defective" shell allegedly delivered, defendant *intentionally* defrauded the government. Proof of a specific intent to defraud is essential to a recovery under the False Claims Act. *United States v. Aerodex,* 469 F.2d 1003, 1007 (5th Cir. 1972); *United States v. Priola,* 272 F.2d 589, 594 (5th Cir. 1959). The essential elements of an intentional fraud are: that (a) a stated false representation was made (b) regarding a material fact (c) by one who did not believe it to be true (d) with the intent that it should be acted on (e) by one who believed it to be true and (f) was misled by it (g) to his (or his principal's) injury. *Southern Development Co. of Nevada v. Silva,* 125 U.S. 247, 8 S.Ct. 881, 31 L.Ed 678 (1888); *Socony Vacuum Oil Co., Inc. v. Allied Oil Corp.,* 178 F.2d 239 (7th Cir. 1949). Each of these elements must be averred to state a cause of action for intentional fraud. *Socony Vacuum Oil Co. v. Allied Oil Corp., supra; CIT Financial Corp. v. Sachs,* 10 F.R.D. 397 (S.D.N.Y.1950); *Curacao Trading Co. v. William Stoke & Co.,* 2 F.R.D. 308 (S.D.N.Y.1941).

The theory under which plaintiff seeks recovery for breach of contract is that its acceptance of the "defective" shell so delivered was obtained "by fraud or such gross mistakes as amount to fraud", and, that, therefore, plaintiff can avoid (what

20. As shown by plaintiff's answers to Interrogatory 38, this civil action was filed during the interim between (a) February 4, 1974 (when Sperry Rand, claiming that same was a part of its "cost" [under the cost-plus-award fee type contract under which it made the inspections referred to in note 14, *supra*], demanded that the government defend Sperry Rand in the antitrust action) and (b) sometime in March, 1974 (when the government agreed that (i) as a part of such "cost", Sperry Rand could employ its own counsel to defend the antitrust action and (ii) the government would pay "some part or all" of any judgment that might be rendered against Sperry Rand in the antitrust action). Defendant contends that the facts affirmed by that answer support its contention herein that the government did not file this civil action in good faith but rather as a means of consuming time and resources that defend-

ant would otherwise be able to devote to prosecution of the antitrust action. Defendant claims that other evidence from which inferences supportive of this contention can be drawn is also found, *inter alia,* in statement (see Exhibit 243 to deposition of Krohn taken by defendant herein on March 18, 19 and 20, 1975, "the Krohn deposition") made by Phillip B. Garberg, Legal Office, HQ, U. S. Army Armament Command (successor to APSA) who, while handling for plaintiff the matter of the claims that are subjects of the ASBCA appeals mentioned in note 1, *supra,* in substance, that a settlement of such claims (which defendant was then asserting for "extras" required of it during its performance of the Supply Contracts) could not be effected so long as the antitrust action was pending because such a settlement might have the effect of "prejudicing" Sperry Rand in its defense of the antitrust action.

otherwise would have been, *Gordon H. Ball, Inc.*, ASBCA No. 8316, 1963 BCA 3925) the conclusiveness of its admitted acceptance under paragraph 5(d) of the General Provisions of each of the Supply Contracts, reading:

. . . [A]cceptance shall be conclusive except as regards latent defects, fraud, or such gross mistakes as amount to fraud.

In each of the Supply Contracts, defendant agreed that, for the fixed prices (about $20 to $23) stated therein, it would produce, inspect and deliver to the government, in accordance with the drawings, designs and "applicable detail specifications" (all of which are sometimes collectively referred to hereinafter as the "tech data package") stated (or incorporated by reference) therein, the quantities of shell called for thereby.

The somewhat detailed discussion next hereinbelow of the tech data package is included at this early stage of this decision because some knowledge thereof—particularly respecting the interrelationship between the mentioned two types of inspection and the classification of defect charateristics—is *essential* not only to an understanding of the principal dispute between the parties but also of this court's discussion of that dispute which follows thereafter.

Excepting certain modifications not here material, the "applicable detail specifications" (pursuant to which the government required all such shell acquired by it to be produced, inspected and delivered) were set forth in the provisions of FA–PD–MI–2720, Rev. 0, 15 April 1966, (the "PD")[21] which provi-

sions, as then so modified, were a part of each of the Supply Contracts.

Part 4 of the PD (the language of which was drafted for plaintiff by FA, as aforesaid,) reads, in part:

4.3.2 Examination. One hundred percent examination shall be performed for all critical defects. Examination for major and minor defects shall be performed on a defect basis *in accordance with the classification of defects contained herein,* using the sampling plans contained in MIL–STD–105.[22] Continuous sampling plans in accordance with MIL–STD–1235 [23] may be used if approved by procuring activity. An AQL [Acceptable Quality Level] of 0.40 percent for each major defect of an AQL of 0.65 percent for each minor defect shall be used. All *non-conforming* material [disclosed by any of such methods of inspection] shall be rejected. [Emphasis supplied.]

The only "classification of defects" expressly made in the Supply Contracts is made in Paragraphs 4.3.2.1, 4.3.2.2 and 4.3.2.3, respectively, of Part 4 *supra.* These paragraphs, respectively, list and *expressly classify* (as "critical", "major" or "minor") the sixty-seven characteristics for which defendant was required to make an inspection at one or more particular (stated) stages of the production process, (a) some before banding (b) others after banding but before paint and (c) still others after paint. And, according to "the classification of defects contained herein (*i. e.,* part 4, *supra)*", two characteristics are expressly classified as "critical" defects, thirty-

---

21. A copy of the PD is included as Exhibit 85 in the bound volume entitled *Claims of Hangar One, Inc.* (the "Addendum") which is on file herein as Exhibit II to defendant's motion to transfer.

22. MIL–STD–105D ("MIL–105"), 29 April 1963, according to its content, "was developed by a working group representing the military services of Canada, the United Kingdom and the United States" and its incorporation "is

mandatory . . . [in all military supply contracts of] the Department of the Army, the Navy, the Air Force and the Defense Supply Agency."

23. MIL–STD–1235 ("MIL–1235"), 17 July 1963, provides that its incorporation "is mandatory . . . by the Department of the Army" in all of its "procurement, supply, storage and maintenance" contracts.

two characteristics as "major" defects and thirty-three characteristics as "minor" defects. Those here pertinent (including the two characteristics "burr" and "surface finish defects" that are the subjects of said dispute) are so classified by said paragraphs, as follows:

| Paragraph | Class | Code | Description |
|---|---|---|---|
| 4.3.2.1 | Critical | 1 | Metal defective |
| | Minor | 202 | Surface finish improper |
| | Minor | 205 | Burr |
| 4.3.2.2 | Major | 116 | Foreign matter in cavity |
| | Minor | 214 | Surface finish improper |
| | Minor | 215 | Burr |
| 4.3.2.3 | Critical | 1 | Pool of paint in cavity |
| | Minor | 208 | Burr |

Paragraphs 3.7.3, 3.7.4 and 3.7.7 of the PD read as follows:

3.7.3 Metal Defects.—All components shall be free from cracks, splits, cold shuts, pipe, porosity, inclusions or any other similar defect.

3.7.4 Surface finish.—The requirements for surface finish are as detailed in the applicable drawing.[24] The body cavity shall be free of scale, fins, deep seams, die scratches, pits or other surface discontinuities, the radii of which shall be . . . less than .030 inch.[25]

The characteristics (cracks, splits, cold shuts, pipe, porosity and inclusions) which are specifically enumerated in paragraph 3.7.3, supra, as "Metal Defects" and which are classified as "Metal de-

fective" critical defects (Code 1) by paragraph 4.3.2.1, supra, are the kinds of defects that the processes used in making steel (a raw material from which shell are made) can cause in the cavity (or elsewhere for that matter) of shell. On his deposition, Hinzman [26] testified, in substance, (p. 45 of April 28, 1975 deposition) that the term "defective metal", as it is used in paragraph 4.3.2.1, supra, "is poor steel or dirty steel" and that these shell defects "are present in the steel from the [steel] mill."

How "surface finish improper" and "burr" characteristics (which, respectively, are depressions in, or protrusions from, the metal surface) are caused to be in the cavity of a shell (in the process utilized by defendant to make shell) is described by the Armed Services Board of Contract Appeals in United States Hoffman Machinery Corporation, ASB CA No. 10906, 68–1 BCA ¶ 7027 (1968), as follows:

[A shell is] formed out of billet steel [27] by means of a technique known as the hot forging process. In that process a metal punch, called a forging tip, [is] rammed into a piece of red hot steel thereby forming a cavity. The hot steel [is] then forced through a series of draw rings which [causes] the walls of the cavity to be elongated to their final size. As might be suspected, the hot forging technique

24. Note 3 of the applicable drawing (Exhibit 12 in the Addendum) reads: "Forged or drawn finish acceptable in cavity." On his depositions taken herein by defendant on March 20 and April 28, 1975, Lawrence H. Hinzman (Chief, Munitions Quality Control Operations, APSA) testified, in substance (p. 19 of April 28, 1975 deposition) that there is nothing in the "technical data, the drawing or the specification which really defines what a forged finish is or what an acceptable forged finish is. And, if you have ever been in a forge shop, you will find out there are all different kinds of surfaces that come out of a forging operation."

25. On his April 28, 1975, deposition, Hinzman was asked, in substance, (p. 20), if he would agree that it would be impossible on the government furnished machinery and equipment in defendant's facility at Sylacauga

(which Hinzman had just described as "was not the best") to forge a shell that was totally free of the characteristics listed in paragraph 3.7.4 and, in response, he answered, "I would say that of the finest equipment . . . ."

26. Hinzman is identified in note 24, supra.

27. Billet steel are bars of steel about 6″ X 6″ X 16′ and are obtained from steel mills. The shell manufacturer, after breaking or cutting the billets into "slugs" (about 6″ X 6″ X 24″), forms such slugs into unfinished shell by means of forging tips, draw rings, etc. and, thereafter, by means of cutting, grinding, bending, etc., operations, into the size and shape of the finished shell (bullet shaped, about 2′ in length and 5½″ in diameter. Each finished shell weighs about 80 pounds.

[does] not produce smooth, machine finished surfaces in the cavity

. . . .

The quality of a projectile's cavity finish [is] directly related to the condition of the forging tip used in shaping the cavity. A forging tip [produces] fewer surface imperfections when it [is] new than it [does] when it [is] ready for replacement.

Under the authority of Paragraph 4.3.2 of Part 4 of the PD, plaintiff's "procuring activity" (APSA) authorized defendant to use the "continuous sampling plans" in accordance with the plan set forth in MIL–1235. On his deposition, Hinzman, testified, in substance, (pp. 77–78 of March 20, 1975 deposition) that continuous sampling plans are designed for use in inspecting for defects that are caused by machinery during the course of a manufacturing process. Using the example alluded to during his deposition, if you are inspecting for a particular defect at a particular point on a production line that is stamping out nickels, you can assume that your manufacturing process is stabilized insofar as that particular defect is concerned when you "clear your 'i' factor" (e. g., find "i" number,[28] say 230, consecutive nickels that reach that point on the line that are free of that particular defect) and, thereafter, sample inspect "at frequency f" [29], say 1 out of 25, of the nickels that reach that point on the line until such time as you find that particular defect in one of the samples you pull for inspection; then you begin all over by screening until you can assume, by again clearing

your "i" factor, that your manufacturing process is stabilized (e. g., that the machine that caused the defect you found in the sample has been adjusted).

The particular "frequency f" and "i factor" that MIL–1235 requires to be used depend upon the volume of units being produced (say 1 to 1200, 1200–3200, etc., per 8 hour shift, per day, etc.) and are ascertainable from tables that are contained in MIL–1235.[30]

From the sheer number of shell required to be manufactured under each of the Supply Contracts, it would seem that an objective third party observer, even without having knowledge of the contract provisions above quoted, would intuitively expect that some of the units delivered would not in fact meet all of the requirements of the drawings, etc., no matter how faithfully the producer has made any required inspection; further, that the number of such units which would not meet a particular requirement would vary, depending upon the severity of the inspection required to be made to ascertain whether the units meet that particular requirement; and further, that the more objectionable a purchaser deems a failure to meet a particular requirement, the more severe the inspection he would require his own, or his supplier's, inspection personnel to make for the purpose of detecting and rejecting units in which such a failure occurs. This view, which it seems one would expect to feel intuitively, finds elaborate explicit support in the Supply Contracts. For example, MIL–1235, which was designed to provide inspections for use in gov-

28. See paragraph 8.3.2 of MIL–1235.

29. "Frequency f" is defined by paragraph 4.1 of MIL–1235, *supra*, as "the desired ratio between the number of units of product *randomly selected and inspected* at an inspection station and the number of units or product passing the inspection station during periods of sampling inspection."

30. In the MIL–1235 sampling plans, the "frequency f" is the same for "major" and "minor" defects and, in their application, the same sample shell may be inspected for

all such defect characteristics that are required to be inspected for at a particular stage of a manufacturing process. The difference in the application of such sampling plans in the case of "major" and "minor" defects arises from the fact that the number of defect free units necessary to clear the "i" factor is a larger number (say 290) for a "major" defect than the number (say 210) for a "minor" defect (e. g., see pp. 12–13 of Exhibit 66 in the Addendum).

ernment acquisitions of all kinds of mass-produced manufactured items that might be needed by the Army (shell being just one of an almost unlimited number of such items),[31] provides, in parts here pertinent:

3.9 Defect.—. . . . Defects are *normally* classified according to severity (see 3.12).

3.12 *Classification of defects*

. . .—A classification of defects is an enumeration of pertinent defects . . . classified acccording to their importance.

3.12.2 *Critical Defects.*—A critical defect is a defect that *judgment and experience* indicate could result in hazardous or unsafe conditions for individuals using or maintaining the product . . . .

3.12.3 *Major Defects.*—A major defect, other than critical, that could result in failure or materially reduce the usability of the unit or product for its intended purpose.

3.12.4 *Minor Defects.*—A minor defect is one that does not materially reduce the usability of the unit of product for its intended purpose, or is a departure from established standards having no significant bearing on the effective use or operation of the unit of product. [Emphasis supplied.]

Provisions that are comparable to the five paragraphs from MIL–1235 quoted next above are also contained in paragraphs 2.1, 2.1.1, 2.1.2 and 2.1.3 of MIL–105.

The fact that the Supply Contracts required that a "one hundred percent" (commonly called "screening") type inspection be made for "critical" defects, but only required that a "sampling plan" type inspection be made for "major" and "minor" defects, and the distinctions in the respective procedures that are built upon and around those two types of inspections, must be clearly understood because the very fact that the two types of inspection exist, to say nothing of their application, is central to understanding the error in plaintiff's view that the tender to plaintiff by defendant of any shell not meeting a particular drawing, etc., requirement, is a breach of the manufacturing requirements, or of the inspection requirements, either or both, under the Supply Contracts.

The court expects that there can be no quarrel with the proposition that, if the government specifies in the contract that only "frequency f" of shell (say one in each group of 25 of the shell that reaches a particular point on the production line) will be required to be inspected for adherence to a particular drawing requirement and that, if that one is faithfully inspected and no defect is found in it, then that group of 25 will be deemed, for purposes of that contract, to meet that said drawing requirement, there is a mathematical probability that some number of shell out of the other 24 shell not inspected (and not required to be inspected for that same particular requirement at that same point on the production line) will not meet that requirement and will move on up the production line for further manufacturing processing. Stated differently, and in its most succinct form, if the government by contract has specified that only one shell in 25, etc., is to be examined for adherence to a particular requirement, the government has automatically thereby created a manifold probability that *some* shell ("non-specification shell") that do not meet that requirement will ultimately be delivered to the government, *and* that this could happen without the contract being ignored or breached and without the government being defrauded.

---

31. See note 23, *supra.*

Inasmuch, as is hereinafter shown, the governing documents, all drawn by the government, not only expressly state that the receipt of some nonspecification shell is "expected", but also go on, as is next hereinafter shown, to evaluate that expectation quantitatively, it appears that the mere delivery by the defendant to the government of some number (*and especially some number not exceeding that expectation*) of non-specification shell cannot, standing alone, constitute either a breach of the governing contract or a fraudulent act.

By means of another table contained in MIL–1235, each of the AQLs that is specified in paragraph 4.3.2, *supra* (*i. e.,* "the 0.40 percent" and "0.65 percent" AQLs), for *each* "major" and *each* "minor" defect, respectively, can be converted into an equivalent AOQL which paragraph 3.18 of MIL–1235 defines, as follows:

3.18 *AOQL.*-The average Outgoing Quality Limit (AOQL) (stated as a percentage) is the largest fraction of defective material, which is *expected* on the average to pass inspection when the associated sampling plan is *followed faithfully.* [Emphasis supplied.]

Other parts of MIL–1235 here pertinent are:

3.15 *Continuous Sampling Inspection.* -Continuous sampling inspection is the examination and/or testing of units of product as they move past an inspection station. *Only those units of product found by the inspector or screening crew to be nonconforming are rejected; the rest of the production, uninspected units as well as units found to be conforming, is allowed to continue down the production line as conforming material.*

5.2 *Order of Production.*-All inspection must be performed in the order produced. Moreover, all units must pass each inspection station [at which acceptance inspections are made for any defect]. This does not prevent *process* inspection by the supplier prior to submittal to the [acceptance] inspection station nor does it prohibit the supplier from removing [from the production line] or correcting units containing defects prior to submittal.

6.1 *Determination of Acceptability.*- The acceptability of product submitted shall be determined by use of a specified sampling plan.

6.2 *Acceptance.*-During 100% inspection periods, the inspection is a sorting process during which good product is allowed to pass the inspection station, while the defective units are withdrawn from the product and returned to the contractor. *During periods of sampling inspection, the product is allowed to pass the inspection so long as the provisions of the plan selected are satisfied. Product which is allowed to pass the inspection station is considered acceptable for the defect(s) concerned, and is not subject to recall for further inspection for those defects except . . . [that upon] discovery of a critical defect* during sampling inspection, the required screening will begin with the unit of product just after the last defect-free sample unit. [Emphasis supplied.]

Contra to the situation with respect to units containing "critical" defects, which defendant was required by the "one hundred percent" inspection procedures to reject (irrespective of how, where or when found before delivery) and which defendant, if it had any knowledge that such unit contained such a defect, could not return it to the production line (for any purpose other than using the production line merely as a conveyor system by which to move such eighty pound units from one place in the plant to another), the said "sampling" plan procedures, with exceptions not here significant, provided, as shown, *inter alia,* (a) that a required sampling plan inspection be made for each of cer-

tain (specified) "major" and "minor" defects at a (stated) particular stage of the production process (*i. e.,* paragraphs 4.3.2.1, 4.3.2.2 and 4.3.2.3, respectively, required that certain of such defects be so inspected for before banding, others after banding but before painting, and still others after painting), (b) that only *"non-conforming"* units found in any of such required sampling inspections be rejected and (c) that a unit that had been properly passed on a required sampling inspection for a particular "major" or "minor" defect (in this example called a "first defect"), even though defective by reason of that defect (for example, one of the say 24 in 25 that, not having been selected for inspection in the sampling process, was not required to be actually inspected for the first defect), was "considered acceptable for the defect concerned [*i. e.,* the first defect in this example]" and was "not subject to recall for further inspection" for that defect, with the consequence that, if a unit had properly passed sampling inspection for the first defect and was thereafter set off the production line for a proper purpose (such as, for example, so that it could be repaired for a subsequently discovered "major" or "minor" defect of another kind [the "second defect"]), defendant was authorized, insofar as the first defect was concerned, to return the unit to the production line at any time after the purpose for which the unit had been so set off had been accomplished (such as, for example, after the second defect had been repaired and the unit had been properly subjected to and had passed any after-repair inspections specified for a unit that had undergone repair for that kind of defect), and to do so with the intention that that unit (containing the undetected first defect) would "continue down the production line" and, still containing the first defect, be delivered to the government "as *conforming* material" that the government was due to accept and for which the government was due to pay.

Although, as stated above, one or more of paragraphs 4.3.2.1, 4.3.2.2 and 4.3.3.3, *supra,* expressly list "burr" and "surface finish improper" characteristics as "minor" defects, and although it is nowhere expressly stated in the PD that such defects are "critical" defects, plaintiff insists herein that, depending on the degree of severity, some "burr" and "surface finish defects" are classified as "critical" defects by the PD. Such insistence by plaintiff is a principal basis for its contention herein that defendant is guilty of breach of contract and fraud. This insistence by plaintiff arises from the fact that defendant admittedly did not, with respect to those two named defects, follow the procedures "required" by the Supply Contracts for "critical" defects (*i. e.,* plaintiff claims that defendant did not make "one hundred percent inspections" for those two defects, and that defendant [under circumstances when such action would have been proper only in the case of units containing "major" or "minor" defects] "returned to the production line" units *knowing* that they contained one or more of such two named defects, etc.).

The premise for said insistence by plaintiff is bottomed on its contentions herein (a) that MIL–1235 and MIL–105 are each referenced in the PD, (b) that paragraph 3.12.2, *supra,* of MIL–1235 states that a "critical" defect is "a defect that judgment and experience indicate could result in hazardous or unsafe conditions for individuals using or maintaining the product", and (c) that the judgment and experience of government ammunition specialists indicate that some "burr" and "surface finish improper" defects have been demonstrated to be so severe as to be as, or more, "hazardous," etc., "for individuals using or maintaining the product", than some of the "metal defective" characteristics that are expressly classified by paragraph 3.7.2.1 as "critical" defects. On the premise of these facts, plaintiff, by evidence and oral argu-

ment,[32] claims that, under the rule of construction known as *ejusdem generis,* i. e., that where, as in paragraph 3.7.3, *supra,* general words (*i. e.,* "other similar defects") follow an enumeration of particular things (*i. e.,* the characteristics "cracks, splits, cold shuts, pipe, porosity, inclusions"), such general words as a matter of law must be held to include other characteristics of the same general kind or class as those specifically mentioned (*i. e.,* all characteristics, including, but not limited to, those listed in paragraphs 3.7.4 and 3.7.7 if they are of such severity that the "judgment and experience" [of plaintiff's ammunition experts] indicate that they too could result in "hazardous or unsafe conditions . . . .").

This position by plaintiff has been a, perhaps the, most bitterly fought legal issue—not only in this civil action but also in the criminal action. Defendant, in opposition, argues that only a moment's contemplation is necessary for one to correctly conclude that the "judgment and experience" referred to in paragraphs 2.1.1, *supra,* of MIL–105 and 3.12.2, *supra,* of MIL–1235 must be such judgment and experience, if any, as may be exercised by the government *before* the time its procuring authority requests a bid or proposal for a shell supply contract; that, if it were otherwise and the "judgment and experience" in question were exercisable by those various persons, firms and corporations who might be selected (by means of competitive bid or otherwise) as shell suppliers on the basis of best (all factors considered) price, as the law contemplates that they be, then those suppliers who had had no experience (with the loading or use of ammunition, or otherwise) on which to base an informed judgment would have a decided advantage over those who might have had much such experience because the former might contractually be entitled to reject as "criticals" no units containing

any paragraphs 3.7.4 and 3.7.7, *supra,* characteristics while the latter would be required to reject, as "criticals" (and to repair, scrap or replace) a substantial part of its production (to say nothing of the added consequence that, each time such a unit was rejected, the more experienced would have imposed on it the added consequence of an extra screen until 2500 consecutive units free of such characteristic had been found); and that plaintiff's contention totally ignores paragraph 3.9, *supra,* which provides that defects will *"normally"* be classified according to "severity"—that no potentially interested supplier who is asked to respond to a request for a proposal of the price for which he will make shell could determine from the government's formal requests for such proposal (which historically have purported to state what it is that the government wants the successful offeror to do) but that, under the government's overall ammunition program, the government already had obtained (as it had with Sperry Rand when defendant entered into the Supply Contracts), or might then already be intending thereafter to obtain, other contracts whereby the government would pay a *loading* contractor to make some (and, if so what) other repairs, inspections or modifications of the shell that the government might from time to time desire to have made of the shell to be supplied before they were loaded. Defendant further contends, in this regard, that, assuming arguendo that there is an ambiguity in the PD which should be resolved by the *ejusdem generis* rule of construction, that what the "particularly enumerated" characteristics ("cracks, splits, cold shuts, pipe, porosity, inclusions") enumerated in 3.7.3, *supra,* have in common one with the other is the fact that each of them is a metallurgically definable steel making process caused kind of cavity defect (a "steel mill caused cavity defect") that has an adverse effect on the soundness and strength of the

---

32. For example in answer to Interrogatory 57 made on November 11, 1974 and, in oral re-

marks of counsel at hearing herein on October 8, 1974.

metal; that a construction such as that contended for by plaintiff would not only nullify, but also be directly contrary to, those respective parts of paragraphs 3.7.2.1, 3.7.2.2 and 3.7.2.3 that expressly classify the two defects in question as "minor" defects without any stated exception on account of severity or otherwise; further, that, only by construing the said phrase "other similar defects" so that its meaning is limited only to metallurgically definable steel mill caused cavity defects that have an adverse effect on the soundness and strength of the metal can all of the various parts of the Supply Contracts be made meaningful and be construed as a harmonious whole—*e. g.*, the phrase "other surface discontinuities, the radii of which is . . . less than 0.30 inch" in paragraph 3.7.4, similarly construed, would thus mean and be limited to shellmaking "process caused" (or "process induced") defects, "the radii of which is . . ."; [33] and, finally, that, under the ever changing subjective standard suggested by plaintiff (*i. e.*, the judgment and experience of those persons who might from time to time be plaintiff's ammunition specialists), a shell supplier who rejected a shell for a paragraph 3.7.4 or 3.7.7 defect but thereafter cleared an "i" factor of only 230 shell (as required for a "minor" defect) instead of 2500 shell (as required for a "critical" defect), would not know until six or eight years later, *after* two petit juries, respectively, had returned verdicts in a criminal case *and* in a civil case, whether by so doing he had defrauded the government or had subjected himself to liability for a False Claims Act violation.

Irrespective of whether either, both or neither of the parties is correct about how the phrase "other similar defect" should be construed, it appears that, because of the significant effect that the provisions quoted hereinabove from the PD and from MIL–1235 will have on what might reasonably be "expected" by the parties to a supply contract, the matter of whether a supply contract will require a particular defect characteristic to be inspected for on a "one hundred percent" or on a "sampling" basis should be considered by and known to the parties *before contracting*—by those charged with government procurement, in order to protect the interests of the government by agreeing to pay for enough but not too much or unnecessary inspection, and by the supplier, in determining the price he will quote or bid in order to determine the cost to him of the inspection system that he must provide as well as the cost to him of the repair, scrapping or replacing (and the handling incident thereto) of the defective units that might reasonably be "expected" to be detected by an inspection made at the required degree of severity—because, once such designation as to any particular defect characteristic is made in a supply contract, it is a material provision of the document to which both parties must look in order to determine their respective rights and liabilities, not only with respect to the severity of the required inspection for that particular defect characteristic but also their rights and liabilities with respect to the repair or replacement of any defective units that might or might not be disclosed by an inspection made for that defect at that degree of severity.

Thus, if, on the one hand, the government determines that it desires that the lots and sub-lots of the units it purposes to acquire by a supply contract be free of a particular defect characteristic (excepting the relatively few such units that might reasonably be expected to escape detection as the result of human fallibility), then, by agreeing with its supplier *in the supply contract* that such characteristic will be inspected for

---

33. On his deposition, Hinzman testified, in substance (p. 43 of the April 28, 1975 deposition) that all surface finish defects in the body cavity are defects that could be caused by the shellmaking process.

on a "one hundred percent" basis, the government, because of its supplier's contractual obligation in that regard, could reasonably expect to realize its quality expectation with regard to that defect characteristic.

On the other hand, however, if the government, for economy or other reason, determines that it is willing to tolerate a particular defect characteristic in up to a certain percentage of the units it proposes to acquire, then, by consulting said table in MIL–1235, it can find the AQL for the degree of the severity (whether 1 in say 10, 25, 50, etc.,) of the "sampling" inspection that it should by contract require to be made for that particular defect in order to achieve its quality expectation; and then, by agreeing with its supplier in the supply contract, that that characteristic, for the purposes of the supply contract, will be deemed to be a "major" or "minor" defect (with that particular AQL) and that it will be inspected for as such on the "sampling" basis at the degree of severity required by MIL–1235 for defect characteristics having that AQL, the government could (at least the statistical probabilities would be such that it could) reasonably expect to realize its quality expectation with regard to that defect characteristic.

Therefore, it follows that, if the government drawn PD is interpreted literally, by agreeing to said provisions in paragraph 4.3.2, *supra* (*i. e.*, that defendant would only be required to inspect for those thirty-two particular characteristics classified by the Supply Contracts as "major" defects on a sampling basis, as provided in MIL–1235, for defects having an AQL of 0.40 percent and that defendant would only be required to inspect for those thirty-three particular characteristics classified by the Supply Contracts as "minor" defects on a sampling basis, as provided in MIL–1235, for defects hav-

ing an AQL of 0.65 percent), the parties to the Supply Contracts, in effect, acknowledged (a) that it was "expected" by each party thereto that (paraphrasing paragraph 3.16, *supra*), if the continuous sampling plans under MIL–1235 were "followed faithfully", the deliveries made under the respective contracts, *"on the average"*, would contain "up to" certain percentages (computable by what amounts to a fixed formula in MIL–1235) of units that would be non-specification shell by reason of *each* one of the thirty-three characteristics that were classified under such contracts as "major" defects and "up to" certain percentages (likewise computable) of units that would be non-specification shell by reason of *each* one of the thirty-three characteristics that were classified under such contracts as "minor" defects; and (b) that, if such sampling plan were "followed faithfully" and "on the average" it turned out that way, the government could not rightly complain about the non-specification (*i. e.*, "defective") units so delivered as it would have obtained exactly what it had bargained to receive. There is, therefore, a vital distinction that must be made in this action between a *"defective"* shell and a *"nonconforming"* shell, and this distinction will be discussed hereinafter. But it should be emphasized here that one does not breach a contract simply by delivering, or violate the False Claims Act simply by submitting invoices by which he seeks payment for, "defective" material that the government ordered, "expected" to receive, and agreed to pay for.

Alleging that this distinction had been ignored by plaintiff in making its said allegation that defendant had delivered "18,000 *defective* shell, more or less" and that such deficiency was in no way cured by plaintiff's conclusory allegations that the delivery of such shell had been made "fraudulently"[34] and "knowingly"[35], defendant filed here-

---

34. Because of Rule 9(b), fraud must be alleged "with particularity".

35. Paragraphs 3.15 and 6.2, *supra*, of MIL–1235 read, in part here pertinent:

in its Motion to Dismiss or, in the Alternative, for a More Definite Statement ("motion to dismiss"). The motion to dismiss also claimed that plaintiff's allegation that defendant "failed to perform *required* inspections" did not take account of the distinction between "process" and "acceptance" inspections.[36]

The importance in this civil action of the mentioned distinction between "defective" shell and "nonconforming" shell is pointed up by plaintiff's answers to defendant's Interrogatories 43, 50 and 57 which interrogatories, *inter alia*, were obviously designed to demonstrate that plaintiff's claims herein exceeded what it reasonably could have "expected" of defendant under the Supply Contracts. Interrogatory 50 reads, in part, here pertinent:

> 50. State the total number of each kind of "major" defect that could reasonably be "expected" to be delivered to the United States by a supplier of shell who in inspecting same "followed faithfully" the plan of inspection specified in MIL–STD–1235, if the AQL specified for each such major defect was 0.40% [the AQL specified by paragraph 4.3.2, *supra*, for *each* of said thirty-two major defects] and the total number of shell delivered were . . . (b) 1,003,000 [the number delivered under the 1967

supply contract] (c) 660,000 [the number delivered under the 1969 supply contract].

Plaintiff's answer to parts (b) and (c) · of that interrogatory, in substance, is that, under the hypothetical contracts posed (which, respectively, in this aspect are identical in all respects material to this discussion with the 1967 and 1969 Supply Contracts), the government could reasonably expect that the respective numbers of *each* of the thirty-two kinds of "major" defects that would be present in the shell delivered to it by a supplier would vary from minimum numbers to (depending upon certain assumptions not necessary to discuss here) maximum numbers, as follows: (b) under the first contract posed (comparable to the 1967 Supply Contract) from a minimum of 17,653 to a maximum of 23,777 and (c) under the second contract posed (comparable to the 1969 Supply Contract) from a minimum of 11,616 to a maximum of 15,599. The results of simple addition show that comparable minimum and maximum numbers for *each* of the thirty-two kinds of "major" defects under *both* contracts would be 29,269 and 39,376, respectively.

Because the AQL specified by paragraph 4.3.2, *supra,* for each of the thirty-three kinds of "minor" defects is "0.65 percent" (instead of the "0.40 per-

---

3.15 . . . Only those units of product found by the inspector or screening crew to be *non-conforming* are rejected; the rest of the production, uninspected units as well as [sample] units found to be conforming, is allowed to continue down the production line as *conforming* material. [Emphasis supplied.]

6.2 Acceptance . . . During periods of sampling inspection, . . . [p]roduct which is allowed to pass the inspection [at which a sampling inspection is required to be made for any particular defect characteristic(s)] is considered acceptable for the defect(s) concerned, and is not subject to recall for further inspection for those defects . . . .

36. Paragraph 5.2 of MIL–1235. reads, in part here pertinent:

5.2 *Order of production.*—All inspection must be performed in the order in which the units of product are produced. Moreover, all units must pass each inspection station [at which acceptance inspections are made for any defect]. This does not prevent *process* inspection [for a particular defect characteristic] by the supplier [at any point on the production line] prior to [the point thereon where] submittal [of it is required to be made] to the [acceptance inspector who is making acceptance inspections for that defect at the] inspection station nor does it prohibit the supplier from removing [from the production line] or correcting units containing defects prior to submittal [to the acceptance inspector who is making acceptance inspections for that defect at the inspection station]. [Emphasis supplied.]

cent" that is so specified for each of said thirty-two "major" defects), it is obvious that the respective minimum and maximum numbers of *each* of such thirty-three kinds of "minor" defects that could have reasonably been "expected" by the government to be present in the shell delivered to it by a supplier under the posed contracts (which, insofar as here material are not unlike the 1967 and 1969 Supply Contracts) would certainly be no less than the comparable maximum and minimum numbers, respectively, that are stated for "major" defects in the next preceding paragraph.

Interrogatory 43 requested, in substance, that plaintiff break down the claimed defects in the 18,000 shell "by lot" and "by class and sub-class". Plaintiff made its first answer to this interrogatory on July 12, 1974, and thereafter, filed the answers or supplements thereto (described below) in response to informal objections made by defendant, in substance, that plaintiff's next preceding answer, as amended or supplemented, was "incomplete or evasive". Plaintiff's first answer to Interrogatory 43 listed the 18,000 shell "by lot" but it did not classify, nor supply sufficient information by which to classify, such shell as "critical", "major" or "minor" defects. Plaintiff's second answer, dated July 26, 1974, listed the 18,000 shell "by lot" and, assuming the document referred to therein was the PD (and not the PD, as amended in March 1970 by the Engineering Orders ["EOs"] that are hereinafter discussed [37]), also listed such shell by "class and sub-class" except as noted, as follows:

(a) listed "by lot" 8403 shell delivered under the 1967 Supply Contract that plaintiff claims were "defective" (*i. e.*, Lot 86, 2685; Lot 87, 2965; Lot 88, 1715; Lot 89, 423; Lot 90, 259; Lot 91, 188; Lot 92, 35; and Lot 93,

169); and classified, or supplied information (a defect code number) whereby a classification could be made "by class (but not "sub-class") of 5777 as "major" or "minor" defects of eight kinds (174 of one kind and 248, 1702, 120, 1270, 479, 1781 and 1226, respectively, of the other kinds). The remaining 2669 were listed as:

| 3.7.5. thread defects | 1403 |
|---|---|
| 3.7.4. surface finish improper | 1226 |

(b) listed "by lot" 10024 shell delivered under the 1969 Supply Contract that plaintiff claims were "defective" (*i. e.*, Lot 133, 2027; Lot 134, 1493; Lot 135, 30; Lot 136, 1545; Lot 137, 1502; Lot 138, 1463; Lot 144, 709; Lot 145, 127; Lot 146, 53; Lot 147, 57; Lot 148, 102; Lot 149, 60; Lot 150, 87; Lot 151, 123; Lot 152, 261; Lot 151, 123; Lot 152, 261, and Lot 153, 310); and classified, or supplied information (a defect code number) by which same could be classified "by class", and, except in the case of the "criticals", by "sub-class" as follows:

(i) 496 "critical" defects (106 in Lot 133; 25 in Lot 134; 6 in Lot 135; 17 in Lot 136; 30 in Lot 137; 137 in Lot 138; 21 in Lot 144; 12 in Lot 145; 18 in Lot 146; 15 in Lot 147; 39 in Lot 148; 17 in Lot 149; 28 in Lot 150; 11 in Lot 151; 8 in Lot 152, and 6 in Lot 153);

(ii) 9,114 "major" defects of eighteen kinds (7064 of one kind; and 13, 1, 5, 7, 15, 2, 13, 6, 1, 38, 1291, 1, 10, 641, 1, 3, and 2, respectively, of the other kinds); and

---

37. As is hereinafter shown, the PD, as amended in March 1970, expressly classified as "critical" defects "burr" and "surface finish improper" characteristics that, prior to that amendment, had been expressly classified in the PD as "minor" defects.

(iii) 414 "minor" defects of four kinds (36 of one kind; and 125, 38 and 215, respectively, of the other kinds).

Thereafter, plaintiff filed a supplement (dated September 10, 1974) to its answer to Interrogatory 43, reading "Specification FA–PD–MI–2720 referred to (in the answer dated July 26, 1974) should read "FA–PD–MI–2720, Revision O, dated 15 April 1966".

Interrogatory 57 requested, in substance, that, with respect to each of the inspections of defendant-made shell which were performed as a part of the other Army investigations, plaintiff state precisely what criteria were used to set aside and classify defects allegedly found in such shell. Plaintiff's answer, dated July 22, 1974, thereto stated, in substance, that the criteria so used were those stated in the PD.

On September 24, 1974, defendant filed herein a Motion for Sanctions under FRCP 37 ("Motion for Sanctions") claiming, inter alia, that plaintiff's respective answers, as then last supplemented or amended, to Interrogatories 43 and 57 were "incomplete, evasive *and* false." [38] In that motion, defendant pointed out (a) that plaintiff's first answer to Interrogatory 43 had been made in "on information and belief" form by L. C. Chandler (QARIC, LAAP) who admittedly had no personal knowledge

of the relevant screenings of Lots 86 to 93, (b) that plaintiff's second answer to Interrogatory 43, dated July 26, 1974, and its said answer to Interrogatory 57, although made in "as of fact" form, were each made by an APSA attorney (the "APSA attorney") who not only had no personal knowledge respecting any of the relevant inspections but also had made prior statements (apparently based on his knowledge of records appertaining to such inspections) that were contradictory of the said answers by him, [39] and (c) that plaintiff's answer to Interrogatory 43, as last amended and supplemented, by Chandler, insofar as it dealt with the approximately 500 "CRITICAL Metal Defects" which that answer, as so supplemented, stated were found in the inspections of Lots 133, et seq., is directly contradictory of testimony which the official court reporter's transcripts show was given by every witness, including Chandler, who was called by the government to testify at the criminal trial who claimed to have personal knowledge of the results of said inspections. In argument at the hearing next referred to, defendant, in support of this motion, directed the court's attention to the government statement (Exhibit 29 in the Addendum, the "April 29, 1971, Response") filed in the criminal action pursuant to court order which defendant claimed was also contradictory of plaintiff's said answer.[40]

---

38. "A false answer is nothing more than a refusal to answer." *Life Music, Inc. v. Broadcast Music, Inc.*, *supra.* In the case of a refusal to answer, F.R.C.P. 37(d) authorizes the application of the sanctions. In such case, no previous order to answer is needed as is the case under F.R.C.P. 37(b).

39. On April 23, 1974, at a conference with defendant's representatives, the APSA attorney stated, in substance, that criteria other than that stated in the PD were used in the inspections in question "because we were checking for alleged fraud". See Exhibit II to Motion for Sanctions.

40. The transcripts show that, with respect to shell that plaintiff's answers to Interrogatory 43 classify as "critical" under the PD, such

persons, during their said cross-examination at the criminal trial, testified, in substance, for example: *Chandler* (on February 16, 1973, pp. 56, 163, 165): I have looked at every one of them. I did not classify them as criticals. I classified them as process-induced defects. Before that time (the 1969–70 investigations made in other Army investigations), I had not ever classified process-induced defects as critical defects. Frankford Arsenal personnel classified these shell as "criticals" by using the "tightened" criteria; *DiGiovannantonio* (on February 16, 1973, p. 25): Characteristics of shell that at that time (the 1969–70 inspections made as a part of the other Army investigations) were called "criticals" had not before that time been called "criticals"; *LeJeune* (on February 14,

On October 8, 1974, this court heard defendant's motion to dismiss and, for the reasons stated in its order of October 9, 1974, ordered plaintiff to amend its complaint *to state with particularity the circumstances constituting the alleged fraud.* After stating that it intended to enter such order, the court, at the October 8, 1974, hearing then directed counsel in open court, in substance, *inter alia:*

(a) That, by reason of their respective five-year intensive investigations and the long criminal trial, each party already knows what the other knows about the facts of the case and it is highly unlikely that either party will know any more about the facts of the case at the time of the trial than it now knows;[41]

(b) That, from defendant's point of view, the charges made here are even more serious than those that were made against it in the criminal case. In the criminal case, the maximum penalty that could have been imposed on defendant in the event of a conviction would have been a fine of $150,-000. Here, if plaintiff prevails, the double damages claimed plus the penalty the law will exact will be almost ten times as great. As the court understands the contracts, each of the 18,000 shell in question was required to be subjected to and to pass 67 inspections. That is over one million inspections. It is not disputed that, during the relevant time periods, defend-

ant utilized hundreds of employees in a multishift operation. Under the Barron and Holtzoff principle cited by defendant,[42] the court has a duty to see to it that defendant has a fair opportunity to defend itself and that means in this instance that defendant should not be required to prepare to defend a million inspections and the acts or omissions of hundreds of employees if the facts are that plaintiff claims that only a few were involved. In the ordinary case with a solvent plaintiff, a defendant could protect itself to some extent from imprecise allegations or totally unfounded charges by requests for admissions, but FRCP 37 exempts plaintiff from the penalty of a wrongful refusal to make admissions. In the ordinary case, a defendant could also protect itself to some extent by interrogatories but, as the record in this complex case shows, many of the interrogatories that defendant propounded in April 1974, more than six months ago, have not been answered and defendant is now asserting that answers that have been made to other of those interrogatories, some of which answers have been already amended or supplemented several times, are still incomplete and evasive. Moreover as a practical matter, defendant cannot effectively inform itself by depositions respecting the claimed in-plant wrongdoing until and unless it is better informed as to which of the million inspections and as to which of its hun-

---

1975, p. *139*) : I don't know if the classification of these shells as criticals was by the application of the criteria in the PD. They were classified as criticals by what we were told to do by the Army people; so it might be stated that it was a mutual understanding between my people and the Army people at that time that these shells were to be considered critical.

In the April 29, 1971 response, the defects which plaintiff's answer, as last supplemented and amended, to Interrogatory 43, list as "critical" defects are broken down and listed (pp. 8 and 9 of Exhibit 39, *supra*), by subclasses under a columnar heading reading "TYPE OF *SUSPECTED* DEFECT". (Emphasis supplied.)

41. As is hereafter shown, when that statement was made, the court was unaware that material evidence had been concealed from de-

fendant because some person(s) for whose conduct plaintiff was then responsible had so acted that plaintiff's duty to make discovery had been evaded.

42. The sufficiency of a pleading must largely depend upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading. Thus in suits for conspiracy and fraud, such as an action under the false claims statutes, it may be necessary that there be greater detail in the allegation of facts than in many other suits. Barron and Holtzoff, 1A Federal Practice and Procedure, § 302 at 217 (1960).

dreds of employees it is that plaintiff really and in fact claims were involved in such wrongdoing.

(c) That, if the material facts in dispute are narrowed by the pleadings as the court is ordering that they be, this case can be tried in a week. If they are not so narrowed, the trial of this action will take as long or longer than the criminal action. A precisely worded complaint will go a long way toward narrowing the issues. Consequently, the court does not want plaintiff to make any vague or catchall allegations for fear of being boxed in. In the unlikely event that any other instances of wrongdoing come to plaintiff's attention after it amends its complaint, the court will be very liberal about permitting a further amendment to take them into account.

(d) That the amended complaint which the court's order contemplates plaintiff will file should be drafted with specificity not unlike that required in the case of a request for admissions. With respect to each of the "numerous occasions" of claimed wrongdoing, plaintiff must articulate in its amended complaint, not only nonconclusory factual allegations that show the elements of fraud but also every fact it knows or can reasonably find out, including names, that will help the defendant and the court to identify a transaction or event and those who participated in it. Plaintiff can even make every sentence that contains a material factual allegation a separate paragraph; and then, if it wants to, it may accompany its amended complaint with a request for admissions and, in that way, shift to defendant its expense of proving any allegation that defendant wrongfully fails to admit. [In response to a comment by lead counsel for plaintiff, in substance, that an amended complaint in this action that would be so particularized would be very, very long], the court does not care how many pages long it is. A long complaint, even one that is a hun-

dred pages long or longer, would be preferable to the long discovery and trial that will otherwise occur.

(e) That the court intends to make defendant be equally specific in its denials and admissions. However, defendant cannot make meaningful admissions or denials unless, as the court is requiring, plaintiff amends its complaint so as to state, by nonconclusory allegations, facts that will show that defendant, by putting a shell with a particular defect characteristic at the particular point on the line it is claimed it was put on, or that defendant, by failing, at a particular point on the line to make an inspection for a particular defect characteristic that it is clamed was omitted, violated defendant's duty under the contract. Defendant has cited instances, for example the Gissendanner accusations [43] respecting an inspection that the government contended at the criminal trial was a "required" inspection and that the defendant then contended was an "in-process" inspection that, under express language of the contracts, it could make or not make at its election. At this stage, even if it be assumed *arguendo* that what defendant has said about the Gissendanner episode did not happen and was a figment of imagination that its counsel used for illustrative purposes, it has cause the court to be very impressed with the probable validity of defendant's contention that whether a shell that defendant will admit contained a particular characteristic is "defective", or is "nonconforming" in the sense that it does not meet the quality requirements of the Supply Contracts, or whether a particular inspection that defendant will admit was not made is a "required" inspection may depend entirely upon a construction of the terms of the contracts in which events it may be that such matters should be resolved by the court before trial as a matter of law.

(f) That this case is going to be tried on the basis of facts—not innuendo.

43. See paragraphs 45, et seq., of defendant's Motion for Sanctions.

The contracts contemplate that some shell with major and minor defects would be delivered and there seems to be no dispute but that (a) defendant had a right to return defective shell to at least some points on the production line for some purposes such as, for example, to repair them, to bonderize them so as to prevent rust while they were awaiting repair or merely so that the conveyor system that was a part of the production line could be utilized in moving them from one point to another in the plant, or (b) but that, as defendant has illustrated by use of the Snider report [44] of his investigation of the Gissendanner episode, both defendant and the DCAS–B'ham representatives interpreted the contractual language in such a way that defendant had a right to do such things for such purposes irrespective of whether any government representative was present at the time. Therefore, as defendant has also illustrated by use of the Snider report, it appears that an allegation that Mr. X, at a time when no government inspection personnel was present, returned defective shell to the production line with the intent that they be delivered to the government is not enough because, for aught appearing from such an allegation, the shell might have been put on the line in the ordinary course of the business with the intent that they be delivered to the government only *after* they had been properly repaired and had passed all required inspections. It is not enough to allege that a defective shell was returned to the production line. The amended complaint must contain nonconclusory allegations of fact showing that such shell at least got to the end of the line and was delivered to the government.

(g) That plaintiff has no case, either under the False Claims count or under the contract count, unless it can articulate nonconclusory allegations of facts that prima facie show fraud. If plaintiff, with the benefit of years of intensive investigation and the long criminal trial, is not now in position to articulate such facts with respect to any one or more of the "numerous occasions" of which it complains, the court does not understand how plaintiff could reasonably expect that it would be able to offer evidence by which such facts would be articulated at any trial. And, consequently, the court does not want the amended complaint to be cluttered up with allegations about any such occasion(s).

Defendant's Motion for Sanctions was also a subject of said October 8, 1974, hearing and of this court's order of October 9, 1974. Sensing that plaintiff's apparent reluctance to make a full and complete answer to Interrogatories 43 and 57 might be occasioned by the fact that plaintiff was attempting to avoid a summary disposition of some part or all of this civil action, the court at said hearing, also directed counsel, in substance, *inter alia*:

(a) That, in paragraphs 100 to 102, inclusive, of its motion for sanctions, defendant had quoted excerpts from the official court reporter's transcripts (which transcripts defendant made available at the hearing for use by the court and opposing counsel) of the testimony of Chandler, DiGiovannantonio, and LeJeune; that it appeared therefrom that each of those persons had participated to some extent in some or all of the inspections made at LAAP of shell from the lots in question; and that, although each of them had been called by the government as a witness in the criminal action, it appeared there might be an inconsistency between testimony given by such persons, respectively, on their cross-examinations at said criminal trial, on the one hand, and plaintiff's said answers as last supplemented or amended, on the other hand, with

44. Exhibit 29 in the Addendum.

respect to what criteria were in fact used, in the inspections that were made as a part of the other Army investigations, in setting aside and classifying characteristics as "criticals";

(b) That, from the court's examination thereof, it seemed that there might also be a similar inconsistency between said answers and the response that the government filed in the criminal action on April 29, 1971, in that characteristics that were there characterized as "suspected" criticals in said answers were classified as "criticals";

(c) That, in the court's view, the matter of precisely what criteria were so used in the said other Army investigations appeared to be the, or at least one of the, most crucial matters in the action;

(d) That, because the matter of precisely what criteria were in fact so used, as aforesaid, did appear to be so crucial, the court would enter an order, and was now expressly directing, (i) that plaintiff's (lead) counsel or his designee discuss each of the particulars wherein defendant is contending that plaintiff's answers to Interrogatories 43 and 57 are false, incomplete or evasive or are contradictory with said testimony and response, with each of Chandler, DiGiovannantonio and LeJeune[45] and with any other person by whose testimony plaintiff expects at the trial to establish the particular criteria utilized in the other Army investigations in setting aside and classifying that part of the 18,000 shell which were then set aside and classified as "criticals"; ·

(e) That such order will also direct that plaintiff, after the discussions have been held that are a subject of the remarks just made, and on the oath or affirmation of each person whose testimony plaintiff expects to use at the trial, as aforesaid, make and reserve full and complete answers to defendant's said interrogatories 43 and 57, and that such reserved answers be specific, *inter alia*, as to whether the criteria that in fact were so utilized were some (and, if so, what) part(s) or all of one or more of:

(i) the criteria stated in the specifications FA–PD–MI–2720, Revision O, dated April 15, 1966, (the "PD") which were a part of the Supply Contracts;

(ii) the criteria stated in the PD, as said specifications were thereafter "tightened", either orally or in writing, and if so, a full description of the nature by which and the date on which same were so "tightened"; and

(iii) the criteria stated in the PD, as same were "tightened" by the EOs (*Engineering Orders* that emanated from FA) dated March 19, 1970.[46]

(f) That the court was directing that such discussions be held to the end that the court might have some assurance that any prospective signer of either of the answers to be re-served, as aforesaid, would have the particulars of defendant's said contentions in mind when and if he made either or both of such answers; and that, if, as the result of any hearing that the court might hereafter hold respecting the matter, the court should ascertain, on the one hand, that, after being cautioned by counsel, as directed, any person has made a false answer respecting the particulars here

---

45. After the order described was entered, on motion made by Sperry Rand in this civil action, a further order was entered on October 24, 1974 which eliminated the necessity for such discussions to be had with LeJeune.

46. The content of said EOs is contained in the document of which a copy is Exhibit 18 in the Addendum.

under discussion, the court now feels it would have a duty to refer the matter to a grand jury for investigation as to whether the facts were such as to warrant any indictment(s) for perjury or subornation of perjury; and that, if, on the other hand, the court should so ascertain that any person had made a false answer respecting such particulars and should further ascertain that, before making such answer, such person had not been so cautioned by counsel, the court now feels that it would be its duty to take action whereby plaintiff's lead counsel would be cited for contempt.

On November 12, 1974, plaintiff, in response to the court's order of October 9, 1974, filed its first amended complaint (the "amended complaint"). As was the case with the original complaint, the amended complaint contains two very general allegations of fraud (paragraphs 18 and 19) which can be summarized as follows:

Paragraph 18 charges that defendant on "numerous [but otherwise unspecified] occasions during its performance of the contracts" knowingly and fraudulently violated the contract inspection procedures by returning "defective" shells to the production line (without the knowledge or approval of plaintiff). Paragraph 19 charges that defendant on "numerous [but otherwise unspec-

ified] occasions during its performance of the contracts" knowingly and fraudulently violated the contract inspection procedures by not performing the "required inspection" of shells (without the knowledge or approval of plaintiff) resulting in the intentional delivery to plaintiff of shells which had not been inspected for defects in accordance with the contract.

The amended complaint also describes in paragraphs 27, 28 and 29 three specific transactions (discussed hereinbelow) that plaintiff claims support, or constitute a basis for some one or more of, the general allegations of fraud made by it in paragraphs 18 and 19, supra.

In paragraphs 23, 25 and 31, plaintiff names twenty-nine persons and alleges that they, together with other former employees of defendant "whose identities are presently unknown to plaintiff," engaged in or directed (without stating how, when or where) the alleged (without specifying which of the) fraudulent acts or omissions that are subjects of the general allegations of fraud made in paragraphs 18 and 19, supra.[47]

Then in paragraph 33, without stating by reason of what defect or by what criteria such shell were determined to be "defective", plaintiff alleges that "[a]s a consequence of the foregoing fraudulent acts and omissions, from, in or about August 1968 through December 1969, defendant knowingly and fraudulently, delivered approximately 18,000

---

47. Defendant contends that plaintiff made such references to twenty-nine named persons and other "unknown persons" with knowledge that it had no relevant evidence that any persons were guilty of any of the charged wrongdoing and has characterized plaintiff's so naming that large number of employees and its references to "18,000 defective shell" in the amended complaint as "window dressing" that was designed to leave a reader of the complaint (or of news items that such defendant claims charges were calculated to generate) with a false impression that some massive fraud or conspiracy had been perpetrated or had existed. In this connection, the court observes, for example, that, as shown by the Lackey affidavit (p. 7) three of the

twenty-nine former employees so named, Sherrill, Tyler and Nivens, were never again employed by defendant after they left defendant's employ at the time of the hereinafter discussed "walkout" that occurred on July 11, 1968 which was more than six weeks before defendant delivered any of the shell complained of in this action; and that another of the twenty-nine, Blankenship, was employed only during the period October 25, 1968 to February 25, 1969, during which period defendant delivered none of said 18,000 shell. How, when, or where these persons could have participated, or did participate, in the charged wrongdoing, or, if they did, how defendant is responsible therefor, plaintiff has nowhere explained.

*defective* shell, more or less, to plaintiff." (Emphasis supplied.)

At about the same time plaintiff filed its amended complaint, it also re-served and filed herein answers (the "re-served answer[s]") to Interrogatories 43 and 57. The re-served answer to Interrogatory 43 was made in three parts:

(a) part one—in "on information and belief" form by the APSA attorney which supplied the same (but no more) information with respect to shell delivered under the 1967 Supply Contract as that which was supplied with respect to those same shell by plaintiff's hereinabove described answer, as theretofore last amended and supplemented, to Interrogatory 43; and

(b) parts two and three—in "as of fact" form by Chandler and DiGiovannantonio which supplied the same (but no more) information with respect to shell delivered under the 1969 Supply Contract as was supplied with respect to those same shell by plaintiff's hereinabove described answer, as theretofore last amended and supplemented, to Interrogatory 43.[48]

In response to Interrogatory 57 which, *inter alia,* asked, in substance, that plaintiff state precisely what criteria were used in each of the inspections (made in the other Army investigations in which any defendant-made shell were set aside and classified), plaintiff filed two identical answers, one by Chandler and the other by DiGiovannantonio, Charles Fairburn (shell engineer, FA), and Robert Coyle (metallurgist, FA) which read, in part here pertinent:

The criteria utilized for the Government's verification inspection[49] of shells was Item Specification FA–PD–MI–2720, Rev. 0, 15 April 1966.

During the inspections, certain defects known as burrs, scale, pits, fins, embedded material and machining marks were considered to be critical defects, *if* the noted defect was large, sharp, or deep, so as to be hazardous to personnel using a loaded shell with such defects. In making this classification the inpectors considered the definitions of critical defect as found in MIL–STD–105D and MIL–STD–1235 which were incorporated into said item specification by reference.

\* \* \* \* \* \*

Although "burr" and "surface finish improper" are listed as minor defects under PD 2720, Rev. 0, dated 15 April 1966, the classification as critical of some burrs, scale, pits, fins, embedded material and machining mark defects was made based upon our judgment and past experience and not pursuant to a "tightening" of said specification or the March 1970 amendment to PD 2720, Rev. 0, April 1966. If the defects, as described above, are determined to be minor in accordance with the classification of defects set forth in PD 2720, Rev. 0, 15 April 1966, our

48. The answers by Chandler and DiGiovannantonio, respectively, were identical except that on the stated ground that he did not participate in the inspection thereof, the DiGiovannantonio answer omitted the six "criticals" and 24 "major" or "minor" defects that were listed by the Chandler answer for Lot 135.

49. The shell delivered under the 1969 Supply Contract of which complaint is made herein were first set aside and classified by Sperry Rand inspectors. Thereafter, those shell (excepting the 414 shell [from Lot DFP 1–138] expressly listed as "minor" defects on page 4 of Exhibit 39, *supra,* and in part (iii) *supra,*

of the court's summary of plaintiff's July 26, 1974, answer to Interrogatory 43) so set aside were again inspected and classified by government inspectors. The government inspectors made no such inspection of the shell delivered under the 1967 Supply Contract of which complaint is here made. Thus, this re-served answer appears to be incomplete in at least the following two respects: it does not state precisely what criteria were utilized in the inspections which Sperry Rand made as a part of the other Army investigations in inspecting and classifying shell delivered (a) under the 1967 Supply Contract and (b) under the 1969 Supply Contract.

error in so classifying these defects as critical was based upon past experience and judgment that these defects may cause an unsafe condition in a high explosive projectile at the time of firing, thus endangering the lives of the gun crew, rather than to a deliberate falsification or to any conscious adherence to a "tightening" of specifications or to the application of the March 1970 amendment to the item specification.

On November 27, 1974, defendant filed herein (a) a motion ("Motion to Dismiss") to dismiss the amended complaint and (b) amended its Motion for Sanctions by assigning as additional grounds therefor, *inter alia,* that the re-served answers were "incomplete, evasive, or false".

In support of its said Motion to Dismiss, defendant claimed that the amended complaint was as legally insufficient as the original complaint—that, in fact, except for the addition of the "window dressing" of (a) a "meaningless listing of twenty-nine names" and (b) allegations respecting the "three already discredited (in the criminal trial) transactions that are subjects of paragraphs 27, 28 and 29", the amended complaint, in substance, was "no more a compliance with the court's order of October 9, 1974, than the filing of a carbon copy of the original complaint would have been". In support of its motion, as amended, for sanctions ("Motion for Sanctions, as amended"), defendant, in addition to the matters noted in the preceding footnote, (a) claimed that the same inconsistencies existed in the re-served answers that it had theretofore cited between the previous answers to those interrogatories, on the one hand, and the said excerpts from the testimony at the criminal trial and the government's said April 29, 1971, response, on the other hand, which, so defendant claimed, demonstrated that the re-served answers were false and (b) pointed out a number of instances of "weasel wording" therein which, so defendant claimed, made the re-served answers incomplete and evasive.

Although it was somewhat taken aback by the unexpected lack of specificity in the amended complaint and by the fact that the problem of the inconsistencies (which the court had sought to cure by ordering a re-service of answers to Interrogatories 43 and 57) rather than being cured had been magnified by vacillation in parts of the re-served answers, the court, being reluctant to dispose, other than on its merits, of an action involving such serious charges by the government, assumed that, by such minimal allegations, plaintiff had complied as best it could with the court's order of October 9, 1974, and that the mentioned vacillation was due to an overreaction to the court's cautionary directions at the October 8, 1974 hearing and, on December 12, 1974, held that, for purposes of defendant's Motion to Dismiss, the amended complaint did seem to satisfy the pleading provisions of Rule 9(b). When so overruling the Motion to Dismiss, the court informed counsel, in substance, that the inconsistency, if any, between such action and what it had indicated at the October 8, 1974, hearing it would do, resulted from a recognition by the court that it had perhaps been overconvinced by defendant's assertions (which were then not supported by any sworn statement on the record in this action) that DCAS had concurred in defendant's interpretation of the contractual language in question and that, if such support were supplied, the court, upon application, would review that ruling. The court also suggested that, by taking the depositions of the persons who had signed the re-served answers, defendant might be able to clear up the matter of the claimed inconsistencies.

On December 20, 1974, the defendant filed a motion (the "Motion to Reconsider") that the court reconsider its ruling on the Motion to Dismiss. The Motion to Reconsider was supported by an affidavit by each of W. C. McCain, E. E. Lackey and K. D. Hughes (the "McCain affidavit", the "Lackey affidavit", and the "Hughes affidavit", re-

spectively), to the effect, *inter alia,* that DCAS had concurred in defendant's said literal construction of the contractual language. The Motion to Reconsider was amended on December 31, 1974, so as to incorporate, in further support thereof, an affidavit by each of Noble Kermit Little and Henry C. Bullard (the "Little affidavit" and the "Bullard affidavit", respectively). As so amended, that motion came on for hearing on January 3, 1975. During the course of such hearing, the court, by a ruling which was confirmed by written order filed on January 6, 1975, granted an oral motion then made by defendant that its Motion to Reconsider, as amended, be treated as a motion for summary judgment. Because Rule 56(e) will not allow a plaintiff to rest on such minimal allegations of fraud as those in the amended complaint in the face of defendant's so highly supported motion for summary judgment, the court ruled (a) that the Motion to Reconsider as amended, with its supporting affidavits, was sufficient to place a burden upon plaintiff under Rule 56(e) to file affidavits to traverse the factual presentation set forth in defendant's said affidavits or face the inevitable consequence of a failure to do so and (b) that plaintiff must file such affidavits within thirty days. As it had indicated at the January 6, 1975, oral hearing it would do, defendant on January 9, 1975, filed herein an alternative motion that the court treat the Motion to Reconsider, as amended, as a motion for partial summary judgment ("Motion for Partial Summary Judgment"). The latter motion was supported with said affidavits by each of Smith, Snider and Mayes. In those affidavits, each of the affiants, after referring to and describing each of the two kinds of certificates quoted hereinabove (*i. e.,* those contained in said forms DD 250 and those that accompanied defendant's said progress payment applications), state, in substance, that nothing that has occurred in the intervening years (including the said FBI investigation, the other Army investigations, the Grand Jury investiga-

tion, the long criminal trial and this civil action) has caused him to question the correctness of any one of such certificates. After so stating, and further stating, in substance, that, as such officials respectively, the affiants had personally supervised the activities whereby DCAS, before accepting any lot of shell, acted, as required by ASPR 14–203(a), *supra,* to "verify" that defendant had "fulfilled contract quality requirements" with respect to the shell so accepted, these affiants, in their respective affidavits, then state:

### The Smith Affidavit (p. 10)

As of the date of this affidavit, it is my judgment that, as my records show, the shell that composed Lots DFP–1 to 138, inclusive, met the quality requirements of the Southern contracts, as such requirements were understood and applied at said facility while I was QARIC, as aforesaid, by me, my staff, DCAS–B'ham personnel and Southern.

### The Snider Affidavit (p. 4)

I now affirm that it is my judgment that said lots which were accepted for the Government while I was QARIC met all of the quality requirements of the Southern contracts as I understood and applied those requirements while I was QARIC at said facility.

### The Mayes Affidavit (p. 6)

Each of Lots DFP–1–86 to 153 [which lots include all lots complained of in this civil action], inclusive, were accepted during the time that I was Assistant QARIC, . . . It . . . is now my judgment, that each of Lots DFP–86 to DFP–153, inclusive, were produced, inspected, delivered and accepted in full conformity with the requirements of the Southern shell contracts, as same were understood and applied at all relevant times by me, the QARIC and DCAS–B'ham personnel.

It thus appears that *DCAS* (acting by and through its said employees *whose duty it was to verify the defendant's in-*

spection procedures, and which had actual knowledge of what those procedures were and that defendant was interpreting the contractual language in question exactly in accord with DCAS's own interpretation thereof) was not misled as to what inspections it was that defendant claimed it was making. According to the affidavits of said DCAS employees, each of them believed, at the respective times the shells in question were produced and inspected and at the respective times of giving their affidavits, that DCAS had not been misled by defendant; and that in fact defendant had acted pursuant to an interpretation of the contractual language in question that coincided precisely with the way that DCAS itself at all material times had interpreted such language. Of course, the court recognizes that fraud would vitiate the effect of DCAS's verification inspection and acceptance but, under the circumstances shown by said affidavits, particularized nonconclusory factual allegations, as required by FRCP 9(b), are necessary to charge the defendant adequately with fraud in the execution, or avoidance, or ignorance (active ignoring) of the contract provisions relating to inspection.

Specifically, by its said Motion for Partial Summary Judgment, defendant seeks summary judgment in its favor as to all claims asserted in the amended complaint except as said claims relate to and are bottomed on the occasions and shell that are a subject of the allegations contained in paragraphs 27, 28 and 29 of the amended complaint. Upon application therefor, the Court on February 3 and 13, 1975, entered orders whereby the parties were given until February 28, 1975, to file affidavits and briefs in support of, and in opposition to, defendant's said Motion to Reconsider, as amended on December 31, 1975, and said Motion for Partial Summary Judgment.

Thereafter, on February 7, 1975, plaintiff filed affidavits dated February 6, 1975 by each of Michael Eugene Williams, Joseph F. Ellison, Charles Dennis Buckner and an affidavit dated January 30, 1975 by Joseph Marchant (herein sometimes collectively referred to as the "opposing affidavits" and individually referred to as the "Ellison affidavit", the "Williams affidavit", the "Buckner affidavit" and the "Marchant affidavit", respectively [50]). No rule 56(f) motion has been filed. Consequently, the court must again assume that plaintiff has met the court's order of January 6, 1975, as best it could.

Each of the eleven affidavits mentioned hereinabove will be discussed hereinafter. In addition, because some of the matters that are a subject thereof tend to explain or illuminate transactions that are also a subject of the pending motion by defendant for summary judgment, defendant's pending Motion for Sanctions, as amended, and some of the affidavits, filed since February 28, 1975, that are directed primarily to the latter motion will also be discussed hereinafter. Extensive discovery has taken place and much of it will also be discussed hereinafter. And the parties have aided the court with excellent legal memoranda in support of, and in opposition to, the said motion for summary judgment.

This is no ordinary action. The pleadings, orders, interrogatories, etc. (and exhibits thereto) in the Clerk's file total more than 2100 pages. In addition, the parties have filed briefs totaling more than 400 pages and the defendant has taken pretrial depositions that, excepting the many thousands of pages of exhibits thereto, contain more than 3500 pages. Except where it is so stated or the context indicates otherwise, all factual statements in the discussions herein of matters that are a subject of one or more of the items referred to in the paragraph next above, are (a) matters asserted by plaintiff with which it is apparent defendant agrees, (b) matters asserted by defendant with which it is apparent plaintiff agrees, (c) uncontested general background information over which there is no dispute, (d) facts before the court

in verified form (either presented by affidavit or as the result of discovery) which are not disputed or contested by opposing verified facts in a form sufficient to demonstrate a genuine issue as to such facts or (e) facts before the court in verified form which, though disputed by similarly verified facts, are not material to the issues being considered by the court.

At all times material plaintiff had fixed-price shell supply contracts not only with defendant but also with Donovan Construction Company (which operated its shellmaking facility in Minnesota) and with The Chamberlain Corporation (which operated two shellmaking facilities—one in Pennsylvania and the other in Massachusetts). In addition to said fixed-price supply contracts, plaintiff had one cost-plus-award fee type shell supply contract with Sperry Rand which operated its shellmaking facility, the "Y line", at LAAP. At the time defendant entered into the 1966 Supply Contract the tech data packages in the respective supply contracts that are a subject of this paragraph were identical.

All fixed price shell supply contracts made by plaintiff at any time material contained a "Changes clause" (Paragraph 2 of the General Provisions) by which plaintiff reserved the right from time to time to change any part of the tech data package therein in consideration of plaintiff's agreement in that clause that, in the event plaintiff made any such change whereby the scope of the work required of the supplier was enlarged, an equitable adjustment would be made in the contract price so that the contractor would be paid his cost plus a reasonable profit for such enlarged work requirement.

Insofar as here material, all shell acquired by plaintiff were shipped to one of three loading plants which were located respectively at Iowa Army Ammunition Plant (IAAP), Ravenna Army Ammunition Plant (RAAP) and LAAP.

So that shell made by any shell manufacturer could be loaded on a mass-production basis at any loading plant, APSA, *inter alia*, designated certain personnel (John Free and William Majors) as "key inspectors" and assigned to them the task of seeing to it that the tech data package was uniformly interpreted by the respective staffs of inspectors that the government maintained in the facility of each supplier of shell.[51] These key inspectors were under the supervision of Hinzman.

After being accepted at Sylacauga, as aforesaid, each of the 153 lots produced by defendant were shipped to LAAP to be loaded at a facility, the "S line" (where items other than shell were also loaded), which was also operated by Sperry Rand under a cost-plus-fee type contract with plaintiff.

Standard operating procedures, at all times in effect, required that shell received at the S line from other suppliers undergo two inspections (a) an "on-receiving inspection" and (b) a "load line" inspection.[52] The S line on-receiving inspections were made pursuant to a MIL–105 "static lot" sampling plan that required frequency f (say 315) samples randomly selected from a newly received lot (of about 16,000 shell) to be inspected for certain (specified) particular charac-

50. The respective affidavits filed by plaintiff do not implicate any person in any specific transaction that is a subject thereof who was not by name similarly implicated in that identical transaction by oral testimony given either during the said criminal trial or to the grand jury that returned said indictment. Moreover, excluding Sherrill (who, as shown in note 47, *supra*, was not employed by defendant during any of the relevant times) only four other of the said twenty-nine named persons that plaintiff named in the amended complaint, as aforesaid, are even named in the said affidavits filed by plaintiff.

51. Hinzman deposition of March 20, 1975, pp. 9–10.

52. The part of the load line inspection here material is commonly referred to, in load line parlance, as the "prior to pour" inspection, or the "station 1" inspection.

teristics. The particular characteristics which were inspected for in the on-receiving inspections were changed by Sperry Rand from time to time so as to take into account such problems as it was then encountering, or which it contemplated it might encounter, on its load line if the lot from which the samples were drawn were to be released to its load line to be loaded.[53]

The procedures for load line inspections on the S line were comparable to those which paragraph 4.3.2, *supra*, specified for use in shellmaking facilities (*i. e.*, certain [specified] characteristics that, *for load line purposes*, were classified as "critical" defects, were looked for in "one hundred per cent" inspections and certain [specified] characteristics that, *for load line purposes*, were classified as "major" and "minor" defects [and to which an AQL was assigned] were looked for in MIL–1235 continuous sampling plan inspections at the degree of severity required by the particular AQL that the load line tech data package specified for such "major" and "minor" defects). Insofar as here material, the "critical" (for load line purposes) characteristic (*i. e.*, the characteristic that was looked for on the S line in one hundred percent inspections) was listed in the S line loading procedures (p. 72 of Exhibit 212B; p. 27 of Exhibit 212F; and p. 18 of Exhibit 212G to Chandler deposition) as "foreign matter in cavity". However, as is hereinafter shown, the definition of that critical load line characteristic was changed from time to time so that it included, *inter alia*, one or more sub-classes which (as John Free testified on his deposition [pp. 183, 184] which was taken herein by defendant on April 29–30 and May 1, 1975 [the "Free deposition"])

were commonly called, in load line parlance, "cavitation defect" (a characteristic in the explosive filler) and "metal defect" (any characteristic[s] in the metal part itself that, in the then current [changed from time to time] opinion of the government ammunition specialists, made it unsuitable to be loaded).

It is significant to note that the term "metal defect", as used in load line parlance, was not synonymous with that same term or the term "metal defective" as they are defined or used in the paragraphs 3.7.3 and 4.3.2.1, respectively, of the PD.[54]

Beginning sometime in 1967, the government ammunition specialists became concerned that "surface irregularities" or "roughness" in a shell cavity might cause a "premature" (an unexpected and undesired explosion of a loaded shell) that would be hazardous to the troops who would be called upon to use ammunition made from such shell. As a result of continuous pressure from these specialists, the government directed changes to be made from time to time in the load line inspection procedures that tightened the load line procedures so that shell with an undesirable degree of roughness in the cavity would not be loaded.[55]

By an undated memo (Exhibit 275 to Free deposition), D. Dau, (Deputy Chief, Quality Control Operations, APSA), sometime on or before January 10, 1968,[56] advised AMC, in substance, that as the result of a review made on *November* 21, *1967*, by representatives of *PA, FA,* and *APSA,* that:

. . . 3. Paragraph 3.7.4 of . . . [the PD] was determined to be inadequate as a standard for the body cavity area of . . [the shell]. The

53. Deposition of Herman LeJeune (the "LeJeune deposition") taken herein by defendant on May 22 and 23, 1975, p. 98.

54. Deposition of Fred Berry (the "Berry Deposition") taken herein by defendant on May 19, 1975, pp. 79–80 and 92–93; and Chandler deposition, pp. 69–70. See also Chandler deposition, pp. 161, 163, 230, 233, and 457.

55. LeJeune deposition, pp. 44–47; Chandler deposition, pp. 387–398.

56. Although the memo bears no date, its content (The group *will* visit . . . on 10, 11 January . . .) evidences the fact that it was written on or before January 10, 1968. At his deposition, Free testified (pp. 48–50) that he prepared this memo for Dau's signature.

new rewritten requirement is now in the process of being put into . . . [the PD].

It is also significant here to note not only that that identical contractual language, the interpretation of which is a principal subject of this civil action "was determined to be inadequate" (*i. e.,* at the very least ambiguous) by representatives of FA (the very agency by which plaintiff drafted such contractual language) *and* by APSA (the very agency by which plaintiff entered into the Supply Contracts which contained such language) but also that *such November 21, 1967, determination was made before the respective dates (December 22, 1967 and February 14, 1969) when the two Supply Contracts here in question were entered into.*

Thereafter, in early 1968, the government expanded the definition, *for load line purposes,* of the characteristic "foreign matter in cavity" to also include "base [cavity] surface irregularities" and in 1969, further expanded the definition of that term to include "sidewall [cavity] surface irregularities".[57] Under these expanded definitions, "surface finish improper" and "burr" characteristics (defined in paragraphs 3.7.4 and 3.7.7, *supra,* of the PD, respectively, and which, *for manufacturing line purposes,* were expressly classified as "minor" defects by one or more of paragraphs 4.3.-2.1 and 4.3.2.2 and 4.3.3.3, *supra,* of the PD), if large, sharp or deep enough to cause cavity "roughness" (in the base in 1968, and in the base or on the sidewall in 1969) were, *for load line purposes,* classified as "critical" defects and, in common load line parlance, as noted above, were called "metal defects".[58]

The 1968 change whereby roughness in base was added, as aforesaid, as a "critical" *load line* characteristic was directed to be made by a letter (p. 50, Exhibit 212F to the Chandler deposition), dated January 24, 1968, from APSA to the Commanding Officer (CO) at LAAP. It reads in pertinent part:

It is requested the inspection for foreign material . . . currently being performed at your [loading] plant on a 100% basis, include inspection for evidence of base cavity surface irregularities (critical defect).

\* \* \* \* \* \*

Projectiles found to have defective or questionable base cavity surfaces are to be retained for the establishment of guide standards by technical representatives from Frankford Arsenal, Picatinny Arsenal and this [APSA] Headquarters.

Above inspection is to continue at your [loading] plant until such time as uniform guide standards can be established at metal parts manufacturing facilities.

Although it was not until July 28, 1968, that the published load line inspection procedures were formally amended to take acount of the change which was directed, as aforesaid, the S line loading inspection procedures were in fact so changed immediately upon the receipt of that letter at LAAP. Because it would obviously have been wasteful for the Y line to thereafter continue to manufacture and send to the S line for loading shell that would be rejected when inspected on the S line for roughness in base, Sperry Rand was then also directed to make comparable changes in its inspection procedures on the Y line. This direction required, in effect, that Sperry Rand, on its Y line, make a "one hundred percent" inspection in the cavity base for those minor characteristics which the PD listed as "surface finish improper" and "burr" defects and to reject (and scrap or repair) shell with those kinds of characteristics that were severe enough to cause such roughness rather than to inspect for those defects on a MIL–1235 sampling basis as it had theretofore been required to do by the

57. See *e. g.,* Chandler deposition, p. 398.

58. See *e. g.,* Berry deposition, pp. 79–80 and 92–93; and Chandler deposition, pp. 69–70.

tech data package. Putting that change into effect on the Y line caused no problem because, as noted, the Y line was being operated by Sperry Rand under a cost-plus-fee type contract.[59]

When, on July 28, 1968, the load line inspection procedures were formally amended (p. 72 of Exhibit 212B to Chandler deposition) so as to classify "base surface irregularities" as a "critical" defect, for *load line purposes*, Sperry Rand informally (*i. e.*, in fact but not in writing) also changed its on-receiving inspection procedures so that, in addition to the characteristics it had theretofore looked for in such inspections, it also made inspections for "surface finish improper" and "burr" characteristics in the cavity base that were of such size, etc., as would cause "roughness". This change in the on-receiving inspections was made because shell made by defendant and other suppliers (who were still producing and inspecting shell pursuant to the PD) were generating problems for Sperry Rand on its load line.[60] It is significant to note that problems caused by shell (that conformed to the tech data package in defendant's contract) on Sperry Rand's load line is a matter for which defendant was not contractually responsible.

After entering into the 1966 Supply Contract which called for the production of 515,000 shell, defendant, for its shellmaking venture, originally leased (and thereafter purchased) real property in Sylacauga; and, in addition to a management team composed of J. L. Builder, Dan Preston and W. V. Phiffer, employed approximately 50 foremen and approximately 700 production and inspection personnel to manage and operate its Sylacauga facility.

At the time said real property was acquired, as aforesaid, there was located

therein and thereon certain production machinery owned by the United States. That machinery (of Korean War vintage) was then in lay-away status. Pursuant to a cost-only-reimbursable basis contract, that and other government owned machinery was put into operating condition by defendant.

By contract amendment, dated June 30, 1967, the quantity of shell to be delivered pursuant to the 1966 Supply Contract was increased by 97,232 units. On January 12, 1968 defendant completed production and delivery of the shell called for by the 1966 Supply Contract.

On December 22, 1967, the parties entered into the 1967 Supply Contract which called for the production of 778,-000 shell; and, in the late spring of 1968, entered into negotiations that culminated in an amendment, dated June 27, 1968, between plaintiff (per Sam Sternberg, Procuring Contracting Officer, APSA) and defendant, whereby the quantity of shell to be produced under the 1967 Supply Contract was increased by 225,000 units and the 75,000 per month delivery schedule provided for therein was increased to 110,000 per month beginning July 1, 1968.

It is significant to note that, at the respective times the said 1967 Supply Contract and the June 27, 1968, amendment thereto were entered into, plaintiff had then already accepted more than one-half million shell manufactured by defendant.

In mid-July, 1968, while defendant was in the midst of the problems it encountered in gearing up to meet the stepped-up delivery schedule required by the said June 27, 1968, amendment, its entire management team, Builder, Preston and Phiffer, together with 37 of the 52 supervisors and foremen then employed by defendant, walked out (*i. e.*, without giving any advance notice, quit defendant's employ).[61]

---

59. Chandler deposition, p. 411.

60. Chandler deposition, pp. 415–417.

61. In his testimony at the criminal trial, Sternberg testified (January 24, 1973, pp. 57–63), in substance, that he was informed by Builder or Preston that Builder, Preston and Phiffer intended to form a corporation to make shell on their own and that, either on the day before, or on the same day that, said June, 1968 amendment was signed, he sent or caused them to be sent an official

The lots produced under the 1967 Supply Contract about which complaint is made here (*i. e.,* Lots DFP 1–86 to 93, inclusive) were delivered to the government during the period August 27 to October 23, 1968, inclusive. After the walkout and before the first of Lot 86 was delivered on August 27, defendant put its operation in charge of a management team composed of John (Jack) Fuqua, General Manager; E. E. Lackey, Assistant General Manager (in charge of) Production; and Ray Bishop, Assistant General Manager (in charge of) Quality Control. This management team had, or established, and maintained a good reputation for integrity with McCain, Smith, Snider and Mayes. For example with respect to the members of that team (and Bullard [62] and Hughes [63]), the Mayes affidavit reads (pp. 1–2):

> After the walkout, the Southern management personnel with whom I most frequently had dealings concerning quality matters were Messrs. Jack Fuqua, E. E. Lackey, Ray E. Bishop, Henry Bullard and Kerney Hughes. I became personally and well acquainted with each of these men and, in my judgment, all of them were not only conscientious and honorable but were also able and diligent about the performance of their respective duties. I had, and still have, a high regard for them and all other Southern post walkout supervisory inspection personnel.

Whatever they lacked in experience, defendant's new management team made up for by a cooperative attitude and a willingness to follow helpful suggestions from DCAS personnel. Within a matter of days after the walkout, Lackey met with McCain and Assistant QARIC Mayes and, at that meeting, stated defendant's policy with respect to quality would continue to be that (Mayes affidavit pp. 2–3):

> The shell delivered to the Government [will] be made and inspected in accordance with the contract requirements and in accordance with the requirements of the QARIC, as Southern understood such requirements; that in the event of a difference between the company and the QARIC as to the contract requirements, Southern [will] (1) comply strictly with the QARIC interpretation until such time as it was changed by a higher Government authority; or (2) inform the QARIC that Southern [will] not comply with his interpretation until such time as Southern was directed so to do by someone who had authority to obligate the Government to pay for changes in the contract work; and that, in no event, would Southern attempt to avoid any contract or QARIC requirement by slipping something by, or over on, the QARIC or any member of his staff. . . . [and that] he and the other members of the company's management and all Company personnel under them would cooperate 100% with me and all personnel under me to the end that all shell delivered at any time would be of the best quality that it was practicable for the company to make; and that the company not only wanted, but would welcome, any help or suggestions from me and my staff as to how the company might better satisfy the quality requirements of its contracts.

Defendant demonstrated by its conduct that the statement by Lackey as to its policy with respect to quality was

---

62. Bullard, an inspection employee when the walkout occurred, was selected, under Lackey's supervision, to direct defendant's quality control activities and he continued to have such position until mid-August (August 20, 1968) when Bishop was employed as Assistant General Manager-Quality Control. After Bishop was so employed, Bullard was an inspection supervisor or foreman (see Lackey and Bullard affidavits). Bullard is a subject of the (opposing) Marchant affidavit which is discussed hereinbelow.

63. As shown by the Hughes affidavit, Hughes was first employed by defendant on October 25, 1968. He was in charge of defendant's quality control during the time that the shell in Lots 1–133, et seq, were delivered under the 1969 Supply Contract about which complaint is made in this civil action.

in fact its policy. For example, the Mayes affidavit, continues (p. 3):

I firmly believe that the pledge made by Mr. Lackey, as aforesaid, was met. I never asked anyone who worked for Southern [defendant] to do anything that they didn't do promptly and right. I could not have asked for or received better cooperation than I got from Southern. Moreover, nothing has at any time come to my attention that caused me to believe that any of Southern's supervisory personnel had knowingly directed, permitted or condoned the delivery to the Government of any nonconforming shell. Further, nothing has at any time come to my attention that caused me to even suspect that such might have been the case with the exception of the reports emanating from LAAP in the latter part of 1969 that large numbers of "critical" defects had been found during inspections there made of shell that Southern had delivered. Even this suspicion was entirely removed when I learned that a member of the DCAS–B'ham staff had personally examined a sufficient number of the shell about which LAAP was complaining to be positive in his own mind that the LAAP inspections had not only been carelessly made but also that the shell that LAAP had reported as "criticals" had been determined to be such only by the use of criteria for criticals other than that specified therefor in the Southern contract, as that criteria was uniformly understood and applied at such facility by me, by the QARIC and the other members of his staff, DCAS–B'ham and Southern.

At or about the same time that Lackey met with McCain and Mayes, as aforesaid, Fuqua met with QARIC Smith and made a like statement and pledge of co-

operation. After so stating, the Smith affidavit then continues (p. 3):

I firmly believe that the said pledge made by Mr. Fuqua, as aforesaid, was met. Moreover, nothing has thereafter come to my attention that caused me to believe that any of Southern's supervisory personnel had *knowingly* directed, permitted or condoned the delivery to the Government of any nonconforming shell.

The successor management team not only made defendant's policy with respect to quality known to DCAS but, as shown by the Lackey, Little, Hughes, and Bullard affidavits, saw to it that all of its employees were frequently informed (by means of bulletin board notices *and* group meetings) of the company policy and directed to carry it out.

The following parts of the Smith affidavit are illustrative of the way in which defendant's management cooperated with DCAS to the end that defendant's said policies would be carried out (Smith affidavit pp. 3–4):

After stating the company's policy, as aforesaid, Mr. Fuqua, at his said meeting with me, also stated to me that the company's management suspected that some of those who had walked out might attempt to sabotage the company's operation and requested that I report to him personally or to Mr. Lackey any violation or suspected violation of the company's said policy and the names of any company personnel that (i) we might suspect of any wrongdoing or (ii) we might believe did not have the competence necessary to do his job or (iii) in whom my staff and I did not have complete confidence. A few weeks later, Mr.

APSA document (Request for Proposal DAAA09–R–0009) whereby APSA was soliciting a contractor to make shell. On July 1, 1968, Builder, Preston and Phiffer caused Alabama Forge and Machine, Inc., an Alabama corporation, to be incorporated. With reference to that corporation, a memorandum

decision by the Army Contract Adjustment Board (Exhibit 65 in the Addendum) states (part 5, p. 2) "Alabama Forge was organized for the purpose of submitting a proposal in response to RFP DAAA09–69–R–0009 and producing the projectile. It had no other business. . . . "

Bishop and I had a discussion in which we considered each of the company's inspection personnel. Although neither of us had any evidence that Mr. [Michael Eugene] Williams [64] had been unfaithful about the performance of his duties, we agreed at this conference that, because we knew that he was a very close personal friend of Mr. W. V. Phiffer, one of the persons who had walked out, it would probably be unwise for the company to permit him to continue inspecting as that job would provide him with an opportunity, if he should be so inclined, to sabotage the company's operation by passing or failing to set off nonconforming material. On the next morning, Mr. Williams was assigned to production and did not again, so long as I remained at the facility, have any inspection responsibility. About two or three weeks later, Mr. Bishop and I had a similar conference in which the two of us discussed each of the company's inspection personnel. At this time, I told Mr. Bishop, in substance, that Doyle Browning had let his foreman job go to his head and that, while I couldn't point to any instance where he had failed to do his duty, he gave me the impression that he resented suggestions from me and my staff as to how he and his crew (which we were still helping to train) might do a better job. I suggested that we should postpone a decision about him and that Mr. Bishop and I watch him very closely for a few days. About one week later, Mr. Bishop and I met again about Browning and at that time, Mr. Bishop said, in substance, that, although our close observation had not detected any wrongdoing by him, he didn't think Browning was as conscientious about his job as he wanted someone in that position to be and was going to have Browning transferred to other work. Browning was so transferred that same day and did not again work as an inspector while I was at the plant. From time to time thereafter, at the company's request, the company's top management inquired of me as to whether I had any suggestions as to personnel or other changes that the company might make that, in my opinion, would eliminate or lessen any problems that I or my staff were having. I do not recall a single instance after August 23, 1968 [65] when a suggestion so made by me was not promptly and cheerfully put into effect.

Because *all* of defendant's quality control supervisory employees walked out with Builder, et al, McCain's staff and the QARIC and his staff, at the direction of McCain, taught defendant's remaining and replacement inspection personnel what was required of defendant in the way of quality control. Apparently, this teaching was effective because quality steadily improved after the walkout.[66]

During August, 1968, Lots DFP 1–80, 81, 82, 83, 84 and 85 were shipped. The report (Exhibit 1 in the Addendum) of the LAAP on-receiving inspection shows that each of these lots was rated "Code 1" which means that the on-receiving inspections thereof indicated that the quality of those lots was such that they could be forthwith released to

64. The author of the (opposing) "Williams affidavit."

65. The length from the point (depicted by the last "X" just before "VS-1" on p. 3 of Exhibit 29 in the Addendum) on the production line where the first acceptance inspection was required to be made of shell to the end of the production line is shown by defendant's answer to plaintiff's Interrogatory 3(a) to be approximately 340 feet; so that, when the rate of production (as shown by defendant's answer to plaintiff's Interrogatory 1) is taken into account, any of the two-foot long shell that had reached the first point where acceptance inspections were performed, if not sooner rejected and set off the line, would have been delivered to the government before the end of the next shift, *i. e.*, before the end of the first shift on Monday, August 26, the day preceding August 27, 1968, when the first of the shell here complained of were delivered.

66. See, *e. g.*, the McCain affidavit, p. 4.

the load line for loading. As said report also shows, these were the first defendant-produced lots to be so rated in more than a year, *i. e.*, since May, 1967, when Lot DFP 1–13 was accorded that status.

In mid-September, 1968, APSA and DCAS were informed by LAAP that 1103 defects had been found in Sperry Rand's "on-receiving" inspection of 800 sample shell randomly pulled from defendant's lots DFP 1–86 and 87. The teletype (Exhibit 5 in the Addendum) by which APSA was so informed respecting Lot 86 concluded with a recommendation that the lot in question "be returned to vendor [defendant] for corrective action".[67]

Since few, if any, of the defects reportedly found, as aforesaid, were latent, the mentioned recommendation, when considered together with the above quoted contractual provisions (paragraph 5[d] of the General Provisions of the Supply Contract) amounted, in substance, to an accusation by LAAP that Southern, in delivering the lot, was guilty of "fraud, or such gross mistakes as amount to fraud".

Because of the serious nature of the accusation made, as aforesaid, investigations were commenced immediately by the QARIC, DCAS, APSA and FA. Because of the said LAAP accusation and reports, and pending completion of the mentioned investigations, DCAS not only tightened its requirements respecting cavity smoothness but also, in order to protect itself in case the LAAP reports and accusations should prove to be correct, suspended (during the period September 24, 1968, to November 27, 1968) defendant's right to use the MIL–1235 continuous sampling procedures in making acceptance inspections for certain kinds of "major" and "minor" defects and required instead that defendant use MIL–105 static lot sampling inspection plans in making acceptance inspections for those certain kinds of defects.[68] It was found as a result of said investigations that the accusations and reports were baseless. For example:

(a) *The QARIC investigation* (Smith Affidavit, p. 5): "Immediately after said LAAP complaints were received, I along with . . . [certain of defendant's employees] went to LAAP to see the shell that occasioned the complaints. We found not only that the LAAP inspections had been hurriedly and carelessly made but also that LAAP had reported as defects conditions for which, under the approved procedures at Sylacauga, Southern was not required to, and [for which it] did not, make any inspection; and, as a consequence, that LAAP's said reports were largely erroneous. For examples, we found that the LAAP inspectors had used gauges calibrated for use in checking unpainted

---

67. See deposition of LeJeune, pp. 259–266.

68. See pp. 12 and 13, Exhibit 66 in the Addendum. In contrast to the continuous sampling acceptance plan specified in MIL–1235 pursuant to which the QARIC and his staff, in order to "verify", as required by ASPR 14–203(a), that defendant had fulfilled the Supply Contract quality requirements would select and inspect (paragraphs 3.5 and 4.1 of MIL–1235) "at the rate of f or oftener units" (say 1 in 50) as units moved down defendant's production line, the QARIC and his staff, at the end of defendant's production line, (as shown by Exhibit 128 in the Addendum) under the static lot acceptance inspection so imposed on defendant, would select sample units for such purpose, either during or at the end of a shift from among all units produced on that shift. Under the MIL–105 procedures, if say 1,200 units or less were produced, the QARIC and his staff would select fifty samples; and, if, say one defect was found in such samples, that entire shift's production would be rejected and defendant would be required to screen that entire shift's production for the kind(s) of defect(s) found in the 50 samples. If 1201–3200 units were produced, the QARIC and his staff would select and inspect 200 samples; and, if two or more defects were found in that 200, the entire shift's production would be rejected, etc.

shell in checking painted shell, and that they had not taken into account the standards for cavity smoothness that had theretofore been set (by agreement with Southern) by Messrs. Free (APSA) and Fairburn (Frankford Arsenal)."

(b) *The DCAS investigation* (McCain Affidavit, p. 4): "Quality steadily improved after the walkout and when, in September 1968, I required Southern to go on static lot acceptance inspection, I believed, and the QARIC's records showed, that the quality of the shell then being produced by Southern was entirely satisfactory and it was at least as good and was perhaps better than it had ever been. I took that action solely to protect my office in the event it should develop that reports emanating from LAAP in the fall of 1968 respecting defects found in Southern shell should prove to be correct. As it turned out, my staff subsequently determined that substantial errors were made in said LAAP inspections and, if I had known of these errors at the time, I would not have made said change in the acceptance inspection procedures."

(c) *The APSA investigation* (Free report [Exhibit 75 in Addendum]): "Examination of quality records before and after new management indicate no significant difference in quality. BUT WHY, all of a sudden is Louisiana AAP being so critical of quality and rejecting recent incoming lots? ? ? . . . There appears to be a definite plan of harassment against this contractor from some unknown source.[69] This harassment, coupled with current quality and schedule problems, make the situation almost impossible." See also Free deposition (pp. 251–252) where Free testified, in substance, that it was correct that it was his conclusion that the reports that emanated from the Sperry Rand screenings were largely erroneous [and that] . . . there was no indication . . . that there was any fraud whatever on the part of defendant.

(d) *The FA investigation* (See Fairburn deposition where Fairburn testified, in substance (p. 158), that we found nothing and heard nothing suggested that indicated defendant was guilty of any wrongdoing. See also (pp. 68–75) where Fairburn further testified, in substance, that we found that: LAAP had checked shells cold that at Sylacauga had checked ok when hot (because of metal expansion); LAAP had not made allowance for paint; Smith found somebody had sabotaged a scale at Sylacauga so that it was not weighing right; found the government design of the shell was causing a burr on the lead in angle of the threads and, when the design requirement was changed, that eliminated a problem that de-

**69.** In his said report, after stating, in substance, that, even though "The problem has been here for two years" and "there are many other forge shops, *i. e.* [Chamberlain's facility in] Scranton AAP which are much worse," Department of Labor representatives were then threatening to take action to close down half of the production capacity of defendant's facility because of a ventilation problem, Free's report then poses the question, "Why, all of a sudden, is this Atlanta Labor Office being so critical and demanding after two years of no action or concern?" Defendant contends that the Labor Department investigators came to defendant's facility and raised this matter sometime between September 20 and 26, 1968, and that the investigators had been "sicced on" defendant by some one or more of Builder, Preston or Phiffer, who had walked out, as aforesaid. In this connection, the court notes that in plaintiff's answer to Interrogatory 45, plaintiff admits that, on September 19, 1968, "E. Y. Rew [a Department of Labor investigator] visited [the offices of] Alabama Forge and Machine, Inc., . . . .," the corporation that is a subject of note 61 hereinabove.

fendant and all other producers were having; and that Roland Smith was doing his job properly.

Fairburn's said testimony that "Smith was doing his job properly" is extremely significant because he made that answer in the context of questions appertaining to the discussions with Smith (in which Fairburn participated) that are a subject of that part of John J. Cunningham's (FA) written report (the "Cunningham report", Exhibit 66 in the Addendum) as to the findings of the FA investigations reading (pp. 3–4):

. . . [I]n talking with the QAR the visitors were convinced that Government inspection of cavity surface defects is, if anything, more critical than the standards.

The screenings ("one hundred percent" inspections for particular characteristic[s]) of Lots DFP 1–86 to 93 (which were made by Sperry Rand as a part of the other Army investigations) were triggered by the mentioned LAAP accusations and resulted in the setting aside and classification of the 8403 shell that are the subject of part (a) of the court's summary, *supra,* of plaintiff's July 26, 1974 answer to Interrogatory 43. Sperry Rand forwarded a detailed listing of the findings that it made in said screenings under cover of a letter (Exhibit 10 in the Addendum) to the CO at LAAP, dated March 3, 1969. That attachment (p. 2 of said Exhibit 10) reads in part:

All of the above defects with the exception of bourrelet rejects were used to fill an order of 7500 ea. projectiles for Jefferson Proving Ground. Since projectiles with defective bourrelets are unserviceable for any use, they are being disposed of as scrap.

Evidence (p. 26 of Exhibit 28 in the Addendum) that was presented before the said Grand Jury in 1970 was to the effect that the shell rejected in the Sperry Rand screenings were "NOT BROKEN DOWN" (*i. e.,* that no determina-

tion had theretofore been made as to whether any of the "surface finish improper" characteristics allegedly found in those shell then so set aside were of such degree of severity that, under plaintiff's contentions herein, would require them to be classified under the PD as "critical" defects). This fact, coupled with the fact that the shell in question were either used or destroyed in 1969, as aforesaid, apparently accounts for the failure of plaintiff in its re-served answer to Interrogatory 43 to classify, or to supply information by which to classify, as "criticals" any of the 1,226 shell which that re-served answer merely lists as "3.7.4 surface finish improper defects". Despite that failure, plaintiff, as shown hereinafter, contends herein that some part or all of those 1226 shell could well be criticals and that this court should so consider them.

As a consequence of the aforesaid findings made in the QARIC, DCAS, FA and APSA investigations, plaintiff was apparently satisfied that defendant was guilty of no wrong-doing respecting the delivery of Lots DFP 1–86 to 93, inclusive. At any rate, plaintiff took no action then (nor has it since) to revoke its acceptance of any shell delivered under the 1967 Supply Contract; and, thereafter, entered into negotiations that, in February 1969, culminated in a letter contract which, on June 10, 1969, was finalized as the 1969 Supply Contract.

It is significant to note here that when plaintiff entered into the contract that is the subject of the next paragraph hereinabove, plaintiff knew as much about whether any, or if so how many, of the 1226 shell mentioned above contained characteristics that it now contends are "criticals" as it has disclosed to this court it now knows or has any reasonable possibility of ever knowing.

In February 1969, Fuqua was transferred to another position by defendant and was not again assigned to defendant's shellmaking venture. Bishop, as General Manager, Lackey, as Assistant

General Manager, and O. E. Walker, as Assistant General Manager-Production, then constituted defendant's management team. Bishop continued to actively manage defendant's quality control activities until he became sick sometime in June 1969 and Hughes, in fact, was put in charge thereof. Hughes formally became a member of the management team upon Bishop's death on July 30, 1969. The other members of that team were Lackey, General Manager, and O. E. Walker, Assistant General Manager (in charge of) Production. In his affidavit, Hughes confirmed that, throughout his employment, defendant's policy as it was stated to be by Lackey and Fuqua, *supra,* and the company procedures as they were stated by Little, *infra,* were continuously in effect throughout his employment. The Hughes affidavit then continues, in part here pertinent (pp. 1–5):

Lots 133 to 153, inclusive, were delivered to the Government during the period 8 July to 18 December, inclusive, 1969. During the time these lots were made and delivered, I was in direct charge of defendant's quality control.

Throughout the times that I was employed by Southern, as aforesaid, it was my primary responsibility to see to it that the policy of the company with respect to the conformity with contract and QARIC requirements respecting shell that were to be delivered under Contracts 0277 and 0330 was carried out.

\* \* \* \* \* \*

Within a matter of two or three days after I was employed, Mr. E. E. Lackey, who was then assistant to the General Manager of the facility, called a meeting that all CD [70] area inspection personnel on both shifts were required to attend in order that he might introduce them to me and me to them. During the course of this meeting, Mr. Lackey explained in detail the above stated company policy and emphasized that if it came to management's attention that any person

violated this policy, they would be fired on the spot—that if any inspection personnel had any doubt as to whether a shell did or did not conform, it was his duty to set the shell off the line until he obtained the approval of inspection supervision to send the shell forward on the line. From that time on, every person who was employed in the inspection department was given a similar talk by me before he was permitted to begin work. In addition to giving such instructions, I frequently had meetings with inspection personnel at which I again stated the company's said policy and gave specific directions as to how it was to be carried out in specific instances.

\* \* . \* \* \* \*

I know that, during the entire time of my said employment, all supervisory personnel in the plant were not only also charged with the duty of strictly complying with said procedures but also of reporting to Mr. Lackey any violation or suspected violation thereof.

I frequently had occasion to discuss the company's said policy with the QARIC and on many occasions I requested that he notify me personally of any violation or suspected violation of the company's said policy that came to his attention. I also frequently caused notices to be posted on the bulletin boards in which explanations would be made of the company policy or in which explicit directions were set out as to how it was to be applied to specific problems.

Every person who is named in the amended complaint that was employed by Southern in its inspection department during the times that any of the lots DFP–1–133 to 153, inclusive, were made and delivered was then subject to my supervision and direction. In my judgment, there were no affected personnel in the plant at any time while those lots were made and delivered who did not know as much about the company policy as he needed

70. Acronym for Contractor Detection station.

to know in order to carry out his duties in accord therewith. If any shell were delivered to the Government other than in strict conformity with the aforesaid policy of the company during the times I had the aforesaid duties and responsibility I know that such delivery was made either inadvertently or by some person(s) who did so with knowledge that such delivery was contrary to company policy. Because of the enormous amount of time and effort that was devoted to catching any such activity, I also know that if any appreciable number of nonconforming shell were in fact passed, it was done in such a way that neither the company's supervision nor the QARIC or his staff were able to detect it by any means that any of us could devise.

It is shown by the affidavit of Snider who replaced Smith as QARIC on August 25, 1969, that on that day Lackey met with him and George Taylor (DCAS–B'ham) and, after stating the company's policy, as aforesaid, pledged his company's cooperation to the QAR and other DCAS personnel. The Snider affidavit then states (pp. 2–3):

. . . This pledge by Mr. Lackey was kept. I received, and I believe that Mr. Taylor and other DCAS-B'ham personnel received, full cooperation from Lackey and all other Southern supervisory personnel in carrying out our respective duties at the facility.

When I assumed the job of QARIC, I was informed by personnel of DCAS-B'ham that LAAP had reported that large numbers of defects had been disclosed by inspection made at that facility of Southern-made shell, and that, as a consequence, my instructions were to put into effect any such measures that in my judgment would further assure that nonconforming shell were not accepted. I carried out these duties and, in doing so, I received full cooperation from Southern.

During my testimony at the criminal trial I was asked, in substance, if I believed that the shell that were delivered during my tenure as QARIC met the contract requirements as to quality. I answered, in substance, that "I not only believe that they did, I know that they did." I was able to give that answer, which I now affirm, because with the precautionary measures that were then in effect and which of my own personal knowledge I know were carried out, there was no reasonable possibility that any shell could have been delivered to the Government without its having first been properly passed through all required inspections.

On June 5, 1969, Joseph F. Ellison author of the hereinafter discussed (opposing) Ellison affidavit was discharged by defendant because of an incident (the last incident described in that affidavit) that occurred on June 2, 1969, while Ellison was making an *in-process* inspection for defendant. After being discharged, Ellison, according to his testimony at the criminal trial, went directly to the headquarters of Alabama Forge and Machine, Inc. (identified in note 69, *supra*); and, on the night of that same day, accompanied by Gissendanner, reported to QARIC Smith that, on the occasion of said incident, he (Ellison) had been directed by Tommy Walker (defendant's inspection shift supervisor) and Jimmy Culver (defendant's inspection foreman) to so conduct his inspections that "when the government inspector's back was turned [he would be able] to get . . . shells ('with light paint') on through the line;" that he attempted to do so but a government inspector "caught" the shells "with light paint" that he had permitted to go by; and that he had been discharged because of the argument that followed when his said supervisors criticized him for getting "caught", as aforesaid. Smith referred Ellison to Rex Minor (quality specialist, DCAS-B'ham) who, in turn, referred Ellison to the FBI. The FBI immediately launched an investigation of the Ellison accusations.

With respect to the effect of the FBI investigation on defendant's shellmaking

operation, the Hughes and Smith affidavits, state, respectively:

*The Smith Affidavit* (p. 7):

. . . Although our procedures were such that I do not believe any nonconforming shell could have been delivered during the interim between the walkout and the time said FBI investigations were begun, I know that if any nonconforming shell were thereafter delivered that such delivery was accomplished by some means that could not be detected by any means that DCAS personnel, my staff or I could devise and implement.

*The Hughes Affidavit* (pp. 5–6):

Throughout the time of my said employment, the company's management believed that those who had walked out in July 1968 might attempt to sabotage defendant's shellmaking venture so that they could take it over. Consequently, the said management and all supervisory personnel did everything that they knew of that could be done to prevent the delivery of nonconforming shell and to catch anyone who, either intentionally or by neglect, might pass any such shell. I was very much a part of this precautionary activity and I personally devoted much time and effort to it. After the first FBI investigation was commenced in June 1969, the said efforts were intensified and other precautionary measures were taken. In my judgment, it would have been virtually impossible for any large scale passing of nonconforming shell to have been accomplished after that time without such fact coming to my attention. The QARIC was kept informed of our efforts in this regard and he was again asked to immediately notify us of anyone that he suspected of any such wrongdoing. After this investigation was commenced, we not only continued to do all that we could to implement the company policy, but we also leaned over backwards to see to it that nothing occurred that might be made a basis for a claim that a violation of the company's said policy had occurred.

On July 14, 1969, before the FBI had completed its investigation of the Ellison allegations, General E. M. Graham (Commanding Officer, the "CO", APSA) received a telephone call in which an individual who identified himself as "Travis Fowler" (the name of an employee of defendant) reported, according to Graham's memo of the event, that:

. . . [Defendant] was shipping rejected shell to the loading plant by wiping off the inspector's chalk markings and mixing them with good shell in the middle of the night when the government inspector was not around . . . that the FBI had been notified but he [Fowler] was not aware that they had taken any action . . Therefore, he was calling directly to the Head of the Procuring Agency in an attempt to obtain action and intended to call Senator Proxmire if he could not get the matter straightened out.[71]

APSA(a) caused the FBI investigation to be expanded to take account of the Fowler accusations and (b) directed, on July 23, 1969, that Sperry Rand screen all unloaded defendant-made shell on hand at LAAP plus all that were received at that location in the next thirty days.

The FBI determined that both the Ellison and the Fowler accusations were baseless. Apparently being satisfied on the basis of the FBI investigation that defendant had been guilty of no wrongdoing, APSA(a) cancelled its said instruction that LAAP screen the defendant-made shell and (b) requested, on July 30, 1969, that defendant submit a proposal for the delivery of 880,000 additional shell to be produced after completion of the 1969 Supply Contract.

71. See deposition of Erwin Montgomery Graham, Jr. (the "Graham Deposition") taken herein by defendant on May 30, 1975, pp. 94–104.

On the day before that invitation was issued (but apparently too late to further delay the issuance of said invitation [72]), Graham received a second report by telephone from "Fowler", the substance of which is set forth in that part of the said Graham memo reading:

. . . [D]efective shell were still being shipped and that he ["Fowler"] saw no indication of action being taken. I [Graham] informed Mr. Fowler that . . . [defendant's] shell were being reinspected at the loading plant and that, as data from this reinspection became available, further action would be taken as indicated. Mr. Fowler expressed satisfaction that proper action was being taken and stated that he would so inform his associates.

Upon receipt of that second "Fowler" report, APSA, on August 5, 1969, directed that LAAP screen a representative sample of 5,000 defendant-made shell for all "critical" characteristics and for all characteristics listed in paragraph 4.3.2.2 and 4.3.2.3 of the PD.

On August 19, 1969, Sperry Rand wrote the CO at LAAP a letter (Exhibit 88 in the Addendum) which reads in part:

Two hundred samples were selected from Lot DFP 1–134 and screened for metal defects (*Critical 1, Paragraph 4.3.2.1*) and defects in Paragraphs 4.3.2.2 and 4.3.2.3 of Specification FA–PD–MI–2720, Rev. 0 [the PD] . . . . Attached is a listing of defects encountered during this screening.

Three thousand [eight hundred] thirty-two projectiles were screened for *all Critical characteristics contained in Paragraphs 4.3.2.1* and 4.3.2.3 and Major 114 (wall variation) contained in Paragraph 4.3.2.2 of Specification FA–PD–MI–2720. Thirty-two samples

contained metal defects (Critical 1) and 676 samples contained wall variation defects (Major 114).

This makes a composite total of 4032 projectiles screened with 33 metal defects [the 32 mentioned next above and one in said listing] (Critical) and 694 wall variations. [Emphasis supplied.]

As is hereinafter shown, Sperry Rand set aside and classified (a) the "33 metal defects (Critical)" by use of the then current *load line criteria* (which, as hereinabove shown, differed materially from the specifications stated in the PD) and (b) the 676 wall variation defects on the basis of measurements taken at a point on the shell 3½ inches from the front face, a point at which defendant neither made, nor was required by DCAS to make, measurements.[73]

On August 19, 1969, Fairburn and Anthony Strazier (FA) were at LAAP, where, according to memo (Exhibit 87 in the Addendum) of the Commanding Officer at LAAP, they had discussions with government quality control personnel at that location about "defective characteristics" and "acceptance and rejection criteria". While there, they also reviewed the shell that had been set aside by Sperry Rand, as aforesaid. From LAAP, these men went to Sylacauga, where, on August 21, 1969, according to Free memo (Exhibit 291 to Free deposition), dated August 27, 1969:

Mr. Fairburn reported that LAAP had on hand * 4 projectiles with what appeared to be piping defects, * 28 with a lap or raised metal type defect, and 676 shell with wall variation type defects (Major). . . .

\* \* \* \* \* \*

Mr. Fairburn had three shells cut up at LAAP and parts of the shell were

---

72. On his deposition, Krohn testified, in substance (p. 70), that in the normal course, such a request for a follow-on contract proposal would have been issued at least six months before the then current contract was scheduled to be completed.

73. Letter (Exhibit 25 in the Addendum) of McCain to APSA dated March 10, 1970. This letter is discussed hereinafter.

hand carried [to Sylacauga] for DCAS and Contractor Inspection. One sample had a pipe completely through the base.[74] One sample had the lap or raised metal defect in the ogive area. One sample had a sharp area, where scale had been chipped from the sidewall. If this had been ground smooth it would have been acceptable.

A Tele-Con report was made to Mr. [Lawrence H.] Hinzman (APSA) . . . [in which] it was recommended . . . that all DFP metal parts lots (est. 85,000) be inspected for critical defects and wall variation requirements.

About two weeks later, on September 4, 1969, Free went to Ravenna, where a screening for thread defects was then underway of five lots of shell manufactured by Chamberlain and, on that day, caused a teletype (Exhibit 261 to the Hinzman deposition) to be sent to Ira Haywood (then Hinzman's superior) stating, *inter alia,* that: "15 units with Critical, repeat Critical, metal defects" had been found in such Chamberlain shell and that Ravenna had been requested to screen all unloaded Chamberlain shell for such "critical" defects prior to loading. This teletype described the "critical" defects referred to, as follows:

The metal defect is a very sharp raised edge of metal in the nose [ogive]

area which begins behind the threads and extends down the sidewall of the cavity. The majority of the defects run ¼ to 1½ inches in length and [are] approximately ⅛ inch high. Others run in excess of five inches long.[75]

On September 5, 1969, APSA sent the FBI a copy of Sperry Rand letter of August 19, 1969, under cover of a letter advising (p. 3 Exhibit 247 to the Krohn deposition), that that letter "attests to the fact that defective material is being shipped to the government by . . . [defendant]." The FBI reopened its investigation.

Chamberlain and the Boston office of DCAS (in whose district the Chamberlain shell were made) were immediately notified by APSA of the "criticals" allegedly found at Ravenna, as aforesaid, and, on September 10, 1969, a meeting, attended by representatives of that company, DCAS–Boston, FA, PA, and APSA (Hinzman and Sternberg), was held at Chamberlain's plant in New Bedford, Massachusetts. Upon arrival at the plant, Hinzman and the other government personnel inspected the alleged "criticals" that, according to the said Free teletype, had been found at Ravenna, as aforesaid, and, according to Hinzman's memo (Exhibit 260 to the Hinzman deposition) of the event:

It became immediately evident that we were not dealing with a *CRITI-*

---

74. Defendant concedes that the first of the three shell described by Free did in fact have a pipe through the base, but contends that it is the *only* shell out of over 2,000,000 delivered under the Supply Contracts that representatives of defendant have ever confirmed to have a "critical" defect under the PD, as it was interpreted by defendant and DCAS. (In his testimony before the grand jury, Chandler testified (p. 14): "We do find [criticals in shell received from other manufacturers], one or two, maybe, per lot"; and at his deposition, Chandler also testified, in substance (p. 299), that there was an AQL of .15 of one percent with respect to criticals to cover the human error element.) Defendant also concedes that at least one and possibly two other of the approximately 500 allegedly "critical"

shell set aside in the hereinafter referred to 1969 screenings at LAAP may also be such "criticals" but that, because these two have been painted, they would have to be sectioned (cut so the interior metal can be seen) before its experts can be sure.

75. Language almost identical to that which Hinzman used to describe the said defects in the Chamberlain shell is used in sub-parts (e) and (f) of Exhibit 100 in the Addendum to describe two of the six "critical" defects in Lot 135 that were allegedly confirmed by Free and Fairburn, *i. e.*:

(e) Large raised metal with sharp edge in ogive.
(f) Raised metal in ogive—sharp edge.

*CAL METAL DEFECT* as described by paragraph 3.7.3 of FA–PD–MI–2720 which would have an adverse effect on the soundness and strength of the metal but actually a *SURFACE FINISH* condition as described by paragraph 3.7.4 of FA–PD–MI–2720 which is classed as a *MINOR DE-FECT*. It was discovered that a large percentage of these defects were caused by the "Chucker" which holds the shell for OD [outside diameter] rough machining . . . [Emphasis by Hinzman]

Paragraph 3.7.4 of FA–PD–MI–2720 states that this raised metal condition is acceptable provided it does not exceed .030 in sharpness. Since it is next to impossible to measure for this sharpness requirement, it was decided to establish a second set of visual standards [76] to aid the QAR and the contractor in determining acceptance or rejection. This was accomplished *with the concurrence of all* Government and *contractor personnel* involved. [Emphasis supplied.]

On September 19, 1969, Hinzman sent a teletype (pp. 6–7 of Exhibit 260 to the Hinzman deposition) to DCAS-Boston, confirming his direction (given on the occasion of that said meeting) that that agency cease the screening it had undertaken of the Chamberlain shell and advising that (p. 7 of said Exhibit 260):

Changes and clarification of "Metal Defective" and "Surface Finish Improper" of Spec. FA–PD–MI–2720 *are forthcoming.* [Emphasis supplied.].

With reference to the said Chamberlain shell Hinzman in his said April 28, 1975 deposition, testified, in substance (p. 45), that the paragraph 3.7.4, *supra,* surface finish improper characteristics that Free reported as "criticals", as aforesaid, were shellmaking process-induced defects as opposed to steel mill

caused defects; that only such defects as are present in the steel as it comes from the steel mill are encompassed in the phrase "defective metal" as it is used in paragraph 4.3.2.1, *supra,* of the PD; further (pp. 66–69) that, although Free had classified the Ravenna-Chamberlain defects as "critical" defects, there was then nothing in the PD, when literally interpreted as it was by DCAS-B'ham, that made any of the characteristics described in paragraph 3.7.7 or 3.7.4 a "critical" defect on a shell manufacturing line; and that such defects as those found by Free at Ravenna, as aforesaid, are "only critical" defects on a *shell loading line.*

Although Hinzman also testified on his said April 28, 1975 deposition (pp. 51–52) that, under APSA's normal procedures, DCAS and defendant should have been promptly notified of the screening that APSA had directed that LAAP make of defendant's shell and that, while he could not account for the fact that such notice was not given, unlike the Chamberlain-Ravenna situation, neither defendant nor DCAS-B'ham were afforded an opportunity such as that afforded Chamberlain and DCAS-Boston, as aforesaid, to make their views and interpretations of the PD known to Free's superiors at APSA.

Pursuant to Free's said recommendation, APSA, on September 2, 1969, wrote a letter (Exhibit 95 in the Addendum) to the CO at LAAP, directing that (a) all unloaded defendant-made shell "be screened 100%" for the following defects:

 (i) All critical defects

 (ii) Wall variations . . .

 (iii) Concentricity . . .

 (iv) Weight

and (b) that all shell passing inspection on such screening be loaded and shipped.

By the time APSA's said direction of September 2, 1969 (*i. e.,* that the 85,000

---

76. At his April 28, 1975, deposition, Hinzman testified, in substance, (pp. 18–19), that the purpose of setting standards is to reconcile the conflict between paragraphs 3.7.7 and 3.7.4 of

the PD, on the one hand, with shell drawing (Exhibit 12 in the Addendum) note 3, on the other hand.

defendant-made shell on hand at LAAP be screened) could begin to be implemented, Lots DFP 1–94 to 132, inclusive, after undergoing regular on-receiving inspections at LAAP, had been released to LAAP's load line and had, in fact, been loaded.

Herman LeJeune, who was charged by Sperry Rand with the management of all of its LAAP inspection activities, admitted on his deposition taken herein that he, without then or ever giving any special instruction to the end that defendant's shell would be set aside, classified and reported pursuant to criteria stated in the PD, delegated the task of directing all of the screenings of Southern shell at LAAP to Bobby Lee, who had charge for Sperry Rand of its inspection activities on the S line (the *loading* line).[77] Lee, in turn, without then or ever giving any such special instructions, further delegated the task to Fred Berry, who had charge for Sperry Rand of loading shell on said S line.[78] With Lee's approval, Berry assembled a crew of S line Sperry Rand personnel to do the screening, and, they, insofar as screening for "criticals" was concerned, were, in substance, told to, and did, set aside and classify as "critical" defects, shell having characteristics that at the time of the screening would have constituted "critical metal defects" on Sperry Rand's shell *loading line*.[79]

On October 2, 1969, Gissendanner (who, as noted hereinabove, had accompanied Ellison on the occasion when Ellison made the accusations that caused the first FBI investigation to be launched) quit defendant's employ and, on October 9, 1969, gave a sworn statement to the FBI· in which he recounted the accusations that are a subject of paragraph 45, *et seq,* of the Motion for Sanctions.[80]

On October 21, 1969, Haywood had a telephone conversation in which he informed McCain that "Mr. Fowler" had again called, this time reporting (p. 7 of Exhibit 64 in the Addendum) that, during the week of October 19, 1969, defects "had been salted" into acceptable production at defendant's facility. In response to his inquiry, Haywood was advised by McCain that Lots 1–144 and 145 had been produced during that week, and (Exhibit 123 in the Addendum) that McCain "did not believe Mr. Fowler due to the tight controls DCAS [had] initiated". APSA thereupon ordered that Lots 144 and 145 be suspended and that 1000 samples be pulled from each of such lots and screened for all "critical" defects and for all characteristics listed in paragraphs 4.3.2.2 and 4.3.2.3, *supra,* of the PD. On that same day (October 21, 1969), the FBI advised APSA that the allegations of fraud had been substantiated and that it had submitted a report of its investigation to the District Attorney for appropriate legal action.

On October 22, 1969, a teletype (p. 1 of Exhibit 30 in the Addendum, which

---

77. See LeJeune deposition, pp. 153–159.

78. See Berry deposition, pp. 43–55.

79. On the deposition of Lawrence Earl Dalton (the "Dalton deposition"), taken herein by defendant on May 20, 1975, Dalton, Sperry Rand inspection foreman, testified respecting the criteria used in the screening of defendant shell, *inter alia*: (pp. 24–25) "We looked for criticals that had roughness or any types of burrs or anything like that inside of them, or anything that would be classified as critical that went down the load line". See also his testimony at pp. 39–40 of that deposition.

80. In said ACAB memo decision (Exhibit 65 in the Addendum) it is stated, in substance,

that on September 30, 1968 (which was after APSA had commenced its said 1968 investigation), APSA requested that the Department of Defense approve an expenditure of $6.9 million to set up a shellmaking facility for Alabama Forge at Talledega; that in April 1969 (shortly before Ellison, accompanied by Gissendanner, made the Ellison accusations that led to the first FBI investigation), the Department of Defense formally disapproved the expenditure; that APSA resubmitted a request for such expenditure and strongly urged its approval, but the Department of Defense again formally disapproved the request on October 9, 1969 (the same day that Gissendanner made these accusations to the FBI).

was prepared by Berry for signature and transmission by J. W. Marston,[81] Civilian Executive Assistant to the CO at LAAP) was sent by LAAP to APSA reporting, in substance, that, pursuant to APSA's September 2, 1969, directions, Lot DFP 1–133 had been screened and that such screening had disclosed 5417 defects of which 70 were "critical" defects. On the next day, APSA forwarded to AMC a "Blue Bell" (suspected criminal conduct) notification (pp. 67 et seq. of Exhibit 247 to the Krohn deposition), which reads, in part:

Attached as Inclosure 5 is a report [the Sperry Rand letter of August 19, 1969, supra] of inspection [by Sperry Rand] of [defendant-made] shells received at [LAAP] which attests that defective material is being shipped to the government [by defendant].

\* \* \* \* \* \*

Widespread or continuing publicity of a derogatory [to the Army] nature is not anticipated concerning this case.

\* \* \* \* \* \*

It is not considered that this case will embarass or otherwise be of concern to the Department of the Defense. [Emphasis supplied.]

As the screenings of other lots were completed, other teletypes (pp. 2–5 of Exhibit 30 in the Addendum) were prepared by Berry for the signature of, and were transmitted to APSA by, Marston.[82] These teletype reports can be summarized, as follows.

The October 24 report:

That the screening of Lot 134 disclosed 4313 defects of which 41 were "critical" defects.

The November 3 report:

That the screening of Lot 136 disclosed 3839 defects of which 17 were "critical" defects.

The November 14 report:

That the screening of Lot 137 disclosed 4298 defects of which 41 were "critical" defects.

The December 9 report:

That the screening of Lot 138 disclosed 2779 defects of which 146 were "critical" defects.

The LAAP report (Exhibit 32 in the Addendum), dated December 10, 1969, as to the results of the Sperry Rand screening of 1000 samples from each of Lots 144 and 145, states, in substance, that the screening of such samples from Lot 144 disclosed 78 defects of which none were "critical" defects, and that the screening of such samples from Lot 145 disclosed 228 defects of which 5 were "critical" defects.

DCAS, being without knowledge that all of the aforesaid activities relative to the LAAP screenings were going on, established a procedure in mid-October whereby a phone call was made to LAAP once each week to determine whether LAAP was having any difficulty with defendant-made shell. In its Fact Sheet (Exhibit 64 in the Addendum) which was prepared sometime on or about December 9, 1969, DCAS states: "In all of our contacts with LAAP . . . we have had nothing but satisfactory reports." Examples of such contacts are stated in DCAS Fact Sheet (Exhibit 63 in the Addendum), as follows:

12 November 1969 Called Chandler at LAAP. He advised that Lot 144 had passed receiving inspection. No problems with DFP shells.

17 November 1969 Called LAAP. No problems. Last Lot inspected was 1–147.

During the interim between September 2, 1969 (when APSA gave its said direction to screen) and December 10, 1969 (when the last of said LAAP reports as to the results of such' screenings was transmitted), Lots 139 to 152, inclusive, were received at LAAP. Because they did not constitute a part of the 85,000 shell that were the subject of APSA's said September 2, 1969 direction and because they were not affected

81. Berry deposition, p. 172. 82. Id.

by APSA's order that 1000 samples from each of Lots 144 and 145 be screened and thus were only subjected to the same on-receiving inspections to which shell received from all other suppliers were subjected, each of Lots 139 to 143, inclusive, 146 and 147 rated "Code 1" on the respective on-receiving inspections made thereof. A "Code 1" rating means, as aforesaid, that the quality of such lots was such that they could be (and they were) released to the LAAP load line to be loaded. As it so happened, each of Lots 139 to 143 inclusive, had already been loaded when on, December 15, 1969, APSA by letter (Exhibit 124 in the Addendum), as amended by teletype (Exhibit 125 in the Addendum), directed that all defendant-made shell then unloaded be screened for: a. Pool of paint in cavity (Critical 1 of Para. 4.3.2.-3); b. Metal defective (Critical 1 of Para. 4.3.2.1); c. Weight; d. Concentricity; and e. Variation in wall thickness.

On his said deposition herein, Chandler testified in substance (p. 237), that, if each of Southern Lots 139 to 153, inclusive, had been subjected to the same on-receiving inspections and procedures to which the shell of Sperry Rand and all other suppliers were being subjected at the respective times that such lots were received, each of Lots 139 to 153, inclusive, would have been released to the load line for loading.[83] He further testified, in substance (pp. 238–258), that, if each of Southern Lots 133 to 138, inclusive, had been subjected to the same on-receiving inspections and procedures that were in effect at the time in 1967 (when the first defendant-made shell were received at LAAP), each of Lots 133 to 138 would also have been released to the load line for loading. Although it is significant to note that Chandler gave such testimony *after* the screening at LAAP of

every lot delivered under the 1969 Supply Contract about which complaint is made in this action, further testimony (p. 249) by him along this line is even more significant in the context of this civil action. Thus, after testifying that the on-receiving inspections and procedures (throughout the times that the defendant-made shell delivered under the 1969 Supply Contract were received at LAAP) were such that "one critical would reject the lot", he admitted that under such inspections and procedures the kinds of defects that are listed as "suspect criticals" in the government's April 29, 1971 response (which, for practical purposes are the same identical shell as those which are claimed to be "SUSPECTED CRITICAL DEFECTS" in plaintiff's reserved answer, as last amended, *infra,* to Interrogatory 43) would have been treated as "minor" defects, if they had been counted as defects at all, in determining the acceptability of lots for release to the LAAP load line.

Because DCAS promptly relayed said LAAP "no problem" reports to defendant and defendant was otherwise uninformed about the LAAP screening, defendant's representatives, throughout the fall of 1969, met in numerous negotiating sessions at Joliet, Illinois, with APSA representatives regarding the proposal respecting a follow-on contract for the production of 880,000 shell that defendant had submitted in September, 1969, in response to APSA's said July 30, 1969, request therefor. Such sessions were held, for example, on October 15, 16, 17, 23 and 24, November 6 and 14 and on December 2 and 11, 1969. Except for what was not more than a passing reference to quality made at the session held on December 2, 1969, all of the negotiations in such sessions dealt exclusively with the matter of the price that defendant would be paid for producing said additional 880,000 shell.[84] On

83. On his deposition, Chandler sought to explain the above mentioned LAAP "no problem" responses to DCAS's weekly telephone calls by stating, in substance (pp. 468–473), that it was thought at LAAP that all DCAS was interested in was knowing how the defendant-made shell were doing in the *on-receiving* inspections.

84. See pp. 14–27 of Exhibit 227 to the Krohn deposition; and Sternberg testimony (p. 147

December 12, 1969, the last day of defendant's production under the 1969 Supply Contract, Sternberg, according to his testimony given at the criminal trial on January 25, 1973, informed defendant, in substance (p. 145), that it would be necessary to suspend the negotiations because some "allegations" had to be investigated.

Being faced with the immediate, unexpected and unpleasant prospect of laying off hundreds of employees just before Christmas, defendant began frantic efforts to ascertain the nature of the "allegations" to which Sternberg referred, as aforesaid. To that end it enlisted the aid of a number of senators and representatives of the Congress who, in attempting to ascertain the facts, met on December 17, 1969 with Fox. Fox stated, in substance, that allegations of fraud were involved but gave his personal assurances to the said members of Congress that the Army would handle the matter judicially and expeditiously so that the interests of all parties—work-

ers, contractor, and the government—would be protected.[85]

In his said telephone conversation with Haywood, McCain requested that, as soon as said screenings were completed, a representative of his agency be permitted to review any shell set aside at LAAP as the result of the screening of 1000 samples from Lots 144 and 145. That request was granted and Minor was at LAAP making such review at the very time that Fox was meeting with said members of Congress, as aforesaid. At the request of APSA, Fairburn was also at LAAP to participate with Minor in making such a review. The findings and conclusions reached by Minor and Fairburn are detailed in their reports (Exhibits 33 and 131, respectively, in the Addendum). Findings in which each of them concurred are detailed in Minor's said report, as follows:

> . . . [L]ots 144 and 145 passed normal receiving inspection when first received . . . [T]he . . . inspection of 1000 projectiles from

on January 24, 1973) at the criminal trial. Sternberg, who conducted said negotiations for APSA, testified at the criminal trial, in substance (p. 147, *supra*), that "nothing", not one word, was said during the negotiations about quality; (pp. 86 to 90 and 102–114) that, after the negotiations with Southern were ended, as aforesaid, the contract to make shell in defendant's Sylacauga facility for which Southern had been negotiating was awarded by APSA, on his recommendation, to National Metals Manufacturing Co., a corporation, of which Builder was president, Preston was executive vice president, and Phiffer "was a part of"; that, thereafter, National Metals defaulted on said contract owing the government "somewhere around" $2,000,000; and that, pursuant to said ACAB decision, Alabama Forge (the vehicle that, before National Metals was incorporated, was used by Builder, Preston and Phiffer to seek a contract to make shell) was paid $235,000 for expenses incurred after the walkout in maintaining readiness to enter into a shell supply contract. National Metals was incorporated on October 31, 1969 (which was just after October 21, 1969, the day when LAAP made its first report as to the result of the Sperry Rand screenings of defendant's shell, as aforesaid; the day when the FBI,

after interviewing Gissendanner, made its report to APSA, as aforesaid, that it had confirmed the allegations of fraud made against defendant and had sent a report of its investigation to the U. S. Attorney "for appropriate legal action"; and the day when Haywood called McCain, as aforesaid, to report that said third telephone report of accusations had been made by "Mr. Fowler"). Fowler and the telephone calls attributed to him are subjects of paragraph 242 (p. 175, *et seq.*) and note (p. 371) of the Addendum wherein defendant contends that on October 6, 1971, defendant reported to a member of the staff of the U. S. Attorney's office that Fowler had made a statement to defendant wherein he had admitted, in substance, that, at the direction of Builder, the said telephone calls were made in Fowler's name and in Fowler's presence by another person and that Fowler had agreed that, upon request, he would give a similar statement to the FBI or to the U. S. Attorney; that Fowler died on January 13, 1973, and that during the criminal trial, the U. S. Attorney's office advised defendant's counsel that an attempt to contract Fowler was made but that it was unsuccessful because Fowler "was ill".

85. See Exhibit 226 to the Krohn deposition.

each lot was conducted under adverse conditions, some of which are as follows:

(a) Not enough time allowed for inspection.

(b) Dimensional inspections performed over paint . . . [without allowance for paint].

(c) Inspections performed on unclean surfaces (threads).

(d) Inexperienced inspection personnel.

(e) Not enough Government personnel available for verification.[86]

With reference to the mentioned finding respecting the incompetency of the Sperry Rand employees who were doing the screening, Fairburn, on his said deposition testified (p. 59):

They wasn't doing a very good job. These loadmen, truck drivers or whatever they have. I don't think they had an artillery inspector on the whole line, really . . . [so] at that time, . . . we blew the whistle on them [Sperry Rand] and told them to cease the inspection until they could get somebody there that knows what is going on . . . .[87]

Apparently, on the basis of the Minor-Fairburn review, APSA was convinced that the Sperry Rand screenings had been incompetently done because, on December 31, 1969, APSA directed that all shell set aside in the Sperry Rand screenings be reinspected by government quality personnel stationed at LAAP and, apparently because such government quality personnel were supposed to have monitored the incompetently done Sperry Rand screenings, that FA representatives monitor such reinspection.[88]

Defendant, having been informed (apparently by McCain) that the Minor-Fairburn review was favorable to defendant, by teletype (quoted at p. 239 of the Addendum and transmitted on January 20, 1970) requested that the government (a) make available to defendant a copy of the Minor-Fairburn reports referred to above and (b) authorize representatives of defendant to inspect the shell that had been set aside in the Sperry Rand screenings. On January 20, 1970, Krohn by teletype (also

86. Examples of some of the conditions found on which these findings were based are stated in said report by Minor (p. 2) as follows: ". . . 71 Concentricity . . . defects were reported and only 21 were found in reinspection. Of this 21, . . . the majority . . . would be acceptable if [allowance for paint were made]. . . . Remington Rand [sic] . . . personnel classified sudden jumps of dial indicator needle as a defect. This sudden movement in most cases was caused by uneven paint . . . or paint chips on the gauge rollers. Of 125 defective threads reported, all were considered acceptable on the reinspection as a result of cleaning the threads prior to gauging. [All] 63 diameter of boattail defects were found acceptable when allowance was made for the base cover. Remington Rand [sic] personnel did not consider the effect of base covers on the gauging of this diameter."

87. This observation by Fairburn is confirmed in memo (Exhibit 110 in the Addendum) dated October 2, 1969, by Ralph Phipps, Sperry Rand foreman, reading, in part here pertinent: "The mentality of the [Sperry Rand] production workers assigned this project [i. e.,

the screening of defendant's shell] on this shift is far below average. They are not capable of separating shells in the necessary increments . . . ." It is further confirmed by memo [Exhibit 111 in the Addendum] of Phipps dated October 3, 1969, reading, in part here pertinent: "I had a full crew of 8 each production workers tonight. They wandered up to the dock at 24:40 hrs. I ask [sic] if they didn't know what time to be on their work station. I did not get an answer from anyone. I ask [sic] all of them if they wanted a warning notice (pink slip). Two of them told me if it ment [sic] they would get some time off—they were ready." Although, as shown, it was determined that the said inspections made by Sperry Rand had been so incompetently done it was necessary that the defendant-made shell be reinspected by goverment quality personnel, plaintiff paid Sperry Rand for making those incompetent inspections and, in this action, as a part of its claim under the False Claims Act, seek judgment against defendant, *inter alia*, for two times the amount of money that the government paid Sperry Rand for those incompetent inspections.

88. See p. 1, Exhibit 52 in the Addendum.

quoted at p. 239, of the Addendum) denied defendant's request for a copy of the said reports and advised that defendant's representatives would be permitted to view the allegedly defective shell only "upon completion of the inspection of [such alleged] defects by the government."

On January 19, 1970, DCAS sent Minor back to LAAP to review all of the alleged "criticals" that had been set aside in the Sperry Rand screenings up to that time. He was joined throughout the time he was making that review by Fairburn, DiGiovannantonio, and Jack Parham (Assistant QARIC at LAAP) and (during the latter part of it, on January 22 and 23) by Free. After completing his review, Minor informed the other persons named (each of whom at the conclusion of such review had expressed to Minor his concurrence with the Sperry Rand "critical" classification), in substance, that, in administering the Supply Contracts, DCAS had interpreted the PD literally (*i. e.*, as meaning exactly what it said and saying exactly what it meant); and that, as "burr" and "surface finish improper" defect characteristics were listed in the PD as "minor" defects, without regard to severity, it was not proper, in his opinion, for shell containing *any* such characteristics to be classified as "critical" defects in inspections made for the purpose of judging defendant's performance as to quality. Although Fairburn admitted on his said deposition (pp. 117–119) that he had known, at least since sometime in 1967, that the language of the PD in question might be interpreted literally (as Minor stated DCAS had done) and that he had neither done anything, nor taken any steps to see that anyone else had done anything, to clarify the language of the PD, Fairburn responded to Minor by stating, in substance, that burr and surface finish defects had been listed in the PD as minor defects "through a typing error" that had not been detected and that "an Engineering Change Order is out to correct this deficiency".[89] Minor answered Fairburn by stating, in substance, that any such "EO . . . was not a part of the 1969 Supply Contract"; and that, although he (Minor) concurred with Fairburn that some burr and surface finish defects could in fact be a "critical" defect *from a loading standpoint*, that, "since these conditions are listed in the item specification [that is a part of the 1969 Supply Contract] as minor defects, they should be classified as such [for purposes of judging defendant's performance under the 1969 Supply Contract] until a contractual change is accomplished." Minor further responded by stating to all of those who had participated in said review that on July 2, 1969 (before any of the shell in the Lot 133 to 153 series that had been screened by Sperry Rand had even been made by defendant), APSA's Sternberg wrote DCAS a letter (Exhibit 16 in the Addendum, the "first Sternberg letter") in which he, as Procuring Contracting Officer, had stated, in substance, that some such defects "could be" critical; that, when it received this letter, DCAS "called the PCO and advised him that . . . [such defects] are classified in the item specification as minor defects and are not covered under the paragraph for Metal Defects"; and that, "as a result of this call, the PCO issued another letter, [Exhibit 104 in the Addendum, the "second Sternberg letter"], dated 22

89. Although, as noted above, Fairburn, on November 11, 1974 stated under oath in plaintiff's re-served answer to Interrogatory 57 that "our . . . classifying these defects as criticals was based on our past judgment and experience . . . rather than . . . to any conscious adherence to a 'tightening' of specifications or to the application of the [criteria stated in] March 1970 amendment to the item specification", he testified on February 26, 1975, at his deposition (pp. 167–168), in substance, that, while at LAAP on December 19, 1969, he had stated to Charlie Grazioso (a consultant then employed by defendant) that "I told him [Grazioso] the same thing. As far as we [the FA personnel who monitored the said reinspection by LAAP quality personnel] were concerned, we thought [when we monitored that reinspection] this E.O. was out but it was not."

July 1969, rescinding the paragraph in the first letter concerning the classification of . . . [such defects] as criticals". And further, that although "on 8 July 1969, . . . DCAS issued a DD Form 1426 [Exhibit 17 in the Addendum] recommending to FA that burrs and/or sharp protrusions be added to Paragraph 3.7.3 of . . . [the PD] in order that they may be contractually classified as Metal Defects, there has been no response to this recommendation as of this date".[90]

With reference to the matter here under discussion, the Smith affidavit states (pp. 5–8):

When during the period 5 to 8 November 1968, a Government team from Frankford Arsenal and APSA (Messrs. Fairburn, Free, et al) were at the Sylacauga facility, they studied and observed the QARIC's requirements as to cavity condition. Among other things, they made a written report [Exhibit 66 in the Addendum] reading, in part:

The Government inspection [at Sylacauga] of cavity surface defects is, if anything, more critical than the standards.

Although Messrs. Fairburn and Free were in the said facility on a number of occasions for the purpose of observing the effectiveness of the QARIC's practices and procedures, neither of them ever suggested to me that any "burr" or "surface finish" defects, irrespective of severity, were or should be considered to be, critical defects. Burr and surface finish defects were expressly classified in the Southern contracts as "minor" defects and, our approved practices and procedures at Sylacauga recognized and treated them as such.

I was QARIC at Southern's said facility throughout its performance of Contracts 0045 and 0277 and until it had about half finished its performance under Contract 0330. During such performance, Southern delivered and we accepted for the Government almost 2,000,000 shell. The first time I ever heard that it had been claimed by anyone that process-caused defects such as scale, fins, pits, laminations (laps), hole in sidewalls, burrs, or machining marks were or should be considered as critical defects was on 14 April 1972 when Mr. Teel, an attorney for Southern, showed me a copy of a document entitled "Reply to Order for Production of Information" which purported on its face to have been filed by the U. S. Attorney in the District Court in Birmingham in Case CR 70–351. Throughout my said tenure at Southern's facility, insofar as Southern was concerned, "burr", and "surface finish" defects were uniformly classified as "minor" defects by me, my staff, the quality personel at DCAS–B'ham and Southern.

* * * * * *

At about the time I was first informed about the "critical" defects allegedly found in the LAAP 1969 inspections of Southern shell, I was also informed that I was to be replaced as QARIC at the facility and was to be transferred to another position, and that, while this transfer would result in an 11¢ per hour increase in pay, I would be demoted two grades. Immediately after I was given this news, I decided to pack my bags and go to to Atlanta to fight the demotion as I considered it to be a reflection on me. I was told that Frankford Arsenal and LAAP had confirmed the existence of the critical defects about which LAAP had complained and, after thinking about the matter, I decided not to fight the demotion because I realized that if huge numbers of critical defects had in fact been delivered to LAAP, they would have to have gotten by me and my staff and, for that reason, I would not have had much chance of winning a protest. If I had known then that LAAP, Frank-

90. Exhibit 33 in the Addendum.

ford Arsenal and APSA personnel had used criteria for criticals other than that that had been effect at Sylacauga, I would have fought the transfer and demotion.

For the reasons hereinafter stated, it is significant to note that the first Sternberg letter, to which reference was made by Minor, as aforesaid, which was written in his capacity as "Procuring Contracting Officer" to DCAS–B'ham, also states:

4. It is requested that PIT B type inspection be immediately performed by the DCAS resident inspection for "burr in cavity" . . . .

5. It is also requested that any other corrective action that can possibly be taken by your office be instituted immediately to prevent further situations where material is accepted by the Government [at Sylacauga] and later found to be unserviceable upon inspection at [LAAP] the receiving installation.

DCAS not only responded to the first Sternberg letter by making the telephone call to APSA and the recommendation to FA to which Minor referred, as aforesaid, it also (a) wrote a letter (Exhibit 105 in the Addendum) advising APSA that it had made such recommendation (b) put into effect the PIT B inspection as Sternberg requested and (c) had Smith make inquiry as to whether defendant would voluntarily agree, without additional compensation, to treat burr defects as critical defects.

The directions whereby on July 18, 1969, revised inspection procedures were put into effect, are stated in Minor's report (Exhibit 34 in the Addendum) as follows:

QAR is currently treating burrs in cavity as a minor defect as listed in the item specification. As a result of Previous User [LAAP] Complaints on this defect *he was advised to . . conduct his degree of inspection* [for cavity burrs] *at the critical level, however not to require the contractor to screen beyond the minor defect level*

[for such defect]. [Emphasis supplied.]

Prior to the time DCAS's (per Minor) said instructions were given, the QAR, insofar as burr defects were concerned, would accept all shell that had properly passed the MIL–1235 sampling plan inspection required for a "minor" defect having an AQL of 0.65% which included, *inter alia*, the clearing of an "i" factor when a burr defect was found by the QAR sampling inspector; and that was accomplished, as noted hereinabove, when one of defendant's inspectors, by a 100% screen, had found, say 210, consecutive units free from burr defects; thereafter, in such event, under the "special procedure" for *acceptance* inspection set up pursuant to DCAS's (per Minor) said instructions, the QAR, insofar as cavity burrs were concerned, would disregard entirely the results of the MIL–1235 continuous sampling plan inspection for that defect from the time a burr was found by the QAR sampling inspector until such time as a QAR inspector had cleared an "i" factor by finding, say 2500, consecutive units free of burrs. During the interim that such increased "i" factor was being cleared, the QAR would accept only those units which a QAR inspector, by an every unit cavity inspection, found to be free not only of burrs but also of surface finish improper and other kinds of cavity defects.[91]

91. The only authority whereby the government had a right (other than under the Changes clause) to impose a "special procedure" for acceptance inspection of defendant-made units was that granted by Paragraph 6.3 of MIL–1235 and Paragraph 6.3 of MIL–105D; and such authority as was granted by these paragraphs, was limited to those defects that were classified as "critical" defects in the PD that was a part of defendant's contract. As is herein shown, the government, acting by and through DCAS and the QARIC, has denied that "burr" and "surface finish improper" cavity defects have been, directly or indirectly, classified by the Supply Contracts as "critical" defects. Therefore, except for

Minor's report (Exhibit 19 in the Addendum) of his visit to defendant's facility on July 9, 1969, indicates that the population of cavity burrs in the units being produced was such that, with defendant, under said DCAS direction, being required to make only a sampling inspection of units for cavity burrs, the probabilities were that the number of units with burrs reaching the government inspector who was inspecting for burr characteristics as if they were "critical defects" was such that, the QAR's periods of respite from making an every unit cavity inspection were not only very infrequent but, when they did occur, were shortlived. The bother (of keeping up with the numbers of consecutive units found free of cavity defects, finding one and having to start over in an effort to find 2500 consecutive units free of burrs) was such that, because the QARIC and his staff were already, for practical purposes, inspecting the cavity of all units that had passed all inspections required of defendant anyway, as is shown by page 9 of Exhibit 63 in the Addendum, beginning August 25, 1969, a "100% inspection [was] instituted by Government . . for cavity defects". The significance here of the described changes made in acceptance inspections for cavity characteristics is, that, under the acceptance inspection procedures as changed, to the extent that the QAR, in clearing the increased "i" factor, made its own all unit cavity inspection of units tendered by defendant for acceptance on and after July 18 and before August 25, 1969, and with respect to all units so tendered on and after the latter date, the government in accepting shell, insofar as cavity defects were concerned, relied on its own, and not defendant's inspection in making its decision to accept or reject shell.

Because defendant persisted in its contentions that its shell had been subjected to screenings by Sperry Rand (and were then being subjected to reinspections by LAAP personnel) pursuant to criteria other than those stated in the Supply Contracts, Porter (by direction of Fox, as aforesaid), Krohn, Sternberg, Hinzman, Free, Fairburn, Coyle, Chandler and perhaps other representatives of the government were at LAAP on February 26, 1970, for the purpose of meeting with representatives of defendant (Gerard W. Mulder, Charles Grazioso, W. W. Storey and perhaps others) in an effort to resolve the dispute as to the correctness of the criteria. To that end, about forty shell were randomly selected for inspection by the persons named above from among those that had been originally set aside and classified as "criticals" by Sperry Rand and thereafter, on the basis of the reinspection thereof by LAAP quality personnel (which APSA had directed, as aforesaid), had been confirmed as "criticals". When such shell had been randomly selected, as aforesaid, each shell was first inspected by the government personnel above named (except Porter and Krohn) and, after such inspection of that shell was made, that same shell was then inspected by defendant's said representatives. When a particular shell had been inspected by both teams, a spokesman for each team, out of the hearing of the members of the other team, informed Porter and Krohn of his team's conclusion as to whether that shell (a) contained a defect characteristic and, if so, (b) the kind, and classification, as "minor" or "critical" of such defect.

Hinzman was a member of the Government team which inspected said shell on the occasion of the Porter-Krohn visit to LAAP. On his deposition herein, with respect to his observations, he testified on April 28, 1975 (pp. 73–74).

A. I will agree . . .[t]hat the majority of defects observed were of the surface finish condition type. There were other bona

---

its reserved authority under the Changes clause, plaintiff's actions in refusing to accept and pay for units that had properly passed

all required contractor inspection, would have been violations of plaintiff's obligations under the Supply Contracts.

fide critical defects that were observed.

Q. All right. Now do you say that you saw some bona fide critical defects?

A. Yes, sir. I personally saw one.

Q. What kind was it?

A. It was a crack in the base of a projectile.

After being informed of the conclusions arrived at by the said teams, respectively, Krohn left LAAP, went to Joliet for the weekend and, in the early part of the following week, met with Fox and Porter. At that time, according to memo (Exhibit 226 to Krohn deposition),[92] Porter and Krohn informed Fox of their findings and conclusions, *inter alia,* as follows:

a. . . . Dr. Fox was told that in almost all cases, the SMP (defendant) representatives indicated the defect observed was a pit and therefore a surface defect which, under the terms of the contract purchase description were minor defects. Conversaly [sic], the Frankford Arsenal representative in all cases described the defect as being critical. When asked to define what they observed, they called it a metal defect (either a pit with a sharp edge or some other similar metal defect as reflected in the applicable purchase description). Mr. Porter noted the applicable purchase description did not classify a pit as a critical defect. He and Mr. Krohn also advised Dr. Fox that the Government representatives seemed to rely on a Military Standard referenced in the contract which set forth the general guidance for critical defects. This MIL Standard advises "A critical defect is a defect that judgment and experience indicates is likely to result in hazardous or unsafe conditions for individuals using, maintaining, or depending upon the product, or a defect that judgment and wxperience [sic] indicates is likely to prevent performance of the technical function of a major end item such as a ship, aircraft, tank, missile, or space vehicle".

Dr. Fox was then advised by Mr. Porter that, in his judgment, the MIL Standard was not the controlling document in this case and critical defects as called out by the applicable purchase description governed this situation.

b. Mr. Porter and Mr. Krohn then advised Dr. Fox that, in their judgment, should this case go to court, the SMP experts would make a more believable presentation that [sic] the Government experts. . . .

c. Mr. Porter and Mr. Krohn then described to Dr. Fox that all critical defects are determined by visual inspection. This is very difficult since the interior of the cavity of the projectile must be observed through a two inch diameter hole. To illuminate the interior cavity, a long probe with a high intensity light is lowered through the same hole the visual inspection is made through. This significantly reduces the area of the hole available for visual inspection. Because of the defects being observed and the difficult lighting arrangement, *determination as to the type of defect observed is very speculative at best.* [Emphasis supplied.]

d. Dr. Fox was then shown several sectioned projectiles which demonstrated the types of defects observed. He asked whether other suppliers' projectiles had similar defects, and when no one could answer positively, asked that a special inspection be per-

---

92. At his deposition, Krohn testified (p. 104) affirmatively when asked if, in his best judgment, the signature on Exhibit 220 was his; and later (p. 211), ". . . I would almost dispute the signature . . . it doesn't look like my normal signature but, then, it depends on the occasion it was done . . . . I am not accusing anyone of forging . . . .. It doesn't look like my normal signature"; and (p. 222), "All I am saying is I did not sign it and I am not indicating that I didn't write it . . . . I feel sure that it was written in our office." "Q. And it is essentially true"? A. "Yes Sir."

formed on 100 samples of other suppliers' projectiles and a report of this inspection be furnished as soon as possible.

A memo (Exhibit 43 in the Addendum) by Hinzman, dated March 6, 1970, shows that on March 5, 1970, Krohn briefed Fox as to the results obtained when, pursuant to Fox's request, the comparative inspections were made. This memo reads, in part:

> c. . . . Dr. Fox was particularly disturbed with the inspection results of the other four suppliers, especially with those concerning [Sperry Rand] Louisiana AAP production. These results seemed to indicate that the quality of the other producers was no better than Southern Metals.

In the Fox-Chesarek letter, Fox stated his understanding of the conclusions which were stated to him on said occasion by Porter and Krohn as follows (p. 2):

> . . . [I]t was determined [by Porter and Krohn] that (a) the Government [FA, APSA, LAAP] and GOCO [Sperry Rand] personnel at [LAAP] the Louisiana Army Ammunition Plant were, in fact, inspecting these projectiles to specifications different from those in [defendant's] contract and (b) those defects previously identified as critical, were, at least in the majority of cases, properly categorized as minor under the contract specification.

APSA was again informed before said grand jury was ever convened that defendant had literally interpreted such contract language by letter (Exhibit 42 in the Addendum, the "Hulse letter"), dated February 27, 1970 from Frank Hulse (Chairman, defendant's Board of Directors), and by letter (Exhibit 25 in the Addendum, the "second McCain letter"), from McCain, dated March 10, 1970.

The Hulse letter, which was written to Krohn the day after the Southern representatives were at LAP when Porter and Krohn were there, as aforesaid, would have been received by Krohn just before or shortly after the time that he and Porter briefed Fox, as aforesaid.[93] It reads, in part:

> [Defendant] has produced approximately 2.3 million 155 millimeter HE M107 projectiles at its plant in Sylacauga, Alabama since 1966. Inspection and acceptance of these projectiles by the Government took place at the plant site subject only to proof firing; none of the 2.3 million shells has ever failed ballistics tests.

Southern encountered normal startup problems which were to be expected, but it also experienced extraordinary problems created by certain dissident employees who, in our opinion, conspired to deprive Southern in [sic] its government contract through sabotage and other unlawful acts. A segment of management, along with some 35 employees, left Southern in July, 1968 to form another company for the avowed purpose of obtaining a government contract to produce the same product, i. e., 155 millimeter projectiles produced at our plant. As a consequence, Southern has been harassed in its production and inspection operations primarily due to the actions of these former officials and employees.

In early August of 1969 it was discovered that, due to innocent error, certain inspection gauges used by both the Government and Southern since the inception of production were inadequate. Southern took immediate action to correct its production methods and to improve inspection procedures, including gauges. Southern also took drastic action to improve its management, production, technical and inspection procedures; and production

---

93. On his said deposition, Krohn testified (p. 50): "[W]e (Porter and Krohn) left Louisiana on a Thursday or Friday [February 26 or 27, 1970] and were in Washington on Tuesday or Wednesday [March 3 or 4, 1970] of the following week."

lots after August 1969 reflect the results of such actions.

\* \* \* \* \* \*

Southern has not and does not now agree with the results of the Government's reinspection [at LAAP]. It has not been furnished a copy of the criteria or standards [that were directed] to be applied by Sperry Rand or the Government in the performance of such reinspection. It is, however, of the opinion that a different and contrary standard has been applied in such reinspection when compared with production specifications included in Southern's contract.

\* \* \* \* \* \*

The Government informed Southern on February 26, 1970 that such defects fell under "FPD–MI–2720, Revision 0, Page 4, Paragraph 3.7.3 entitled "Metal Defects: as being "xxxx or any other similar defect." . . . The Government has relied on the general and broader classification to categorize "defects" as any other similar defect which is new and novel to Southern. Southern's representatives have classified all such so-called "defects" as "minor" involving surface finish discontinuities under Paragraph 3.7.4 of the above referred Purchase Description. Southern contends that projectiles inspected are within the applicable contract specifications, and were inspected and accepted by the Government at Southern's plant in Sylacauga, Alabama; and are of the same general characteristics as some 2.3 million shells produced by Southern over a three-year period. . . .

Military Standard, 1235 (ORD) 17 July, 1962 Page 3, Paragraph 3.12.2 entitled "Critical Defects" states "A critical defect is a defect that judgment and experience indicate could result in hazardous or unsafe conditions for individuals using or maintaining the product xxxx". It is Southern's contention that the Government, having inspected and accepted after proof-firing some 2.3 million projectiles over a three-year period, should not now be entitled to apply a different standard contrary to and not in accordance with Southern's contract.

Southern recognizes the difference between the Government's inspection at its plant and the inspection performed at Government loading plants. We recognize that certain projectiles previously accepted may be set aside for loading if in the judgment of the inspector he feels that such projectiles may be hazardous or unsafe. This is a practice which, in our opinion, enables the Government to realize savings resulting from mass production methods at the producer's plant, while at the same time applying the highest safety standard at its loading plants to protect the ultimate user. However, this practice has nothing whatsoever to do with Southern's contractual obligations, and Southern insists its projectiles be inspected against the standard appearing in its contract and not under a different or contrary standard being applied at LAAP.

The McCain letter which states that it was written in response to APSA's request for DCAS's comments re the Hulse letter reads, in part:

2. . . .

a. In early August 1969 this office received reports from APSA that defective projectiles were being received at Louisiana Army Ammunition Plant from Southern Metal Products. During telephone conversations between Mr. John Free, Key Inspector, and Mr. Rex Minor, this office, Mr. Free advised that a large number of defects encountered were "variation in wall thickness". He further advised that the bulk of the wall variation defects was occurring 3½" from the front face and immediately behind the rotating band.

b. On 12 August 1969, a plant visit revealed that neither contractor nor Government inspectors were inspect-

ing projectiles at 3½″ from the front face, and that the gage configuration would not allow inspection behind the rotating band. All wall variation gages in house had been previously marked to provided for consistent inspection at the following locations . . . .

\* \* \* \* \* \*

c. The five (5) inspection points listed above had been in effect since the early stages of Contract DAAA–09–67–C–0045.

d. [When, pursuant to request by Free, DCAS directed that defendant measure for wall variation at two additional points,] It was determined that the [government supplied] gages on hand were capable of measuring wall variation 3½″ from the front face. However, a major modification, consisting of milling a slot in the carriage of the wall variation arms, was necessary before the gages were capable of measuring wall variation behind the rotating band. Measurements behind the rotating band had not been taken in this facility since the original opening of the plant [by] "Rudisill Foundry" in the early 1950's. The majority of gages presently on hand have been in use in this plant since that time. Gages furnished later were of the same configuration.

3. . . .

a. Since the beginning of produc-duction at Southern . . . metal defects (critical) have been classified in accordance with paragraph 3.7.3 of FA–PD–MI–2720, Rev 0.

b. It has consistently been the interpretation of this office that defects such as scale, fins, seams, die scratches, pits, etc., as defined in Para. 3.7.4, Surface Finish, are minor defects under Code 214, Para. 4.3.2.2 of FA–PD–MI–2720.

In the Hinzman memo of March 6, 1970, *supra,* it is stated that "a general meeting [whose attendees included, *inter alia,* Fairburn, Krohn and Hinzman]

was held . . . [at the AMC headquarters in Washington]. *The purpose of this meeting was to establish the AMC position for presentation to [i. e.,* that AMC would seek to have approved by] Dr. Fox . . . on the next day. As a result of this meeting . . . ., *the attached set of briefing charts were agreed upon* for presentation to Dr. Fox." Portions here pertinent of the charts so agreed upon are as follows:

### AMC POSITION ON CRITICAL DEFECTS

*No change in position.*

Critical defect inspection—

. . . Based on judgment, experience, and established visual standards a determination is made of whether a surface condition *"appears to be"* a crack, split, lamination, etc, or not. *If it is determined to be a suspect metal defect, it is rejected.* . . . [Emphasis supplied.]

The evidence in this record would most certainly warrant a finding (which in the present posture of this action, the court, as aforesaid, deems unnecessary to make) that at said "general meeting" a decision was made in the highest echelons of the Army that, *irrespective of facts then known and of any injury that might ensue to defendant and the individuals who were then under investigation for fraud,* there would be "no change" in the AMC position on critical defects. Evidence herein, *inter alia,* from which inferences supportive of such finding can be drawn is referenced in the discussions next hereinbelow respecting (a) the letter (Exhibit 45 in the addendum, the "Fox-Hulse letter") of Fox to Hulse (b) the letter (Exhibit 46 in the Addendum, the "Krohn-Hulse letter") of Krohn to Hulse (c) breaches of the government's duty to make discovery, (d) plaintiff's re-served answers to Interrogatory 43 and (e) the Graham affidavit of March 28, 1975.

The earliest evidence (from the standpoint of when it occurred) to be found in this record that Fox concurred in

said AMC position is to be found in the Fox-Hulse letter which was written by Fox to Hulse on March 27, 1970. It reads, in part here material:

The most recent report that I have received relative to the screening of the shells produced by Southern Metal Products under contract DAAA09–69–C–0330 indicates that more than 8,700 defective shells have been discovered. *Included in this total are more than 340 projectiles which, in the opinion of Army experts are critically defective within the meaning of paragraphs 3.7.3 and 4.3.2.1 of the purchase description which was a part of the contract,* the balance are "major" defects within the terms of the contract . . . . [Emphasis supplied.]

It is significant to note that Fox wrote the letter quoted next above on *March 27, 1970,* about *one month after* he had been briefed by (a) Porter and Krohn, regarding their said findings and conclusions at LAAP and (b) by Krohn regarding the results of the comparative inspections of the shell of other suppliers that had been made at Fox's request.

Then, on March 31, 1970, *four days after* writing the Fox-Hulse letter, Fox wrote the Fox-Chesarek letter. After making an earlier reference therein to the "assurances" that he had given, as aforesaid, to "a number of Senators and Representatives of the Congress", Fox concluded his letter of March 31, 1970 to Chesarek, as follows:

. . . *It was most embarassing to learn that our inspection criteria for defective projectiles were not uniform and that we had not been informed previously of this situation during the current investigation.* [Emphasis supplied.]

I am very concerned over this problem and would appreciate your investigation into this matter and your assurance that corrective measures have been taken to prevent a similar occurrence.

Evidence that Krohn concurred in, or at least followed, the said AMC position, is to be found in the Krohn-Hulse letter, which was written on April 7, 1970. It reads, in part here pertinent.

Following is a review of the Government count of Southern Metal projectile lots set aside at Louisiana Army Ammunition Plant:

| Lot No. | Criticals [94] | Majors |
|---|---|---|
| 133 | 27 | 1951 |
| 134 | 10 | 1468 |
| 136 | 17 | 1528 |
| 137 | 30 | 1457 |
| 138 | 137 | 1607 |
| 144 | 21 | 106 |
| 145 | 12 | 63 |
| 146 | 18 | 35 |
| 147 | 15 | 42 |
| 148 | 39 | 63 |
| 149 | 18 | 43 |

The inspection criteria utilized to screen the above referenced lots by the

94. The 344 "criticals" listed by Krohn coincide with the numbers, respectively, of criticals that are listed in part (b) of the Court's summary hereinabove of plaintiff's July 26, 1974, answer to Interrogatory 43 except that the Krohn letter lists 27, 10 and 18, respectively, for Lots 133, 134 and 149, whereas, said summary lists 106, 25 and 17, respectively, for those lots. The discrepancies in Lots 133 and 134 are accounted for by testimony of Chandler on the criminal trial wherein Chandler, with respect to Criminal Trial Exhibits 126 and 127, testified (pp. 160–170), in substance, that those exhibits were letters dated February 10, 1970, wherein LAAP had reported to

APSA that 27 and 10 criticals, respectively, had been found in the screening of Lots 133 and 134 and that, thereafter, LAAP was notified that there were some other "process induced defects" which had been set aside but that had not been counted and, thereupon, correcting reports were made. The discrepancy between the said 18 and 17 for Lot 149 is noted, but not explained, on page 26 of Exhibit 9 in the Addendum. At the time the Fox-Hulse and Krohn-Hulse letters were written, LAAP had not made its reports (pp. 28–35 of Exhibit 9 in the Addendum) to APSA about its findings from the screenings of Lots 150 to 153, inclusive.

Government was the same criteria set forth in your contract. . . .

f. . . . *As stated previously, all inspection performed at Louisiana Army Ammunition plant by the Government has been in accordance with the criteria contained in the Southern in the Southern Contract.*[95]

It is significant to note that the Krohn-Hulse letter was written six weeks *after* Krohn had convinced Fox that he (Krohn) and Porter had "determined . . . that the Government and GOCO personnel . . . were in fact inspecting these [defendant's] projectiles to specification different from those in . . . the [defendant's] contract".

■ The government's duty to make discovery in the criminal action and in this civil action has been ignored or evaded on numerous occasions. Some of the more significant of such instances are discussed next hereinbelow.

In the pending Motion for Sanctions, it is charged that the Fox-Chesarek letter has been the subject of serious breaches of the government's duty to make discovery—both in the criminal action and in this civil action. The production of that letter was called for, *inter alia,* by identical subpoenaes duces tecum which were directed (at the instance of defendant herein in the criminal action on January 10, 1973) to the Secretary of the Army and to the respective Commanding Officers at AMC and APSA. The government moved to quash the subpoenaes. After a hearing held in chambers, Judge Allgood orally ordered that the government forthwith produce, for *in camera* inspection, all documents called for by such subpoenaes.

In response to Judge Allgood's order, Colonel William B. Carne, on behalf of the Assistant Secretary of the Army, wrote a letter (the "Carne letter") dated February 12, 1973, which was addressed to the U. S. Attorney and directed to attention of the WDJ attorney who was lead counsel for the government in the criminal action. This letter advised that, although a search (the "first search") of described files had been made, no document called for by the subpoena was found and that an affidavit (the "Lang affidavit") so stating had been executed and was enclosed; that, after the Lang affidavit had been executed, in the course of making a second review (of said files, the "second search") a file copy of the Fox-Chesarek letter had been found; and that "a copy of the file copy [was also] enclosed *for your information"* (emphasis supplied).

No copy of the Fox-Chesarek letter was produced, either in response to the subpoenaes or to Judge Allgood's order. Instead, some person(s) acting for the government in the premises filed the Lang affidavit with the Court's clerk on February 15, 1973. More than two years later, on February 19, 1975, defendant first learned of the existence of the Fox-Chesarek letter.

In response to defendant's efforts in this civil action to discover why it had been deceived in the premises, affidavits were filed herein by all of counsel of record for the government in said criminal action as well as in this civil action. The respective affidavits by each of such counsel in the criminal action state, in substance, that the affiant either did not

---

95. In the Krohn deposition, Krohn testified, in part (pp. 342-343)

A. I don't see that there is a great discrepancy to what I told Dr. Fox and what is in this [the Krohn-Hulse letter] letter here.

Q. Well, when AMC adopted a position, was it your duty as a government employee of the . . . Department of the Army to follow it?

A. I presume, if that was their instructions, but I don't recall that that was their instructions.

Q. Well, without any explicit instructions, if you knew it was AMC's position that, "we are going to take the position that those inspections were made right", would it be your duty to take that position in every thing you wrote?

A. Either that or they wouldn't have sent me, I suppose. . . .

know about, or had no recollection of having known about, the existence of any copy of the Fox-Chesarek letter prior to conclusion of the criminal trial. On his deposition herein, Chandler, on February 28, 1975, testified (pp. 140–143; 374–375) that he had not theretofore seen any copy of the Fox-Chesarek letter but that the WDJ lead counsel of record in the criminal action (to whose attention the Carne letter was directed) had mentioned the Fox-Chesarek letter to him while he (Chandler) was in Alabama to testify as a witness in the criminal trial. Chandler concluded his testimony in the criminal trial on February 15, 1973, the day that the Lang affidavit was filed with the Court's clerk, as aforesaid.

▮ Even though an affidavit is true when made, the use of it at a time when (the one so using it knows that) intervening circumstances have so changed that the statements sworn to therein are no longer true is the equivalent of the use of an affidavit known to be false when made and can amount to a deceit and fraud.

Fair dealing in the premises required that those acting for the government in the premises deliver the Fox-Chesarek letter to defendant for inspection and copying or to Judge Allgood for *in camera* inspection but, instead of doing that, the Lang affidavit was filed. The filing of that affidavit under the circumstances, in this court's view, is reprehensible conduct for which the government, as a party to the criminal action, is responsible. Insofar as defendant is concerned, it is immaterial that it has not been, and may never, be established which person(s) acting for the government in the premises caused the Lang affidavit to be filed and, by that means, caused defendant to be deceived with respect to the existence of, or of leads to, material evidence relative to one of,

if not, the most crucial issues not only in said criminal action but also in this civil action for, as was held in *S & E Contractors, Inc. v. United States*, 406 U.S. 1, 10, 92 S.Ct. 1411, 1417, 31 L.Ed.2d 658 (1972):

> A citizen has the right to expect fair dealing from his Government [citations omitted] and this entails in the present context treating the government as a unit rather than an amalgam of separate entities.

In its Motion for Sanctions, as amended on March 7, 1975, defendant claims that, in January 1975, another WDJ attorney (who is plaintiff's lead counsel in this civil action and who was present as an observer throughout substantially all of the criminal trial) removed a signed copy of the Fox-Chesarek letter (together with the file folder [in which it was contained] bearing the legend "Possible Brady Material" [96]) from one of several boxes in the offices of the U. S. Attorney in Birmingham wherein (in response to routine discovery efforts by defendant in this civil action) papers had been assembled for inspecting and copying by defendant; that after doing so such WDJ attorney carried the said signed copy of that letter (and said folder) to Washington; that, thereafter, said WDJ attorney represented to defendant that such boxes containing the papers that the government was obligated to produce, as aforesaid, were ready for defendant's inspection, but did not inform defendant that said signed copy of the Fox-Chesarek letter (and file folder) had theretofore been removed and were still missing therefrom; that, thereafter, on February 19, 1975, while inspecting the contents of such boxes, defendant first learned of the existence of any copy of the Fox-Chesarek letter when its counsel found an unsigned copy (presumably the above mentioned file copy) of the Fox-Chesarek letter in one of such boxes; that on,

---

96. On the front cover, there is what appears to be an index to what at one time were the contents of such file folder. It reads:

"1. Fox ltr to CG AMC 33170

2. Gauge check off sheets—prev furn (DCAS box # 2)

3. Fairburn T/R?"

February 27, 1975, during the course of the Fairburn deposition, defendant's counsel made it known to said WDJ attorney that defendant, on February 19, 1975, had found an unsigned copy of such letter in one of said boxes by serving on said WDJ attorney a document giving notice that defendant would take deposition of plaintiff as to why the Fox-Chesarek letter had not been produced at the criminal trial and as to when certain persons, including each counsel of record for plaintiff in said criminal action and in this civil action, had learned of the existence of the Fox-Chesarek letter (of which a copy of said unsigned copy was attached as an exhibit to that notice); that, thereafter, on March 2, 1975, he (said WDJ· attorney) admitted (during a colloquy with defendant's counsel reported in the Chandler deposition [pp. 374–377]) that he had removed said signed copy from such box, as aforesaid, and had taken it with him back to Washington because he "wanted a copy of it . . "; that, thereafter, on March 3, 1975, said WDJ lead counsel wrote a letter (Exhibit K to said motion, as amended), to said defendant's counsel (under cover of which he enclosed the said signed copy of the Fox-Chesarek letter and the said file folder) stating that he had "made two copies [of it] for [his] files"; and that, the receipt of that letter is the first knowledge that defendant had had that said file folder had existed at any time.

Pursuant to motion of plaintiff, the court permitted plaintiff, as a part of its response to said notice of deposition, to file affidavits by said counsel of record. In the affidavit filed by him, said lead counsel in this civil action stated, in substance, *inter alia,* that he had first known about the existence of any copy of the Fox-Chesarek letter when, on January 3, 1975, he had found said signed copy of it in one of said boxes. One of his co-counsel of record herein, another WDJ attorney, stated in his said affidavit, in substance, that he had not known of the existence of any copy

of the Fox-Chesarek letter until sometime in January 1975, when his said lead counsel told him that he had found a copy of it in said boxes. The other of his co-counsel of record, a member of the staff of the U. S. Attorney's office, stated in his affidavit, in substance, that he had had no knowledge whatever concerning any copy of the Fox-Chesarek letter until March 4, 1975 (a week after the mentioned colloquy occurred during the Chandler deposition, as aforesaid).

Defendant had so worded the documents pursuant to which the papers were assembled in said boxes, as aforesaid, that it was the government's duty ·to produce in response thereto each "non-identical" copy of the Fox-Chesarek letter and each file folder in which each such copy at any time had been contained. Consequently, here again, in this court's view, a serious breach of plaintiff's duty to make discovery with respect to the Fox-Chesarek letter has occurred and, under the principle stated in *S & E, supra,* plaintiff is responsible for it irrespective of whether any particular one or more of those acting for it in the premises is personally guilty of any wrongdoing.

Defendant has not expressly charged that plaintiff's lead counsel is personally guilty of wrongdoing in the premises, but the fact that defendant makes such charge is implicit from the juxtaposition of the allegations of defendant's Motion for Sanctions, as amended, *i. e.,* in substance, that such lead counsel said he had looked through the papers in the boxes but (after the time he claims to have done so) defendant found therein a number of FBI documents that plaintiff (in a pending motion signed by such lead counsel) had objected to ·producing; that such lead counsel said that he wanted to make a copy of it, but it was not necessary that he take it (*and* the file folder) to Washington for that purpose, etc.

Further evidence from which inferences could be drawn, as aforesaid, that it was established that it would be, and

would continue to be, the position of the Army that there would be "no change" in the Army's position (with respect to its claim that the burr and surface finish defects found in defendant-made shell, as aforesaid, were "critical" defects) is to be found in affidavit by Graham, dated March 28, 1975, and filed in this civil action on April 2, 1975 in response to discovery by defendant. This affidavit which is in "as of fact form" reads, in part here material:

An investigation and evaluation of the validity of reinspection of the [defendant-made] shells was made to insure equity of treatment of the contractor [the defendant]. Many of the inspections involve some degree of judgment by the inspector, and in those cases a validation was made by an inspector supervisor from . . . [APSA]. The product supplied by the contractor was found to contain unacceptable defects, including a number of critical defects. . . . *The company was not subjected to any inspection different from their contractual obligations.* [Emphasis supplied.]

Thereafter, on May 30, 1975, during the course of his deposition herein which was taken by defendant, Graham admitted (pp. 17, et seq.), in substance, that, although his said affidavit was made in "as of fact form", as aforesaid, he had not personally inspected any defendant-made shell and that the statement made by him in the last sentence of his affidavit that is quoted next above was "[b]ased on the information provided to me by my employees".

After defendant had learned of the existence of the Fox-Chesarek letter and DiGiovannantonio, Fairburn and Chandler had each testified, in substance, on their depositions (which were taken herein by defendant beginning on Jan-

uary 29, 1975, February 26, 1975 and February 28, 1975, respectively) that the shell which contained the characteristics that the re-served answer to Interrogatory 43 had denominated as "critical" defects were only "suspected" to be critical defects, plaintiff, on April 21, 1975, amended its re-served answers so that same, as amended, denominates such characteristics as "SUSPECTED CRITICAL DEFECTS".[97] As so amended, the re-served answer to Interrogatory 43 conformed, in the respects here material, to the government's April 29, 1971 Response. Why plaintiff could not earlier have made that same admission in this civil action has not been explained on this record by the persons who are acting for plaintiff in the premises. In this regard, defendant contends, in substance (*e. g.,* p. 282 of the Addendum), that "except when perpetrating a fraud", one acting for a buyer does not assert a claim of civil and criminal fraud against a supplier whom he knows has contracted to deliver shell free of *actual* critical defects on the basis of a contention that the supplier has delivered shell "having a surface condition" that he knows "appears [even to the buyer] to be" what, at *most,* are only "SUSPECTED CRITICAL DEFECTS".

The matters and transactions discussed hereinabove appertain to that aspect of plaintiff's charges, in substance, that, even if defendant made the inspections that defendant claims to have made, defendant is guilty of fraud and breach of contract.

It is significant to note before leaving that subject that *all* shell that are a subject of this civil action were accepted by plaintiff during the course of, or after, the activities whereby DCAS personnel literally taught defendant's inspection personnel what the Supply Con-

---

97. For example: at page 148 of his deposition, DiGiovannantonio testified:

Q . . . [S]o the only determination you made . . . was that the 491 or 500 shells you set aside were suspect?

A That is correct.

Q But you did not go further and determine that any of them in fact had a critical defect?

A No.

See also deposition of Fairburn, pp. 104 and 105; deposition of Chandler, pp. 80–85.

tracts were deemed by DCAS to require of defendant in the way of quality control; and further, as shown by the affidavits of McCain, Smith, Snider and Mayes, that defendant, to the extent that it made the inspections it claimed to have made, complied with such teaching. Consequently, plaintiff, acting by and through DCAS, was in no way misled about what inspections defendant claimed to have made. Plaintiff, acting by and through DCAS, knew exactly what inspections defendant claimed it had made when defendant submitted, and obtained payment for, invoices bearing certificates by DCAS officials to the effect that the shell so invoiced had been subjected to and had passed the inspections required by quality provisions of the Supply Contracts.

The court discusses next hereinbelow the other aspect of plaintiff's charges, in substance, that defendant is guilty of fraud and breach of contract because defendant did not make the inspections that defendant claims to have made.

In the present posture of this civil action, the latter aspect of plaintiff's charges only requires consideration by the court of the matters and transactions that are a subject of one or more of paragraphs 27, 28 and 29 of the amended complaint and of the four opposing affidavits (the "remaining charges") because, as stated above, it is required by FRCP 9(b) that fraud be alleged with particularity and, except for the matters and transactions that are a subject of one or more of said paragraphs and affidavits, all the rest of the charges (the "rest and residue charges") by plaintiff amount to no more than conclusory nonfactual assertions that defendant is guilty of breaching the 1967 and 1969 Supply Contracts and of violating the False Claims Act and that, by reason thereof, plaintiff ought to be awarded a judgment, for damages and penalties, which it claims exceed one million dollars. The content of the rest and residue charges by plaintiff is not good enough in a matter of such great importance. *Robison v.*

*Caster,* 356 F.2d 924 (7th Cir., 1966); *Dyer v. Eastern Trust and Banking Company,* 336 F.Supp. 890 (D.Me., 1971).

The matters and transactions that are a subject of plaintiff's undiscussed remaining charges, separately and collectively, pose questions for the court as to (a) whether plaintiff's allegations with respect thereto are sufficient to charge wrongdoing by some one or more of defendant's employees by means of which the inspection procedures defendant claims to have followed were fraudulently ignored, or evaded, and if so, (b) whether plaintiff, acting by and through the DCAS employees who took the actions whereby plaintiff accepted the shell in question, was deceived by such wrongdoing, and finally, if so, (c) whether defendant is liable in this civil action for such wrongdoing.

The government's (opposing) *Ellison* affidavit recounts several instances that in material respects are not unlike the one referred to hereinabove that led to Ellison's discharge on June 5, 1969 and to the FBI's investigation that began in June 1969. Each of the instances that Ellison recounts is deficient because he neither makes, nor states any facts by which, a distinction can be made (a) as to whether the inspections referred to in his affidavit are "acceptance" or "in-process" inspections and (b) as to whether the shell referred to in his affidavit are "non-conforming" or merely "defective". Moreover, no facts are stated in his affidavit which show that any shell to which reference is made in his affidavit was at any time accepted by the government.

If, *arguendo,* it be assumed that the deficiencies mentioned in the paragraph next above did not exist, the Ellison affidavit still does not comply with that part of FRCP 56(e) which requires that "opposing affidavits . . . set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." It is as-

serted in the Ellison affidavit that all transactions that are recounted therein were personally observed or participated in by Ellison during the time he was an inspection employee of defendant. However, his affidavit fixes the time that he was so employed as "somewhere between October and November, 1968 until either May or June, 1969".

In the absence of some special circumstances not shown by any evidence in this record, evidence respecting transactions observed by Ellison before his discharge on June 5, 1969 would not be relevant or material as to any issue in this civil action respecting the government's acceptance of shell under the 1969 Supply Contract because none of such shell were accepted before July 8, 1969. Likewise, such evidence by Ellison would not be relevant or material as to any issue involving acceptance of shell here complained of under the 1967 Supply Contract, the last of which were accepted on or before October 23, 1968, *unless* Ellison were employed on or before that date. Ellison's statement that he was first employed by defendant "somewhere between October or November, 1968" is not sufficient to "show affirmatively" that he was employed at any time on or before October 23, 1968.

The affiant in the government's (opposing) affidavit by *Marchant* states that he was one of the DCAS inspectors who was stationed at defendant's facility at the time of the said walkout (mid-July 1968) and that he continued to have such employment until "the latter part of October 1968". In his affidavit, Marchant states, in substance, that, on three separate described occasions, while he was engaged in performing his official duties of verifying that defendant was fulfilling the quality requirements of the 1967 Supply Contract, he saw named defendant's inspection personnel fail to make a particular required inspection—one on August 17, 1968, one

on August 22, 1968, and the other "sometime (exact date not recalled) after the walkout in July 1968 and before . . the end of October 1968". Thus the Marchant affidavit does not state facts which "affirmatively show" that evidence respecting those instances would be relevant and material with respect to any issue involving the acceptance of shell on or after August 27, 1968, the date that the first acceptance was made of any shell complained of herein. Because of the deficiency, the Marchant affidavit does not meet the requirements of FRCP 56(e) next above quoted. However, the court will discuss the said third instance hereinbelow because such discussion will be helpful to an understanding of other hereinafter discussed deficiencies in plaintiff's remaining charges.

The Marchant affidavit further states that Marchant reported the first two instances (one of which involved three, and the other one, of defendant's nonsupervisory inspection personnel) of specifically described improper inspection activity to QARIC Smith; that those first two instances were documented; and that one of those two, the one involving the three employees, was the subject of a request by Smith to Fuqua for corrective action.

The Marchant affidavit states that said third instance, the one which occurred "sometime after the walkout in July and before the end of October, 1968", happened at a time when Marchant, in the performance of his said duty, was verifying that defendant was fullfilling the contract quality requirements at the CD–3 inspection station where defendant was required to make the "after paint" acceptance inspections for the characteristics listed in paragraph 4.3.2.1, *supra*; that Bullard was making the "100% inspections" for the "critical" defect ("pool of paint" [98])

---

98. The only characteristic listed as "critical" in paragraph 4.3.3.3. *supra*, (which lists required after paint inspections, as aforesaid)

is "Critical Code 1 Pool of paint in cavity". Although all of the more than 2,000,000 defendant-made shell accepted by the government

that the Supply Contracts required defendant to make at that station; that Marchant left his post, went to a point on the outside of the building from whence he peeped through a window and saw Bullard "rolling shells down [the production line] without even looking at them to the point where these shells would be palletized and delivered to the Government"; and that, upon observing such activity, Marchant went back into the building, approached and said to Bullard, "That's not the way to inspect shells".

According to the Marchant affidavit, Bullard held a supervisory position in defendant's inspection department, but Marchant did "not recall [Bullard's] exact title at the time of the [said third] incident". In the Bullard affidavit, Bullard states, in substance, that he was one of defendant's inspection employees at the time of the walkout (when, as noted, hereinabove, *all* of defendant's supervisory personnel quit defendant's employ); that immediately thereafter, he was promoted and "put next in authority to . . . Lackey insofar as . . . [defendant's] quality control was concerned" and "continued to be so in charge until about August 20, 1968, when . . . Bishop was employed"; and, that thereafter, "so long as I was employed by . . . [defendant], I was an inspection foreman . . . responsible for some or all (at different times) of the company's inspection in the CD areas."

As noted hereinabove, because defendant was left with no supervisory inspection personnel after the walkout, QARIC and DCAS personnel, at the direction of McCain, taught defendant's remaining inspection personnel what was required of defendant in the way of quality control. According to the Smith and Lackey affidavits, these teaching activities were continuing at least as late as "about one week" before September 5, 1968. The statement that Marchant

have been required to be subjected to inspection at LAAP for "pool of paint" defects, no such defect has ever been found in any of

made to Bullard, as aforesaid, (*i. e.*, "That's not the way to inspect shells") seems to be more like the kind of statement that a member of the QARIC staff would have made to one that he was teaching, as a part of such teaching activities, rather than to one that he had caught red-handed attempting to perpetrate a fraud, but the court, for purposes of the pending motion, will draw no such inference.

After relating the said three instances, the Marchant affidavit then states:

Incidents such as the above happened on numerous occasions, many of which were documented and others worked out on the spot.

While stationed at the Sylacauga facility, I never did feel that the Contractor's inspectors were properly performing inspection. My feelings are based upon the above and the fact that on numerous occasions, I have pulled the same shell an inspector had passed after his examination and found it defective. This happened when inspectors were screening every shell as well as during normal (frequency) inspection.

Assuming *arguendo* that there could be a contract that (as plaintiff contends by its said evidence in the Marchant affidavit) would require an inquiry into the state of the feelings of some one or more government inspectors during any interim when they made an inspection on the basis of which a party thereto refused to accept a shell or claimed that a contract violation had occurred, presumably it would be proper to follow established principles whereby ambiguities in contracts are resolved by law. One of such principles is stated in *Gresham Company, Inc. v. United States*, 470 F.2d 542, 200 Ct.Cl. 97 (1972), as follows:

We have held that in resolving an ambiguity in a contract, it is reasonable to look at the conduct of the parties. [citation omitted]. It is a proper tech-

such shell. LeJeune deposition, p. 99; plaintiff's reserved answer to Interrogatory 43.

nique of contract interpretation to give the language the meaning that would be derived by a reasonably intelligent person standing in the parties' shoes and acquainted with the circumstances. [citation omitted]. This is equally true whether [the government] has originally written an ambiguity into a contract, or has administered an initially unambiguous contract in such a way as to [create an ambiguity].

When resort is made to the evidence as to the conduct of the parties, it appears that, when interpreted in the manner that defendant *and* DCAS contend that it should be interpreted, the PD at least provided a basis for a workable standard. That is established by the fact that more than 2,000,000 shell passed by defendant's inspectors were also accepted by the DCAS inspectors. Having on literally thousands of occasions prior to the summer of 1968 had the experience of seeing in shell cavities the result of forging tips being worn out and replaced, defendant and DCAS, by practical interpretation, by that time had reached such an understanding of the PD that there rarely was an occasion when, with respect to any unit, there was any question in the mind of defendant or in the mind of the government (which formed its judgment by visual observations made through the eyes of the QARIC and his staff) as to what was required in the way of cavity smoothness (*e. g.*, as to when a forging tip should be replaced). The only problems in this regard, insofar as disclosed by this record, came about (a) when, in the fall of 1968, as shown by the Smith affidavit and the Cunningham report, the government requirements respecting cavity smoothness were tightened and (b) when, in the summer of 1969, such requirements were again further tightened by DCAS pursuant to the directions and authority of said July 2, 1969, letter from Sternberg, as PCO. In the former case, memo (Exhibit 129 in the Addendum) written by Smith on October 9, 1969, shortly after Free's September 26, 1968 visit to the facility

in connection with said APSA investigation states (p. 2):

I [Smith] have been for the past three or four days selecting some samples at inspection station #3 that can be used as standards and I believe if that [sic] you [Fuqua] and I work together in selecting these standards that our inspectors will know, *as near as we can tell them,* what is acceptable and what is rejectable. [Emphasis supplied.]

The problem generated by the 1968 tightened cavity smoothness requirement is a subject of the minutes (Exhibit 20 in the Addendum) of a meeting held to consider, *inter alia,* defendant's request to APSA for relief from the tightened cavity requirement and for a downward adjustment in the contract delivery schedule (by reason of the problem just mentioned as well as that mentioned hereinabove that arose from said change to "static lot" acceptance inspection that came about at that same time). The said minutes state, insofar as here pertinent (p. 2):

From 1 through 18 October the contractor had shipped 35,700 shells against a contract delivery requirement of 110,000 per month.

The contractor pointed out that approximately 50% of the production is being rejected or delayed in processing *by the Contractor inspection [personnel] due to doubt or uncertainty that Government Quality Assurance would accept the final product.*

As noted in the Smith affidavit (p. 5), "[W]e [DCAS] did not relax our tightened cavity standards"; and, as shown by the said minutes, instead of granting the request for a relaxation of the delivery schedule (p. 2):

Mr. Sam Sternberg, PCO from APSA . . . emphasized to all present that this schedule of 110,000 per month must be met.

Thereafter, by the process of seeing many other forging tips being worn out

and replaced, DCAS and defendant, by means of mutual experience in their practical application of the tightened criteria, reached another understanding as to what the government required in the way of cavity smoothness. When that was done, defendant's operations got back on an even keel and, as shown hereinabove, operated smoothly until, acting pursuant to the authority granted in the Sternberg letter of July 2, 1969, DCAS, on or shortly before July 14, 1969, as stated in the McCain letter [Exhibit 105 in the Addendum], "reinstructed all [QAR] inspectors" so that, thereafter, irrespective of what was called for by the PD, the DCAS inspectors, as the Sternberg letter directed, and according to DCAS's understanding of what LAAP desired, would not accept defendant-made shell at Sylacauga which they (the DCAS inspectors) believed would "be found unserviceable upon inspection" by Sperry Rand at LAAP. It was during the period immediately after DCAS was in effect directed to see to it that defendant-made shell had the degree of cavity smoothness that LAAP wanted, that DCAS, on the basis of its own one hundred percent inspections, accepted substantially all of the shell containing visually determinable defects delivered under the 1969 Supply Contract about which complaint is here made; and, as noted above, insofar as cavity characteristics were concerned, most shell accepted after that direction was given, were accepted, insofar as is disclosed by this record, solely on the basis of DCAS's own "one hundred percent" cavity inspections which, in effect, amounted to a sorting process whereby all shell tendered for delivery, even though manufactured and properly passed on all required inspections made pursuant to the PD, were sorted into two classes (*i. e.,* one in which the cavity had the degree of cavity smoothness that DCAS personnel believed would meet LAAP's requirement for lack of cavity "roughness" and one that was returned to defendant with directions to grind the cavity of the shell

to a degree of smoothness that DCAS believed necessary to meet such LAAP requirement).

The Marchant affidavit does not state whether the shell (the subject of the part of his affidavit last quoted above) which Marchant found to be "defective" after such shell had passed [actual] inspection by defendant's inspectors were defective because of defect characteristics that were determinable visually (as is the case with the "metal defective", "burr" and "surface finish improper" characteristics that are classified by paragraphs 4.3.2.1, 4.3.2.2 and 4.3.2.3, *supra*) or by measurements made by gauges. With reference to visually determinable characteristics, memo (Exhibit 103 in the Addendum) by Hinzman, dated July 6, 1970, reads, in part (p. 1):

. . . [T]he acceptance or rejection of a cavity is . . . left to the sole judgment of the individual inspector and how he personally compares what he sees with the standards. There will always be arguments and differences of opinion regarding visual inspections due to this human factor.

When on his deposition Hinzman was asked to elaborate on that statement, he responded, in substance, (p. 154 of April 28, 1975 deposition) that what he meant thereby is that it is "very possible" that any contractor, by signing a contract with the PD as a part of its tech data package agrees, in effect, he will subject himself to the whims of any government inspector who happens to inspect shell made pursuant to such contract; that, while he (Hinzman) would "hope" all government inspectors, as well as all contractor inspectors, would exercise "an intelligent judgment", the human element being what it is, "we know" that some days inspectors get up feeling bad with the consequence that the same shell that looked good to them on the previous day when they were feeling good will look defective because they feel bad.

When the part of the Marchant affidavit (last quoted above) is considered in the light of Hinzman's said memo and testimony, it appears that, by offering that part of the Marchant affidavit as a part of plaintiff's evidence in opposition, plaintiff claims that, even if defendant faithfully performed the inspections that it claims to have performed, defendant is still guilty of fraud because its inspectors did not exercise enough, or of the proper kind, of what Hinzman termed "intelligent judgment". If it be true, as plaintiff claims, that the terms of the Supply Contracts are such that, in final analysis, one must look to the state of the health or "feeling" of one or more inspectors in order to determine whether a breach of such contracts has occurred, such claim by plaintiff first poses for the court a question of what is the legal meaning and effect of such contract documents. Moreover, such claim also poses for the court an additional question, namely, if plaintiff is correct that defendant did not abide by the true meaning of such a contract, whether what plaintiff contends the true meaning of the contract to be may be so equivocal and ambiguous that, under all the circumstances presented at this stage, or at any later stage of these proceedings, defendant could be held to have committed a breach of contract, much less fraud for violating it.

■ Stated differently, the facts necessary to be alleged to maintain a right of action for fraudulent violation of a contract must be fuller and more profound if the contractual provisions relied upon (to state the standard of conduct relied upon) are equivocal or open to conflicting interpretations. In that respect, the court observes that (a) the first suggestion that defendant was misinterpreting a key aspect of the PD was made to plaintiff by a third party (Sperry Rand) as a consequence of a Sperry Rand load line problem that is unrelated to these particular Supply Contracts; (b) the defendant's conduct that is complained of by the government in this respect was obviously considered by the government's DCAS personnel (of which Marchant was one) on the scene, who were (and were charged with the duty of) monitoring defendant's quality control activities as well. as making the government's decision as to its rejections and acceptances of the shell, as being or not being in compliance with the contracts; and (c) the shell have been "accepted" by those same DCAS employees on behalf of the government, knowing all of the circumstances about the defendant's inspection processes (including whatever it was about those processes that caused Marchant to "feel" the way he did).

■ If Marchant "never did feel that the Contractor's inspectors were properly performing inspection", the time for him to have made his feelings known was back in 1968 when DCAS, presumably in partial reliance on such communication as he did in fact make, accepted the shell in question. The court does not hold that Marchant's failure (if he did fail) to make his feelings known in this regard is an "estoppel" against the government; but this court does hold, simply by applying the rules and law of acceptance, that, because the shell were "accepted", all issues, including any issues as to the state of any inspector's feelings, are merged in, and terminated by, an acceptance, as here, where the persons on behalf of the government issuing the "acceptances" were fully apprised of the facts; and further holds, that absent latent defects (of which none are claimed), fraud, or such gross mistakes as amount to fraud, that the government is bound by the said DCAS acceptances.[99]

---

99. In its answer made July 10, 1974, as supplemented July 19, 1974, to Interrogatory 44, plaintiff admits that theretofore plaintiff had neither taken any action to revoke its acceptance of any of the said "18,000 defective shell" nor made any demand or request that defendant repair or replace any of such shell on the ground that its acceptance thereof

With reference to the documentation apparently referred to by Marchant, the Smith affidavit states, in part, here pertinent (pp. 8–9):

> While I was QARIC at said facility, it was a duty of the members of my staff to report to me any irregularities that came to their attention and my duty, in turn, to report to my superiors in DCAS–B'ham all such matters of any significance. It is my judgment that we performed our respective duties in this regard. In the event it came to my attention that any condition or activity threatened the integrity of the inspection process, it was my duty as QARIC to make a written demand (a "Method C" report) to the top company management at the facility for corrective action and to send a copy of that demand to my superiors at DCAS–B'ham. In the case of matters of lesser import, such as, for example, the failure of a non-supervisory company employee to do his job for such reasons as failing to follow instructions, inattention to duty, carelessness, monotony-fatigue, etc., the one of us who observed the condition would report it immediately to Southern's lower level supervision and, at the end of the day, I would generally write a memo (a "QDR report") to the company Quality Controller confirming the fact that the condition had been noted. The Quality Controller was required to write me a memo acknowledging the fact that he had received the QDR report and advising me what had been done in the way of corrective action (such as, for example, transferring the employee to other work, reprimand, further training, etc.). If I did not promptly receive such a response or was not satisfied with the corrective action taken, it was my duty to make a Method C report of the situation to the top plant management and to my superiors at DCAS–B'ham. During the interim between 24 Aug 1968 and the time I was replaced as QARIC, no Method C demand was issued because, in my judgment, nothing occurred that required such action.

Although it is stated in the Marchant affidavit that Bullard rolled the shell in question to the point where "shells *would* be delivered to the government", the affidavit is deficient in that it does not state that *any* shell that are a subject thereof, including any of those involved in the Bullard incident, were ever accepted by the government. But the situation would have been no different if they had been. Having, and being chargeable with the knowledge that Marchant obtained by peeping through the window, absent collusion on the part of Marchant (which is not even suggest-

had been procured through fraud or such gross mistakes as amount to fraud. The one and only shell shown by this record (a) to have been accepted by the government *and* (b) to have contained a defect that was not detected on a required actual inspection is the one shell with the pipe characteristic which defendant concedes (see note 74 *supra*) to have contained a critical defect. Plaintiff certainly had actual knowledge that such shell contained that characteristic when, in August 1969, it was carried to Sylacauga by Fairburn.

So far as is disclosed by this record (see pp. 105 to 108 of the Addendum), on only one occasion has plaintiff made a demand that defendant repair or replace any shell that the government had theretofore accepted. On that occasion, as shown by the July 19, 1969, letter (Exhibit 105 in the Addendum) of McCain to APSA, defendant acted promptly to comply with such request by plaintiff even though (a) it is not disputed that the QARIC, with *actual* knowledge of the presence in the shell of the characteristic that occasioned the demand, expressly authorized the acceptance of the shell in question with respect to which the demand was made, and (b) according to contention of defendant (stated in said cited pages of the Addendum), facts (unknown to defendant at the time defendant complied with that demand) show that shell containing such characteristic with respect to which the demand was made were in full compliance with the particular requirement of the PD which the government then claimed had not been met. An amendment to the 1969 Supply Contract was made on July 30, 1969, whereby the government accepted defendant's offer of $5,000 to cover the cost incident to the "repair" of the shell which were the subject of that one government demand.

ed on this record), plaintiff could not, in this regard, successfully contend that its acceptance of the shell, or its payment of any invoice rendered therefor, was made in reliance on any representation that the shell conformed to contract. *United States ex rel. Weinstein v. Bressler,* 60 F.Supp. 676 (S.D.N.Y. 1945), *aff'd,* 160 F.2d 403 (2d Cir. 1947); *United States v. Robbins,* 207 F. Supp. 799 (D.Kan.1962); *United States v. Goldberg,* 158 F.Supp. 544 (E.D.Pa. 1958).

■ In view of the fact that the Marchant affidavit is not sufficient with respect to the three instances that are there particularly described, it is obvious that plaintiff's situation on this motion would not be strengthened had Marchant described with particularity the occurrences to which he refers in that part of his affidavit reading: "Incidents such as the above happened on numerous occasions, many of which are documented and others worked out on the spot."

Several specifically described incidents are related in the (opposing) *Williams'* affidavit. These are summarized and discussed next hereinbelow.

 (a) In *1967* I was working as an inspector. On numerous occasions I received instructions from Odell Sherrill, who was Chief Inspector at that time, ordering me to send "defective" shells through the production line. I would do this . . . [Emphasis supplied.]

Sherrill is named in the Lackey affidavit as one of the thirty-seven of defendant's fifty-two employees that walked out in mid-July 1968. He was not again employed by defendant. Williams is described in the Smith affidavit as a "very close personal friend of Phiffer". The first delivery of any of the shell complained of in this civil action was made on August 27, 1968. How Williams' putting shell on the production line in *1967,* pursuant to an order given by Sherrill, could have resulted in the delivery to plaintiff of shell on or after August 27, 1968 is nowhere stated or explained. With regard to this incident, the Williams affidavit does not meet the said requirement of Rule 56 (e) *supra.*

The subject accusation by Williams (which in this respect is not unlike several of the other accusations in the opposing affidavits hereinafter discussed) is further illustrative of a fundamental weakness in plaintiff's case. Assuming *arguendo* that the transaction that Williams described happened and that it was willful and wrong and would constitute a basis for fraud, plaintiff's *failure to trace the shell in question to acceptance* by DCAS leaves the subject one of speculation in a vital particular. *United States v. United States Cartridge Co.,* 95 F.Supp. 384 (E.D.Mo.1950); *aff'd,* 198 F.2d 456 (8th Cir. 1952), *cert. denied,* 345 U.S. 910, 73 S.Ct. 645, 97 L.Ed. 1345.

 (b) [While] I was a production foreman, [d]uring the latter part of 1968 and early part of 1969, my supervisor, V. O. Abrams directed me to take rejected defective shells . . . from the area used for correcting defective shells. I *believe* that these defective shells had not been corrected. James Earl Robinson, foreman over inspection line would agree to let these defective shells pass by his inspectors for shipment to the Government. These shells would *sometimes* be run when the Government inspectors were away from their posts and unable to catch defective shells being sent through the line *at that point.* [Emphasis supplied.]

It appears on the face of the Williams affidavit that the affiant substituted the words that are emphasized next above [*i. e.,* "believe" and "sometimes", respectively] which appear in the affidavit he signed for the words "know" and "always" in the proposed affidavit that was typed for his signature. The emphasized words "at that point" were added in longhand. If it be assumed, as

it must for the purposes of the pending motion, that the facts stated in the affidavit are true, such facts are *not* sufficient to show any wrongdoing by defendant.

Apart from the fact that the affidavit in this instance is deficient by reason of its failure to observe the distinction discussed hereinabove between "defective" and "nonconforming" shell, the *facts* stated respecting this incident are not even sufficient to charge that the shell that are a subject thereof were "defective". The affiant's statement that he "believe[d]" the shell had not been corrected without a statement of the facts on which such belief is based is not sufficient. Further, the affidavit nowhere states that the shell that are a subject thereof were tendered to or were accepted by the government at any time.

From a comparison of the respective content thereof, it is obvious that the last quoted part of the Williams affidavit, *as proposed,* was designed either to supply deficiencies comparable to those mentioned next above which also appear in the averments of paragraph 29 of the amended complaint or to meet the burden imposed on plaintiff by FRCP 56(e) that plaintiff come forward with relevant and material evidence to support, *inter alia,* such averments, which read:

29. Bobby Ray Roland, a forklift operator for defendant, on instructions from V. O. Abrams, Charles Robinson, and Michael Williams, defendant's production foreman, hauled shells having wall variation defects from defendant's warehouse to the inspection area along the production line, depositing the shells near the bonderizer, at times when plaintiff's quality assurance representatives were not present to observe the return of these defective shells to the inspection area, and these defective shells were thereafter returned to the production line for the purpose of delivery to plaintiff.

If the last quoted part of the Williams affidavit *as proposed* was designed to accomplish either of such purposes, the Williams affidavit, *as signed,* for the reasons above stated, does not do the job it was designed to do.

The next part of the Williams affidavit states:

(c) During the early part of 1969 . . . pallets of uncorrected defective shells . . . were . . . ~~shipped to the Government.~~

The words "shipped to the Government" which appear in this part of the proposed affidavit as typed were stricken from the affidavit *as signed.* Further discussion of this part of the affidavit is unnecessary.

(d) During this same period of time [early 1969] . . . it was common practice to load the bonderizer with defective uncorrected shells from the dry pack area [shell repair area] when the Government Inspectors were gone to lunch or before they arrived at work. By doing this we were able to get these shells through the line while the Government inspectors were not on duty.

Neither party to this action will dispute the fact that the use made by defendant of the bonderizer was a subject of evidence at the criminal trial or that such use and evidence has been a subject of much colloquy of the court with counsel. From such colloquy, it appears that, after forging, the outside diameter of shell are machined with turning lathes which leave them with a gleaming metal finish that, unless protected, will begin to tarnish and rust, depending on the humidity, within a matter of hours or, at most, a matter of a very few days; and that, any unbonderized shell that is set off the production line for repairs which cannot be promptly made must be bonderized to prevent such rust while it awaits such repair; that shell were put into this very large furnace-type machine where they were heated, cleaned and sprayed with a rust preventative;

that the capacity of the bonderizer was such that it was a "bottleneck" on the production line; and that its use during lunch and between shifts to bonderize shell awaiting repair or being held for waiver was commonly done to alleviate said bottleneck. Entirely disregarding the fact of such use, the affidavit is not sufficient to charge defendant with wrongdoing. In the first place, it does not state facts sufficient to show that any of the shell that are a subject thereof were accepted by the government. In this connection, the Mayes affidavit states:

> Under the procedures at all times in effect, a Government inspector was required before leaving his station unattended to take note of the last shell he had approved before he left his station and, upon returning, to pull a specified number of samples from the shell that had passed his station during his absence and, if the quality of such shell did not measure up to what it should have been, to require all shell passed during his absence to be returned to the line and be screened. In a QARIC investigation in which I participated, we were unable to find any credible evidence that any member of the QARIC's staff had, in fact, left any station unattended for an appreciable amount of time while regular production shell were being run, or had at any time violated the procedures above mentioned.

In the second place, plaintiff has again failed to take account of the distinction between defective and nonconforming shell. As is hereinabove shown, defendant was authorized to return some "uncorrected defective shell" to the production line for delivery to the government, *i. e.,* as shown above, shell which had properly passed sampling inspection for a particular defect (the first defect) could be set off the line because another defect (the "second defect") was found in a subsequent inspection thereof and, insofar as the first defect was concerned, the shell could be returned to the production line and be delivered to the government as "conforming" material.

In the final paragraph of his affidavit, Williams states that, in July 1969, he gave the FBI a statement wherein he had stated that he "had never been engaged in activity in which rejected shells were shipped to the Government." So far as is shown by the Williams affidavit, he has still not done so.

In paragraph 27, *supra,* of the amended complaint plaintiff charges, in substance, that James McVey, a corrector machine operator, on instructions of Nobel Kermit Little and Isaac Thrash, production foremen for defendant, "feigned operation of a corrector machine to give the appearance [contrary to fact] that he was repairing the shells of their defects"; that he thereafter washed the defect markings off the unrepaired shell without plaintiff's knowledge or approval; and that thereafter, with the intent to defraud plaintiff, such unrepaired "defective" shell were "returned to the production line for the purpose of delivery to plaintiff."

With respect to that charge, insofar as here pertinent, Little stated in his affidavit, in substance, that he was first employed by defendant in the summer of 1968 shortly after the walkout; that just after he was employed, Lackey explained to him defendant's said policy respecting quality, and (p. 2):

> Mr. Lackey then also informed me that to implement that policy, Southern had adopted procedures as follows:

> 1. That, except when directed to do so by some personnel having supervisory authority, production workers were forbidden:

> (a) to remove any defect markings from, or to move, any shell that had been set off of the production line by inspection personnel; or

> (b) to return to the production line any shell that had been set off the production line other than shell on which "on the spot" repairs had been made of a defect discovered before CD–1, and then, such shell could only be returned to the identical point in the

line before CD–1 where such defect was discovered.

2. That except when directed to do so by some inspection supervisory personnel, production supervisory personnel were forbidden to do, or to order any personnel to do, any of the acts described in (1) next above.

\* \* \* \* \* \*

Mr. Lackey then also informed me that I would be expected not only to comply with the said policy and procedures but also to help enforce them. Thereafter, I not only complied with said policy and procedures, but also devoted much time and effort to seeing to it that those under my supervision also complied therewith. The said policy and procedures were so often repeated and knowledge appertaining to them was so widely disseminated, both verbally and by bulletin board notices, that it is my judgment that if any nonconforming shell were delivered to the Government while I was so employed, that such delivery was inadvertent or was done by person(s) who knew that such activity was in violation of the company's said policy.

I know James McVey who operated a corrector machine during a part of the time I was employed as aforesaid. For a part of the time that I was so employed, McVey was under the supervision of Isaac Thrash, who then was one of the production foremen under my supervision. I know of my own knowledge that each of McVey and Thrash knew all that he needed to know about the said policy and procedures to do his job in accordance therewith.

I have read the averments of paragraph 27 of the Government's First Amended Complaint. I deny that any instructions that McVey use his corrector in such a way as to feign the correction of a shell were given by me, directly or indirectly, and nothing has ever come to my attention that causes me to believe or to suspect that Isaac Thrash (who is now deceased) gave any such instructions.

When requested to do so by inspection supervisory personnel, I have, on several occasions, directed that production personnel erase defect markings from shell. I have not on any occasion given such direction with respect to any shell other than those that were the subject of such a request to me by inspection supervisory personnel. Under the procedures that were in effect throughout the time I was employed at said facility, as aforesaid, Southern [defendant] was authorized to erase defect markings if the shell from which markings were erased were put in a pallet or in a designated area that was marked to indicate that it contained shell that had been set off the line for the defect concerned. . . . No credible evidence has ever come to my attention that has caused me to believe or to suspect that these procedures were violated or that any Southern supervisory personnel ever knowingly directed, permitted, or condoned the delivery to the Government of any nonconforming shell.

Paragraph 28 of the amended complaint reads (in its entirety):

28. Eural E. Muzzell, a truck driver for defendant, hauled defective shells in his truck, on an average of two trips per week, from defendant's warehouse, where defective shells were stored, to the inspection area along the production line near CD–3, on the instructions of V. O. Abrams and Odie Walker.

With reference to that paragraph, the Lackey affidavit reads (p. 9):

I have also read the averments of paragraph 28 of the amended complaint. If they are true, it is my judgment these averments do not charge any wrongful activity at all. Shell previously rejected were frequently moved from the warehouse to the plant for proper purposes such as reinspection, repair, bonderizing to prevent rust, or, in the case of waiver, to be delivered to the Government.

It is without dispute that the government from time to time accepted on

"waiver" shell that except for the waiver, would have been nonconforming shell. For example, said Cunningham report respecting the visit of the APSA and FA investigators to defendant's facility in November 1968, reads, in part (pp. 4–5):

> The contractor is currently encountering a problem with wall variation. . . . The visitors agreed to accept shell on wall variation up to .115 (.025 over maximum) for a length of time to be agreed upon at a later date. . . . It was emphasized that wall variations up to .115 must be attributable to this bump to qualify for acceptance on this waiver.

It is without dispute that, at the time that report was made, many (perhaps 10,000 to 15,000) thousands of shell containing wall variation defects had been accumulated and were being stored in a warehouse with the expectation that such a waiver would be granted; or that, in late 1968 or early 1969, such shell were returned to the production line so that an inspection could be made of them to see if they would meet the condition stated in the last sentence quoted above; or that, all such shell as were found on such inspection to meet such condition were moved down the production line for delivery to and, in fact, were delivered to and were accepted by, the government.

Had the Lackey and Little affidavits admitted that each fact averred in paragraphs 27 and 28, *supra* was true, the averments of those paragraphs would be, as this court holds that they are, deficient in a vital particular, *i. e.,* they do not state that any shell that are a subject thereof were accepted by the government.

In his (opposing) affidavit, *Buckner,* who describes himself as a "part time" employee of defendant, also fails to take account of said distinction between "defective" and "non-conforming shell". Perhaps he did not know there was one. Buckner states, in substance, that he was once transferred to a "less desirable harder job" for "[continuing] to reject shell conscientiously"; but he still "re-fused to go along with the [otherwise unspecified] general activity of wrongdoing in the plant"; that he was later "again" transferred to a "dirtier, harder and even less desirable" job because of his "continued insistence to reject defective shells"—that he would reject a shell and thereafter would notice it coming back down the line "with no noticeable correction"; that he would "reject it again"; that, because he was doing this so often, his supervisors would come down to his work station, would reinspect shell he had rejected and "override" his "judgment"; but that he "continued to reject defective shells as he found them regardless of the actions" of his superiors. No facts are stated in the Buckner affidavit on which this court could make a determination that it was not entirely proper for Buckner's judgment to be overridden. For aught appearing, it may be that (paraphrasing Hinzman's said testimony) Buckner felt bad all the time.

The Buckner affidavit also does not take account of the distinction between process and acceptance inspections. None of the shell that are a subject of the Buckner affidavit are shown thereby to have been accepted by the government at any time. At some unstated time between 1967 and the fall of 1969, while Buckner was "working in the paint room", he states:

> [I]t was a common procedure that whenever the Government Inspector would leave his post for a break [his supervisors] would start placing defective shell which had been rejected . . . back in the production line without the defects being corrected. These defective shell were then rolled from employee to employee without further inspection to the end of the finish line for shipment to the Government. Whenever this was being done a close watch was maintained for Government Inspectors, and upon sighting the return of the inspector, various employees on the line would shout "ho" in a loud voice to alert the

other employees as to the return of the inspector.

█ It is not disputed that it was a common practice for the production line to be used as a conveyor system (*e. g.*, when the accumulation of rejected shell at some point along the line was such that it was necessary to move them in order to have work room) or that that was generally done when the government inspectors took a break which they sometimes did just in order that the production line could be so used. Pursuant to this common practice, shell that had been set off in the paint room area were moved or rolled along to the end of the production line from whence they would be taken to repair stations, etc. Except for his conclusory statement that the shells were rolled to the end of the line "for shipment to the government", the facts that he states would be entirely consistent with the practice just described. Entirely disregarding the fact that the production line was also used as a conveyor system, Buckner's affidavit is deficient in that no *facts* are stated therein showing that any shell that are a subject of his affidavit were accepted by the government. Fraud is not to be presumed. In a False Claims Act action, it is essential that the evidence be clear, unequivocal and convincing. *United States v. Ueber*, 299 F.2d 310 (6th Cir. 1962).

As is shown, plaintiff's charges in said paragraphs and affidavits may be generally summarized as claims that, despite their positive and unequivocal statements under oath that such was not the case, plaintiff's DCAS employees were in fact deceived by defendant, *e. g.*, that wrongdoing for which defendant is responsible occurred, *i. e.*, as charged in paragraph 27 of the amended complaint, when such DCAS employees "were not present at the inspection stations" or "were not observing defendant's inspection personnel". In this connection, plaintiff argues that, despite the extensive statement in the affidavits of the facts on which such beliefs are founded, that the DCAS and QARIC officials can-

not know as of fact that they or their staffs were not deceived and that, therefore, the denials in the McCain, Smith, Snider and Mayes affidavits amount to nothing more than conclusions. Under the circumstances of the case, the court disagrees.

Of course, the court is mindful of the fact that one can be deceived and not know it. If it were otherwise, few, if any, frauds could ever be perpetrated. Properly construed, the affidavits of the DCAS employees do not constitute a denial by them that a particular transaction or event occurred while they or their staff were taking "a break", etc., but a positive assertion by them that they do know what shell they did accept and also know that, assuming *arguendo* that any such transaction as that described by Buckner, etc., did occur, they were not deceived thereby into accepting any nonconforming shell.

For example, in paragraph 21 of the amended complaint, plaintiff charges:

In order to carry out the fraudulent acts and omissions above described without the knowledge or approval of plaintiff, defendant instituted a warning system, pursuant to which defendant's inspectors, and other employees . . . received signals . . . that plaintiff's quality assurance representatives were returning . . . and upon receiving the signal, defendant's inspectors [ceased the claimed wrongdoing they had been doing during the interim that plaintiff's inspectors had not been present or had not been looking] and resumed proper inspection procedure.

In their respective affidavits, the DCAS officials don't deny that such signals were given and received or even that no inspections were improperly made during their absence. What they do deny, on the basis of their own personal knowledge, is that, assuming *arguendo* that such signals were given and received and that improper inspection activities did occur in their absence, they were thereby deceived or caused to, and did, accept any nonconforming shell. For example,

the respective affidavits of Mayes and Snider after reciting, that the affiant had read the allegations of paragraph 21, *supra,* state:

*The Mayes Affidavit* (p. 5)

[A] warning system of the type described in said paragraph could not have resulted in any benefit to the contractor or any injury to the Government. Under the procedures at all times in effect, a Government inspector was required, before leaving his station unattended to take note of the last shell he had approved before he left his station and, upon returning, to pull [and inspect] a specified number of samples that had passed his station during his absence and, if the quality of such shell did not measure up to what it should have been, to require all shell passed during his absence to be returned to the production line and be screened. In a QARIC investigation in which I participated we were unable to find any credible evidence that any member of the QARIC's staff had, in fact, left any station unattended for an appreciable amount of time while regular production shell were being run, or had at any time violated the procedures above mentioned.

*The Snider Affidavit* (p. 4)

In my judgment those averments are false. At any rate, I know that no shell were delivered to the Government by the use of such a system while I was QARIC. . . . I saw to it that they [the procedures described by Mayes] were followed during the time I was QARIC.

In other words, shell that passed a DCAS inspector's station during his absence were subjected to exactly the same verification inspection to which they would have been inspected had he been present. Even when government inspectors were present they could not tell whether an inspector who went through the motions of making a visual inspection on the basis of which he passed a shell containing a characteristic (that the government inspector later found and believed to be a defect) had not been seen by the company inspector or whether the company inspector had not exercised "an intelligent judgment". Insofar as DCAS was concerned, "the proof" on which it relied to make its acceptances "was in the pudding," *i. e.,* the "verification" inspections made by its own inspectors.

Although the False Claims Act is civil in nature, in order to establish even civil liability there must be proof of criminal intent. The False Claims Act is thus a *malum in se* statute rather than a *malum prohibitum* statute. Therefore, in order to find the defendant corporation guilty in this case there must be evidence of criminal intent on the part of at least one individual whose position with the corporation is such that his intent may properly be imputed to the corporation. The actions of a corporate officer, within the scope of his authority, are obviously imputable to the corporation, but plaintiff has presented no evidence that any of defendant's officers were involved in the alleged fraud. Whether the intent of someone of lesser rank than a corporate officer may be imputed to the corporation has been the subject of much discussion. The great weight of authority is that where someone less than an officer is involved corporate criminal liability is imposed *only* where the criminal employee has a position of substantial responsibility and broad authority. Stated otherwise, criminal liability is not imposed on a corporation where the criminal employee is a lower-level functionary.

Thus, in *Continental Baking Company v. United States,* 281 F.2d 137 (6th Cir. 1960), where the criminal acts of the general manager of the plant were imputed to the corporation, the court observed (p. 149):

However, when the decisions are viewed as an entirety, a common denominator appears.

There is an officer or agent of a corporation with broad express authority, generally holding a position of

some responsibility, who performs a criminal act related to the corporate principal's business. Under such circumstances, the courts have held that so long as the criminal act is directly related to the performance of the duties which the officer or agent has the broad authority to perform, the corporate principal is liable for the criminal act also, and must be deemed to have "authorized" the criminal act.

Any number of courts have followed this rule, without expressly saying that they were doing so, by emphasizing the responsible positions held by the individuals whose intent was imputed to the corporation. In *Imperial Meat Company v. United States,* 316 F.2d 435 (10th Cir. 1964), the court noted that although there were some 15 rank-and-file employees who actually performed the labor involved in executing the fraudulent scheme, their involvement was immaterial, since the president and the plant superintendent ". . . were the only two persons concerned whose intent could make the corporation liable . . ." *Id.* at 440.

Similarly, in *Carrier Corporation v. United States,* 328 F.2d 328, 164 Ct.Cl. 666 (1964), the court noted that there were workmen involved who performed the manual labor, but stressed that the plant manager devised and executed the fraudulent scheme. See also *United States v. Bornstein,* 361 F.Supp. 869 (D. N.J.1973), (part owner and general manager; part owner, vice-president and sales manager); *United States v. American Precision Products Corporation,* 115 F.Supp. 823 (D.N.J.1953), ("President and guiding spirit"); *Wagner Iron Works v. United States,* 174 F.Supp. 956, 146 Ct.Cl. 334 (1959), (president and vice-president who together owned 99.5% of the corporation's stock and who ". . . were, in fact, the corporation and, therefore, their fraud is the corporation's fraud." *Id.* at 958). *Cf. Holland Furnace Co. v. United States,* 158 F.2d 2 (6th Cir. 1946), where the corporation was held not liable for the

criminal act of a salesman where no one ". . . as high in authority as branch manager [was] a partner in the crime." *Id.* at 8.

If any further authority were needed to permit the court to hold that a corporation can be held liable under a criminal-intent type of statute only for the actions of higher level employees that authority is supplied in *United States v. Acme Process Equipment Company,* 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966), which involved the Anti-Kickback Act, 41 U.S.C. §§ 51–54.

In *Acme* the government cancelled a contract because three of the contractor's employees had accepted kickbacks for awarding subcontracts. The corporation brought suit for wrongful cancellation in the Court of Claims which held for the contractor on the ground, *inter alia,* that the corporation could not be liable since none of the corporate *officers* had known of the kickbacks. On certiorari, the Supreme Court reversed, saying, on this point:

> The Court of Claims, in holding that the Act does not authorize government cancellation because of kickbacks, relied heavily on its finding that none of the officers of Acme were aware of the kickbacks. But as previously stated those of Acme's employees and agents who did know were in the upper echelon of its managers. One of the guilty employees was the general manager of one of the company's chief plants and the son of Acme's president, and the other two kickback receivers were in charge of operations, sales, and government contracts. They were the kind of company personnel for whose conduct a corporation is generally held responsible. (*Id.* at 147, 87 S.Ct. at ·356)

As noted hereinabove, plaintiff was obligated to traverse the material allegations of defendant's supporting affidavits. The court assumes that plaintiff has fulfilled its obligations and has come forward in the opposing affidavits with the strongest evidence available to it.

On the point under discussion, plaintiff's remaining charges are that a few lower-echelon employees were involved in an alleged fraudulent scheme and, in the furtherance of such scheme, engaged in irregular inspection or other activity in a relatively few isolated instances.[100] The court, applying the "upper echelon" of management rule approved in *Acme, supra,* holds that even if those employees committed the acts with which they are charged in plaintiff's opposing affidavits, their intent cannot be imputed to the defendant, since none of those employees can be considered in the "upper echelon" of management for whose actions the defendant corporation would be liable. As is shown hereinabove, it was the corporate policy that only conforming shell be delivered under the Supply Contracts. The company not only adopted such policy, as is shown by the affidavits filed herein by defendant in support of the pending motion (*e. g.,* the Lackey, Hughes, Little, Smith affidavits), it spent an unusual amount of money and the time of its managers in seeing to it that its procedures were enforced and that its policies were carried out. Defendant not only did not try to evade its quality obligations under the Supply Contracts, it solicited and followed suggestions from personnel of DCAS–B'ham, the QARIC and his staff as to how it could better meet those contract obligations. Moreover, as the Lackey and Little affidavits show, defendant made its policy known to all of its employees, even to the extent that, according to the Hughes affidavit, Hughes personally explained the policy to each one of defendant's inspection employees, and that, according to the Lackey affidavit, Lackey, although he could not know and, therefore, could not state it to be a fact

that no nonconforming shell had been delivered to the government for acceptance, did know, and therefore, could state it to be a fact that, if any such shell were delivered by an employee of defendant, "that such delivery was made either inadvertently or by some person(s) who did so with knowledge that such delivery was contrary to company policy." What more, if anything, defendant could have done in this regard that it did not do is nowhere suggested by anything on this record.

At the general meeting at which AMC's said "no change" policy was determined, it was also determined that the PD would be amended so as to incorporate therein the proposed change that is described in the part of said briefing chart quoted hereinabove. That amendment (the content of which is set out in Exhibit 18 in the Addendum), which was recognized as needed by Fairburn in 1967, by the Dau memo in 1968, and which the Hinzman teletype in 1969 stated was "forthcoming", was finally made on March 13, 1970. Under the PD, as amended, *all* burrs and *all* surface finish defects, regardless of severity, were expressly classified as "critical" defects for which a supplier of shell thereunder would have to conduct a "one hundred percent inspection". As Hinzman described the effect of the amendment at his April 28, 1975 deposition (pp. 147–150):

[A]ll we did [by the amendment] was switch things around to cover the government's position [so] that we could reject *anything,* . . . regardless of degree, location, size, what have you, or any pit. . . . [a]ny burr . . . if it was just as big as a

---

100. Entirely disregarding any in-process inspections that defendant could make or not make at its election, each of the 1,003,000 and 660,000 shell which were accepted under the 1967 and 1969 Supply Contracts, respectively, were required to be subjected to and pass a by-attribute inspection for sixty-seven defect characteristics. That is more than 100 mil-

lion by-attribute inspections. As the court in *United States v. United States Cartridge Co., supra,* observed (p. 419) "With . . . [numerous employees and a multi-shift operation], it would have been an industrial miracle if there had been no failure, no wrong-doing, no negligence, on the part of [lower level] employees, . . . ."

hangnail on your finger. [Emphasis supplied.]

Of course, one problem with the PD, as amended, in the respect just described, is that, as is hereinafter shown, no one could make shell that would meet its requirements. Recognizing the impracticalities of the amendment, Lieutenant Stephen W. French, Acting Commander, Twin Cities AAP where Donovan's shell facility is located, stated, with respect to the amendment, in a letter (Exhibit 278 to the Free deposition) to APSA, dated August 4, 1970, in part here pertinent (p. 2):

8. EO A00128 deletes para 3.7.3 "metal defects" of PD and adds 3.7.3.1 and 3.7.3.2". "The body cavity shall be free of scale, fins, burrs, draw marks, . . . and sharp edges. The [sic] radius of which shall be no less than .030 inch".

9. Two problems have been created. One, by the very nature of the manufacturing process draw marks are and will be evident unless the cavity is machined, and two, TT EO A00264 deletes "the radius of which shall be no less than .030", thereby leaving no measurable standard to work by. *By literal application of these two EOs, (EO A00128 and A00264) it would be impossible for the contractor to have a single unit of his product accepted by current manufacturing methods.*

10. Para 3.7.3.3. of PD is added by EO A00128. i. e. "Visual standards for evaluation of metal defects will be established for each contract after the first months production". Who is to establish this standard?

In explaining how the "[v]isual standards" aspect of the amendment would

work to overcome the problem that, even though it would be impossible for a shell supplier to make the shell that his contract required him to make, he must make shell for at *least* a month without knowing whether a single unit he produced would be acceptable, Hinzman further testified (p. 147), "[W]e [APSA] are reasonable people . . . so *we* [also amended] the PD so that *we* would set standards".[101] [Emphasis supplied.]

When LAAP received word of the amendment, substantial difficulties were caused on the Y line and S line. Marston sent a teletype (Exhibit 86 in the Addendum), dated March 16, 1970, to APSA which reads, in part (p. 1):

4. These difficulties are primarily due to changes in defects classification and standards as defined in spec FA–PD–MI–2720 Rev 0 dtd 15 Apr 66, metal parts acceptance criteria, and spec MIL–P–60377 (MU) dtd 8 May 66. *These verbal changes directed by Frankford Arsenal personnel change the classification of several metal defects now classed as minors to criticals. This resulted from the screening inspection of DFP M107 155 MM mpts at this plant as instructed by your MQS.* It is emphasized that this application of revised standards to metal parts manufacture at this plant has been strictly verbal. No written changes to specs have been received. [Emphasis supplied.]

5. Three different types of defects involving the surface of the interior cavity of the projectile have been melded together without regard to degree of severity. These are surface finish improper, burr and defective metal. The first two characteristics are defined in the spec as minor defects with the third classed as critical. IAW

---

101. Defendant contends (*e. g.*, page 289 in the Addendum), that the amendment is itself a fraud by which the government will be deprived of competitive pricing for the business of supplying shell; that the very language of the amendment demonstrates that it was deliberately designed to insure that, after its adoption, the only suppliers of shell would be such "friends" of APSA that they would not object to being subject to the "mercy and whims" of that agency which, without obligating the government to make any adjustment in the contract price, could *unilaterally* set standards "after the first month's production" that could either make or break the supplier.

verbal direction the three defects are now regarded as one, i. e., defective metal, a critical defect.

With reference to the same difficulties, Sperry Rand wrote a letter (Exhibit 61 of the Addendum) dated March 19, 1970, to the CO at LAAP, reading in part:

Verbal instructions received have directed us to tighten the acceptance criteria on the interior surface of the projectile. *These instructions indicate that burrs should be considered critical which is in direct contradiction with FA–PD–MI–2720, Revision 0, dated 15 April 1966.* Similarly, the conditions defined under Surface Finish, paragraph 3.7.4, which includes scale, are now also considered critical. *This, too, is in direct contradiction to FA–PD–MI–2720.*

It would seem from the language used in the foregoing teletype and letter that, before the PD was amended, it was interpreted by LAAP and Sperry Rand precisely the same way that the two letters above quoted (the one from Hulse, dated February 27, 1970, and the other [the second McCain letter] from McCain, dated March 10, 1970) had advised APSA that the PD had been interpreted at Sylacauga throughout the time that defendant was making shell under the Supply Contracts.

 It appears to this court that, insofar as "burr" and "surface finish" defects are concerned, the matter of whether the PD should be interpreted as defendant contends (*i. e.,* literally according to its language) or as plaintiff contends (*i. e.,* as that language is modified by the "judgment and experience" that MIL–105 and MIL–1235 would authorize to be exercised) has been a subject of controversy at least since 1968, when the ASBCA had for consideration the appeal of *United States Hoffman Machinery Corporation, supra.* In rejecting the government's contentions in that case, the Board held:

We next consider the Government's final argument which urges that it should not be faulted for rejecting projectiles for cavity surface defects because the gauging of a cavity surface finish according to the criteria of the specifications involved a judgment factor. The interesting part of this argument is the fact that the testimony relied on by the Government in support of its position, when quoted in its entirety, reflects that the cavity surface finish criteria in the contract constituted a subjective standard, so that imperfections which were acceptable to one inspector would be cause for rejection by another. If this is really the position the Government is espousing, it is in effect saying that the appellant contractually agreed to subject itself at all times to the mercy and whim of the Government's inspectors. Of course we do not construe the cavity surface finish criteria . . . to be a subjective standard; . . .

The matter of such interpretation was again considered in a legal context by Porter who, according to the Krohn memo (Exhibit 226 to the Krohn deposition), briefed Fox, *inter alia:*

Dr. Fox was . . . advised by Mr. Porter that, in his judgment, the MIL Standard was not the controlling document . . . and critical defects as called out by the applicable purchase description governed the situation.

In this case, this court, agreeing with *Hoffman* Board and Porter, holds as a matter of law that, as between plaintiff and defendant, "burr" and "surface finish improper" defects are classified by the PD as "minor" defects.

As was held in *Klein v. United States,* 285 F.2d 778, 784, 152 Ct.Cl. 8 (1961):

When one makes a contract with the Government, he of course takes the risk that the provisions of the contract, worked out by the Government in its long experience in the writing and administration of contracts, may work to his disadvantage. But he does not, merely by signing a contract with the

Government, award it a license to twist and warp one of the . . . provisions which it has written into the contract, and make it apply to a situation not covered by the provisions, as written.

If the court be mistaken in its ruling next above, the court further holds that the provisions of the Supply Contracts whereby "burr" and "surface finish" defects are classified are ambiguous and that, according to a reasonable interpretation of the PD, "burr" and "surface finish improper" defects are classified thereby as "minor" defects.

In a broad sense, it could be said correctly that plaintiff has brought before this court all of the defendant's conduct in connection with the 1967 and 1969 Supply Contracts that might be alleged to constitute a breach of contract, or a violation of the False Claims Act (*i. e.*, the court construes the complaint as amended to place before this court all of the claims, and all of the evidence that could be adduced by plaintiff in support of any claims, that, in performing or failing to perform any of its obligations under the 1967 or 1969 Supply Contracts, or submitting, or obtaining payment of, any claims under the authority of either of these two contracts, defendant was guilty of one or more breaches of contract or of one or more violations of the False Claims Act). Thus, it is the court's construction of the effect of this action that, were the government to recover anything from the defendant for any breach or for any violation of said Act with respect to either one of said contracts, such recovery would be the only recovery to which the government would ever be entitled for breach of such contract or for violation of such Act by reason of any conduct by defendant referable to such contract. The other side of this proposition is

that, if the defendant is entitled to prevail on this motion, the judgment will be conclusive as to matters that have or that could have been brought to the court's attention on the defendant's motion and this court so construes its own judgment being rendered and entered on and with reference to this opinion.

For the reasons hereinabove discussed, the court is of the firm opinion that defendant is entitled to summary judgment in its favor as to all issues, and the court, in conformity with its said order of January 6, 1975, will treat the pending motion of defendant filed December 20, 1974, as amended December 31, 1974 to reconsider defendant's November 27, 1974 Motion to Dismiss (together with the affidavits filed on January 9, 1975 in support of defendant's alternative motion for partial summary judgment) as a request by defendant for such a summary judgment.

■ To recover damages or penalties under the False Claims Act, plaintiff must prove all seven of the elements of intentional fraud hereinabove listed. And, apart from the substantive burden of proof, FRCP 9(b) requires the particular acts and circumstances of fraud to be pleaded with particularity. Although the court is mindful of the fact that, in some cases apparently involving fraud, courts are reluctant to grant summary judgments because the facts may not be fully developed, in this action, there appears to this court to be no reason why plaintiff at this stage of these proceedings (and particularly in view of its seven-year history) has not tendered to the court allegations and proof thereof of facts (if they do indeed exist [102]) sufficient to meet the standards of Rule 56(e), in opposition to the defendant's motion. In this respect, there are two main points in this action (a) defendant has sought extensive discovery from plaintiff, and has sought extensive par-

---

[102]. Brief submitted by plaintiff in this civil action on December 6, 1974, in opposition to defendant's motion to dismiss the amended complaint (which motion as noted above finally evolved into the pending motion) reads, in part here pertinent: "Simply stated, plaintiff is unable to provide further details."

ticularization (by the plaintiff) with reference to plaintiff's claims of fraud and the bases therefor, but has not been successful in seeking to compel plaintiff to make allegations, or tender to the court sworn evidence, of facts, sufficient in form and substance, according to the applicable rules, to defeat the defendant's motion; and (b) the prior history of extensive investigations and lengthy litigation between these same two parties in a criminal case is its own demonstration that plaintiff has not tendered a valid excuse for failing to comply with the governing law. A summary judgment is due to be granted when, as this court so finds and holds the facts in this civil action to be, that the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FRCP 56 (e) provides that "summary judgment shall be rendered forthwith" under those conditions, and they obtain here. An appropriate final judgment will be entered.

In *United States ex rel. Brensilber v. Bausch & Lomb Optical Co.*, 131 F.2d 545 (2nd Cir. 1942), *aff'd*, 320 U.S. 711, 64 S.Ct. 187, 88 L.Ed. 417 (1943), the Second Circuit affirmed a summary judgment that had been granted in a civil action wherein the circumstances must have been comparable to those facing this court in this civil action for, in taking such action, that court (L. Hand, Augustus Hand, and Clark in a *per curiam* decision) said that:

> To subject the defendants to a long harassment by examination and trial upon a certainly empty charge could serve no purpose except possibly to force them to buy their peace, an extortion against which 31 U.S.C.A. §

232 [the False Claims Act] would not protect them. The action is of precisely the sort which a motion for summary judgment was intended to nip in the bud.

The following is added as a postscript. Earlier in this Memorandum of Decision, the court observed that this is no ordinary action. This comment was made in connection with the over 7,600 pages of record, and more than 400 pages of briefs, developed to date. The court greatly hopes that this is no ordinary action in another manner of speaking, viz., that it is so extraordinary as to be unique. The defendant's view of this litigation (that the action is but another scene in a drama of planned harassment of defendant pursuant to which persons acting for the plaintiff, by repeatedly raising in litigation issues that are known to them to be baseless, have set about to break defendant financially so that defendant cannot pursue litigation whereby wrongdoing of persons for whose conduct plaintiff is responsible will be exposed and established) is, at the least, frighteningly close to being accurate. Certainly, as herein held this day, totally baseless issues have been raised in this action which have heretofore been pursued elsewhere (including specifically the four year criminal proceeding and its attendant grand jury presentations). Such issues *must* have been known to be baseless by those pursuing them. No doubt their actions originated with good intentions.[103] Clearly a duty existed to investigate, and even reinvestigate, the matters associated with the reports out of LAAP in the fall of 1968 and associated with the allegations of Joseph F. Ellison and "Travis Fowler" in June and July of 1969. But it is difficult for this court to comprehend how any responsible employee of plaintiff in April of 1970, with knowl-

---

103. Although one must wonder why the determination made by representatives of FA (the agency by which plaintiff drafted the Supply Contracts) and of APSA (the agency by which plaintiff entered into the Supply Contracts) *prior* to entering into the 1967 and 1969 Supply Contracts that paragraph 3.7.4 of the PD was inadequate and was being rewritten, did not result in a change of that paragraph in the 1967 and 1969 Supply Contracts if FA and APSA intended to enforce a standard then in the process of being rewritten.

edge of the results of *all* the various investigations (and facts underlying them) which had been conducted (and particularly if he had seen the Fox-Hulse letter of March 27, 1970, and the Fox-Chesarek letter of March 31, 1970), could have requested the United States Attorney to present the matter to a grand jury.[104] The court would like to think the explanation is simple—that no employee of plaintiff had available to him the results of *all* such investigations and underlying facts—that the traumatic experience of defendant is only a result of lack of communication within a bureaucratic government. If this is the explanation, it will be evident now, for defendant at great expense has collected in one place (the record herein) all such material which the plaintiff must now consider in light of the high standard it must maintain in conducting litigation. As the court observed in *United States v. Choctaw County Board of Education*, 310 F.Supp. 804, 810 (S.D.Ala.1969):

> The U. S. has a higher duty than an ordinary adversary. It is the representative of all the people, by the will of the people surviving on and expending the people's tax money and should be charged with a high standard of conduct in litigation, i. e., find the truth regardless of the consequences to the position of the U. S. as a party adversary.

Fortunately for the defendant, and indeed for the real plaintiff as well, not all persons have acted for the plaintiff in a fashion which caused the court to feel it should add this postscript. Under what must have been very taxing circumstances, DCAS–Birmingham personnel in general, and the Chief, QAD, DCAS–Birmingham (W. C. McCain), the QARIC (Roland Smith and W. E. Snider) and assistant QARIC (F. B. Mayes) and their staff in particular, conducted themselves in a manner that is consistent with the public interest and the trust associated with their employment. Personal knowledge of the fashion in which they discharged their duties necessarily must be satisfying to them.

## APPENDIX A

### Abbreviations and Acronyms

| | |
|---|---|
| ACAB | Army Contract Adjustment Board which rendered the memorandum of decision (Exhibit 65 in the Addendum) in the matter of the application of *Alabama Forge and Machine, Inc.* |
| Addendum | Bound volume entitled *Claims of Hangar One, Inc.* (Exhibit II to defendant's motion to transfer). |
| AMC | Army Materiel Command. |
| AOQL | "The Average Outgoing Quality Limit", as that quoted phrase is defined in paragraph 3.18 of MIL–STD–1235 (*i. e.*, "[T]he fraction of defective material which is expected on the average to pass inspection when the associated sampling plan is followed faithfully."). |

104. A similar observation might well be made concerning the filing of this action.

Abbreviations and Acronyms

| | |
|---|---|
| April 29, 1971 Response | Government response (Exhibit 39 in the Addendum) to Court Order, filed on April 29, 1971 in the criminal action (No. CR 70–351). |
| APSA | Ammunition Procurement and Supply Agency, Joliet, Illinois, the agency of the government by which plaintiff entered into the Supply Contracts. |
| AQL | The "Acceptable Quality Level", as that quoted phrase is defined in paragraph 3.17 of MIL–STD–1235 (*i. e.*, "a nominal value expressed in terms of percent defective [which] serves as an index to the sampling plan to be used . . ."). |
| ASBCA | Armed Services Board of Contract Appeals. |
| ASPR | Armed Services Procurement Regulations. |
| Berry deposition | Deposition of Fred Berry taken herein by defendant on May 19, 1975. |
| Buckner affidavit | Affidavit made by Charles Dennis Buckner on February 6, 1975, and filed herein by plaintiff on February 7, 1975 (one of the opposing affidavits). |
| Bullard affidavit | Affidavit made by Henry C. Bullard on December 30, 1974, and filed herein by defendant on December 31, 1974. |
| CD | Contractor (defect) detection station. |
| Chandler deposition | Deposition of L. C. Chandler taken herein by defendant on February 28, March 2, and May 21 and 22, 1975. |
| CO | Commanding Officer. |
| Code 1 | A symbol that, when used in reference to a particular lot of shell, signifies, in load line parlance, that the quality of such lot has been demonstrated by an on-receiving inspection to be such that it can forthwith be released to a load line to be loaded with high explosives. |
| Criminal action | Criminal Action No. CR 70–351 in this District Court. |
| Dalton deposition | Deposition of Lawrence Earl Dalton taken herein by defendant on May 20, 1975. |
| Dau Memo | Memorandum (Exhibit 275 to the Free Deposition) of D. Dau to AMC (See note 56 for date). |
| DCAS | Defense Contract Administration Services. |
| DCAS–B'ham | Defense Contract Administration Services Birmingham (Alabama) district. |
| DFP | Prefix (to lot numbers) used to identify 155 mm HE M107 metal parts made by defendant. |

148

DiGiovannantonio
deposition — Deposition of James DiGionvannantonio taken herein by defendant on January 29, 1975.

District Attorney — United States Attorney for the Northern District of Alabama.

Ellison affidavit — Affidavit made by Joseph F. Ellison on February 6, 1975, and filed herein by plaintiff on February 7, 1975 (one of the opposing affidavits).

EOs — Engineering Orders.

FA — Frankford Arsenal.

Fairburn
deposition — Deposition of Charles Fairburn taken herein by defendant on February 26 and 27, 1975.

FBI — Federal Bureau of Investigation.

FORM DD 250 — Certificate signed by government quality representative acknowledging acceptance of items by the government.

Fox and Krohn
Investigation — Investigation initiated and undertaken by the Secretary of Army.

Fox-Chesarek
letter — Letter dated March 31, 1970 from J. Ronald Fox, Assistant Secretary of the Army (Installations and Logistics) to Gen. F. J. Chesarek, Commanding General, AMC (Exhibit 219 to Krohn deposition).

Fox-Hulse letter — Letter (Exhibit 45 in the Addendum) dated March 27, 1970 from J. Ronald Fox, Assistant Secretary of the Army (Installations and Logistics) to Frank W. Hulse, Chairman, defendant's Board of Directors.

Free deposition — Deposition of John W. Free taken herein by defendant on April 29 and 30 and May 1, 1975.

frequency f — The desired ratio between the number of units of product randomly selected and inspected at an inspection station and the number of units of product passing the inspection station during periods of sampling inspection (paragraph 4.1 of MIL–STD–1235).

Graham deposition — Deposition of Erwin Montgomery Graham, Jr., taken herein by defendant on May 30, 1975.

Hinzman
deposition — Deposition of Lawrence H. Hinzman taken herein by defendant on March 20 and April 28, 1975.

Hughes affidavit — Affidavit made by K. D. Hughes on December 19, 1974, and filed herein by defendant on December 20, 1974.

Abbreviations and Acronyms ·

| | |
|---|---|
| Hulse letter | Letter (Exhibit 42 in the Addendum) dated February 27, 1970 by Frank W. Hulse, Chairman, defendant's Board of Directors to John Krohn, Procuring Contracting Officer, APSA. |
| IAAP | Iowa Army Ammunition Plant. |
| i factor | The number of units that must be screened 100% without the occurrence of a defective unit before sampling inspection can be begun (or reinstituted after the occurrence in a sample unit of the type of defect which is being inspected for). |
| Krohn deposition | Deposition of John W. Krohn taken herein by defendant on March 18, 19 and 20, 1975. |
| Krohn-Hulse letter | Letter (Exhibit 46 in the Addendum) dated April 7, 1970 from John W. Krohn, Procuring Contracting Officer, APSA, to Frank W. Hulse, Chairman, defendant's Board of Directors. |
| Krohn Memo | Undated memorandum (Exhibits 220 and 226 to the Krohn deposition) by John W. Krohn. |
| LAAP | Louisiana Army Ammunition Plant. |
| Lackey affidavit | Affidavit made by E. E. Lackey on December 20, 1974, and filed herein by defendant on December 20, 1974. |
| LeJeune deposition | Deposition of Herman LeJeune taken herein by defendant on May 22 and 23, 1975. |
| Little affidavit | Affidavit made by Noble Kermit Little on December 30, 1974, and filed herein by defendant on December 31, 1974. |
| McCain affidavit | Affidavit made by W. C. McCain on December 19, 1974, and filed herein by defendant on December 20, 1974. |
| McCain letter, first | Letter (Exhibit 105 in the Addendum) dated July 14, 1969 from W. C. McCain, Jr., DCAS–B'ham to APSA. |
| McCain letter, second | Letter (Exhibit 25 in the Addendum) dated March 10, 1970 from W. C. McCain, Jr., DCAS–B'ham to APSA. |
| Marchant affidavit | Affidavit made by Joseph Marchant on January 31, 1975, and filed herein by plaintiff on February 7, 1975 (one of the opposing affidavits). |
| Mayes affidavit | Affidavit made by F. B. Mayes on December 30, 1974, and filed herein by defendant on January 9, 1975. |

150

| | |
|---|---|
| MIL–105 | Military Standard 105D (often MIL–STD–105D) a document wherein procedures for "static lot" sampling inspections are set out. |
| MIL–1235 | Military Standard 1235 (often MIL–STD–1235) a document wherein procedures for "continuous" sampling inspections are set out. |
| MIRR | Material Inspection And Receiving Report. |
| non-specification shell | Shell that if actually inspected, as one of the samples drawn during sampling inspection, would not meet a particular drawing, etc., requirement. |
| opposing affidavits | Affidavits made by each of Michael Eugene Williams, Joseph F. Ellison and Charles Dennis Buckner on February 6, 1975, and an affidavit made by Joseph Marchant on January 30, 1975, all of which were filed herein by plaintiff on February 7, 1975, in opposition to defendant's motion for summary judgment. |
| other Army investigations | Investigations performed by or at the direction of personnel employed by the Department of Army at LAAP, APSA and FA relative to defendant and shell produced by it. |
| PA | Picatinny Arsenal. |
| PCO | Procuring Contracting Officer. |
| PD | Purchase Description For Projectile, HE 155 mm M107 Metal Parts Assembly (FA–PD–MI 2720, Rev. 0, 15 April 1966). |
| PQA | Procurement Quality Assurance. |
| prior to pour inspection | In common load line parlance, a descriptive phrase used to designate a point on a shell loading line where specified inspections are made of shell prior to loading them with high explosives. Such phrase is sometimes also used to designate the particular inspection(s) made at such point. |
| QAR | Quality Assurance Representative. Sometimes a staff of such representatives. |
| QARIC | Quality Assurance Representative In Charge. |
| RAAP | Ravenna Army Ammunition Plant. |
| remaining charges | Those charges made by plaintiff, in substance, that defendant is guilty of breach of contract or fraud because defendant did not make (or properly make) the inspections that defendant claims to have made. |

Abbreviations and Acronyms

| | |
|---|---|
| re-served answers | Plaintiff's answers to defendant's interrogatories 43 and 57 made pursuant to the court's order of October 9, 1974. |
| RFP | Request For Proposal. |
| S line | The load line operated at LAAP by Sperry Rand. |
| screening | Making an every unit (a "one hundred percent") inspection for some particular one or more characteristics. |
| shell | 155 mm HE M107 metal parts. |
| Smith affidavit | Affidavit made by Roland Smith on January 3, 1975, and filed herein by defendant on January 9, 1975. |
| SMP | Southern Metal Parts; the name of a former division of defendant corporation. |
| Snider affidavit | Affidavit made by W. E. Snider on December 31, 1974, and filed herein by defendant on January 9, 1975. |
| Sperry Rand | Sperry Rand Corporation. |
| Station 1 | A point on a shell loading line where certain specified inspections are made on shell prior to loading them with high explosives. Sometimes used to designate particular inspection(s) made at such point. |
| Sternberg letter, first | Letter (Exhibit 16 in the Addendum) dated July 2, 1969 from Sam Sternberg, PCO, APSA, to McCain and Mitchell, DCAS-B'ham. |
| Sternberg letter, second | Letter (Exhibit 104 in the Addendum) dated July 22, 1969 from Sam Sternberg, PCO APSA, to McCain and Mitchell, DCAS-B'ham. |
| Supply Contracts | The three shell supply contracts (numbers DAAA09-67-C-0045, DAAA09-68-C-0277 and DAAA09-69-C-0330) between plaintiff and defendant dated October 3, 1966, December 22, 1967 and February 14, 1969, respectively. |
| Supply Contract, 1966 | The shell supply contract DAAA09-67-C-0045, dated October 3, 1966, between plaintiff and defendant. |
| Supply Contract, 1967 | The shell supply Contract DAAA09-68-C-0277, dated December 22, 1967, between plaintiff and defendant. |
| Supply Contract, 1969 | The shell supply Contract DAAA09-69-C-0330, dated February 14, 1969, between plaintiff and defendant. |

Abbreviations and Acronyms

| | |
|---|---|
| tech data package | Drawings, designs and applicable detail specifications for the manufacture of 155 mm HE M107 metal parts. |
| tt | Teletype message. |
| walkout | The occasion in mid-July, 1968, when defendant's management team and 37 of its 52 supervisors quit defendant's employ without having first given any advance notice that they intended to do so. |
| WDJ Attorney(s) | Attorney(s) from the Washington office of the Department of Justice. |
| Williams affidavit | Affidavit made by Michael Eugene Williams on February 6, 1975 and filed herein by plaintiff on February 7, 1975 (one of the opposing affidavits). |
| Y line | Sperry Rand's shell manufacturing facility at LAAP. |

Appendices B and C to follow

## APPENDIX B

Names

| | |
|---|---|
| Alabama Forge and Machine, Inc. | An Alabama corporation which was incorporated on July 1, 1968. Its principal officers were Builder, Preston and Phiffer. |
| Berry, Fred | A Sperry Rand supervisor. He was in charge under Lee of inspection on that part of the S line on which shell were loaded. |
| Bishop, Ray | Assistant General Manager (in charge of) Quality Control at defendant's shellmaking facility from August 20, 1968 until sometime in February 1969 when he was promoted to General Manager. He thereafter continued to manage defendant's inspection activities until sometime in June 1969 when he became ill. He died on July 31, 1969. |
| Browning, Doyle Wayne | An employee of defendant who was an inspection foreman until a few weeks after the walkout. (See Smith affidavit.) Thereafter he was transferred to work other than inspection. One of the 28 of defendant's employees named in amended complaint. |
| Buckner, Charles Dennis | A former employee of defendant and the author of the (opposing) Buckner affidavit. One of 28 of defendant's employees named in the amended complaint. He is there described as an inspector. |
| Builder, J. L. | Headed defendant's plant management team at its shellmaking facility until he walked out in mid-July, 1968. Thereafter he was a principal officer of Alabama Forge and Machine, Inc. and National Metals Manufacturing Company and was not again employed by defendant. |
| Bullard, Henry C. | A former employee of defendant. At the time of the walkout he was an inspection employee. At that time he was promoted and until August 20, 1968, when Bishop was employed, was in charge, under Lackey, of defendant's inspection activities at its shellmaking facility. After August 20, 1968 he was an inspection foreman for the company until sometime between October 23, 1968 when defendant delivered the last of the shell under the 1967 contract which are complained of in this action and July 8, 1969 when defendant delivered the first of the shell under the 1969 contract which are so complained of. Author of the Bullard affidavit. |

| | |
|---|---|
| Chamberlain Corporation, The | A corporation that operated a shellmaking facility in Pennsylvania and another shellmaking facility in Massachusetts. |
| Chandler, L. C. | QARIC at LAAP. |
| Chesarek, Gen. F. J. | Commanding Officer, AMC. |
| Coyle, Robert | Metallurgist, Frankford Arsenal. |
| Culver, Jimmy Lee | A former inspection foreman for defendant at its shellmaking facility. One of the 28 of defendant's employees named in the amended complaint. |
| Cunningham, John J. | An employee of the Mortar Engineering branch, Frankford Arsenal. |
| Dalton, Lawrence Earl | A Sperry Rand inspection foreman on the S line. |
| Dau, D. E. | Deputy Chief, Quality Control Operations, APSA. |
| DiGiovannantonio, James | Quality Assurance Specialist, Frankford Arsenal. |
| Donovan Construction Company | A corporation that operated a shellmaking facility in Minnesota. |
| Ellison, Joseph F. | Former inspection employee of defendant and the author of the (opposing) Ellison affidavit. One of the 28 of defendant's employees named in the amended complaint. |
| Fairburn, Charles | Quality Assurance Specialist, Frankford Arsenal. |
| Fowler, Travis | A former production employee of defendant to whom certain telephone calls were attributed. |
| Fox, J. Ronald | Assistant Secretary of the Army, Installations and Logistics. |
| Free, John W. | Key Inspector of 155 mm HE M107 metal parts, APSA. |
| French, Lt. Stephen W. | Acting Commander, Twin Cities Army Ammunition Plant, New Brighton, Minnesota. |
| Fuqua, John (Jack) | General Manager of defendant's shellmaking facility from the time of walkout until February, 1969. |
| Garberg, Phillip B. | Attorney, Legal Office, Headquarters, U. S. Army Armament Command (successor to APSA). |
| Gissendanner, Jerry Malcolm | A former inspection employee of defendant who accompanied Ellison at the time in June 1969 |

when Ellison made the accusations that launched the FBI investigation and who himself made accusations against defendant in October 1969. One of the 28 of defendant's employees named in the amended complaint.

| | |
|---|---|
| Graham, Gen. Erwin M. | Commanding Officer, APSA. |
| Grazioso, Charles | A consultant employed by defendant. He is further identified in note 2 on page 218 of the Addendum. |
| Haywood, Ira K. | Director of Quality Assurance, APSA. |
| Hinzman, Lawrence H. | Chief, Munitions Quality Control Operations, APSA. |
| Hughes, K. D. | A former employee of defendant and author of the Hughes affidavit. He was in charge, under Bishop, of defendant's inspection activities from the time of his employment on October 25, 1968 until Bishop became ill sometime in June, 1969. After that time, he was a part of defendant's management team in charge of defendant's inspection activities until its shellmaking venture was ended. |
| Hulse, Frank W. | Chairman, defendant's Board of Directors. |
| Krohn, John W. | PCO, APSA. |
| Lackey, E. E. | Prior to the walkout he was defendant's controller. Immediately following the walkout, he was promoted to Assistant General Manager, and in such capacity, under Fuqua, managed defendant's production and inspection activities until August 20, 1968 when Bishop was employed. Thereafter, he was Assistant General Manager (in charge of) Production until sometime in February, 1969 when he became General Manager of defendant's shellmaking facility. Author of the Lackey affidavit. |
| Lee, Bobby | A Sperry Rand supervisor. He was in charge under LeJeune of load line inspection activities. |
| LeJeune, Herman | Director, Sperry Rand Quality Control at LAAP. |
| Little, Noble Kermit | A former production supervisor for defendant and author of the Little affidavit. One of the 28 of defendant's employees named in the amended complaint. |
| McCain, W. C. | Chief, Quality Assurance Division, DCAS–B'ham and the author of the McCain affidavit. |
| Major, N. W. | A Key Inspector of 155 mm HE M107 metal parts, APSA. |

Names

| | |
|---|---|
| Marchant, Joseph | A member of the QAR staff at defendant's shellmaking facility from sometime in July 1967 until sometime in October, 1968 and the author of the (opposing) Marchant affidavit. |
| Marston, J. W. | Civilian Executive Assistant to the Commanding Officer, LAAP. |
| Mayes, F. B. | Assistant QARIC at defendant's shellmaking facility and the author of the Mayes affidavit. |
| Minor, Rex | Quality Specialist, DCAS–B'ham. |
| Mulder, Gerard | Employed as consultant by defendant sometime in January, 1970. He is further identified in note 1 on page 218 of the Addendum. |
| National Metals, Inc. | An Alabama corporation which was incorporated on October 31, 1969. Its President was Builder and its Executive Vice President was Preston. After defendant's shellmaking venture ended, this corporation obtained a shellmaking supply contract under which it made shell in the same facility that was utilized by defendant during the time defendant was engaged in its shellmaking venture. |
| Nivens, Eddie | A former inspection foreman of defendant who walked out in mid-July 1968 and was not again employed by the company. One of the 28 of defendant's employees named in amended complaint. |
| Phiffer, W. V. | A former employee of defendant who, prior to the walkout was a member of defendant's management team. He left defendant's employ at the time of the walkout and was not again employed by defendant. |
| Porter, Richard | Attorney in the office of the General Counsel for the Department of Defense during the relevant times herein. |
| Preston, Dan | A former employee of defendant and a member of defendant's management team until he walked out in mid-July, 1968. He was not thereafter employed by defendant. |
| Sherrill, Clarence Odell | A former employee of defendant until he walked out in mid-July, 1968. He was not again employed by defendant. One of the 28 of defendant's employees named in amended complaint. He is there described as an inspection supervisor. |
| Smith, Roland | QARIC at defendant's shellmaking facility until he was succeeded as such by Snider in 1968. He is the author of the Smith affidavit. |

| | |
|---|---|
| Snider, W. E. | QARIC at defendant's shellmaking facility from mid-October 1969 until defendant ceased its shellmaking operations. He is the author of the Snider affidavit. |
| Sternberg, Sam | PCO, APSA. |
| Storey, W. W. | An attorney employed by defendant sometime in 1970. |
| Strazier, Anthony | Quality Assurance Specialist, Frankford Arsenal. |
| Taylor, George | A DCAS–B'ham employee. |
| Tyler, Joe | Prior to the walkout he was an inspection foreman for defendant at its shellmaking facility. He left defendant's employ at the time of the walkout and was not again employed by defendant. One of the 28 of defendant's employees named in amended complaint. |
| Walker, O. E. | A former employee of defendant. He was defendant's Assistant General Manager in charge of Production from sometime in February 1969 until at or about the time defendant's shellmaking venture was ended. One of the 28 of defendant's employees named in amended complaint. |
| Walker, Tommy | A former inspection supervisory employee of defendant at all times material on and after September 5, 1968. One of the 28 of defendant's employees named in amended complaint. |
| Williams, Michael Eugene | A former employee of defendant. He was an inspection employee for a few weeks after the time of the walkout (see Smith affidavit). One of the 28 of defendant's employees named in amended complaint. |

Appendix C to follow

APPENDIX C

Exhibits

| EXHIBIT NO. | DESCRIPTION | LOCATION |
|---|---|---|
| 1 | LAAP on-receiving inspection results for shell produced by defendant, Donovan Construction Company and The Chamberlain Corporation. | Addendum |
| 5 | tt dated September 14, 1968 from LAAP to APSA. | Addendum |
| 9 | Reports to APSA by Chandler and DiGiovannantonio of government and contractor (Sperry Rand) screenings of Lots 133 et seq. | Addendum |
| 10 | Sperry Rand letter report to APSA dated March 3, 1970 of results of Sperry Rand screenings of Lots 86–93. | Addendum |
| 12 | Drawing of 155 mm HE M107 metal part, a part of the tech data package in the Supply Contracts. | Addendum |
| 16 | Letter (the "first Sternberg letter") dated July 2, 1969 to DCAS–B'ham from Sternberg, PCO, APSA. | Addendum |
| 17 | DCAS–B'ham (per Minor) recommendation re amending PD, dated July 8, 1969. | Addendum |
| 18 | tt from FA to APSA dated March, 1970 in which content of EOs A00128 and AT0033 is set out. | Addendum |
| 19 | Minor report re his trip to defendant's facility on July 9, 1969. | Addendum |
| 20 | Minutes of meeting of personnel of APSA, DCAS–B'ham and defendant on October 19, 1968. | Addendum |
| 25 | Letter (the "second McCain letter") dated March 10, 1970 from DCAS–B'ham to APSA. | Addendum |
| 28 | Blue Bell notification letter (with indorsements and attachments) from APSA to CO, AMC. | Addendum |
| 30 | tts from CO, LAAP to APSA dated October 22 and 24, November 3 and 14 and December 9, 1969, respectively, reporting re- | Addendum |

Exhibits

| EXHIBIT NO. | DESCRIPTION | LOCATION |
|---|---|---|
| | sults of Sperry Rand screening of defendant's Lots 133, 134, 136, 137 and 138. | |
| 32 | Report by LAAP and Sperry Rand to APSA of results of screening of 1000 samples from each of Lots 144 and 145. | Addendum |
| 33 | Minor report dated January 5, 1970 re his December 1969 trip to LAAP. | Addendum |
| 34 | Minor report dated July 28, 1969 re his July 18 trip to defendant's facility. | Addendum |
| 42 | Letter (the "Hulse letter") dated February 27, 1970 from Hulse to Krohn. | Addendum |
| 43 | Hinzman's report dated March 6, 1970 re his trip to AMC headquarters during March 3–5, 1970. | Addendum |
| 45 | Letter (the "Fox-Hulse" letter) dated March 27, 1970 from Fox to Hulse. | Addendum |
| 46 | Letter (the "Krohn-Hulse" letter) dated April 7, 1970 from Krohn to Hulse. | Addendum |
| 52 | DiGiovannantonio report re his trip(s) to LAAP during time defendant shell Lots 133, et seq. were received. | Addendum |
| 61 | Letter dated March 19, 1970 from Sperry Rand to CO, LAAP. | Addendum |
| 63 | DCAS–B'ham fact sheet. | Addendum |
| 64 | DCAS–B'ham fact sheet. | Addendum |
| 65 | ACAB memo decision dated July 25, 1972. | Addendum |
| 66 | Cunningham report dated November 14, 1968 re his trip to defendant's facility during November 5–8, 1968. | Addendum |
| 75 | Free's report dated November 11, 1968 re his trip to defendant's facility during November 5–8, 1968. | Addendum |
| 85 | FA–PD–MI–2720, Rev. 0, 15 April 1966 (the "PD"). | Addendum |

**160**

Exhibits

| EXHIBIT NO. | DESCRIPTION | LOCATION |
|---|---|---|
| 86 | tt dated March 16, 1970 from LAAP, per Marston, to APSA. | Addendum |
| 87 | Letter dated August 27, 1969 from CO, LAAP to APSA. | Addendum |
| 88 | Letter dated August 19, 1969 from Sperry Rand to CO, LAAP. | Addendum |
| 95 | Letter dated September 2, 1969 from APSA to CO, LAAP. | Addendum |
| 100 | Letter dated August 4, 1970 from D. E. Dau, APSA to CO, PA. | Addendum |
| 103 | Memo by Hinzman dated July 6, 1970. | Addendum |
| 104 | Letter (the "second Sternberg letter") dated July 22, 1969 from Sternberg to DCAS–B'ham. | Addendum |
| 105 | Letter (the "first McCain letter") dated July 14, 1969 from DCAS–B'ham to APSA. | Addendum |
| 110 | Sperry Rand Daily Log (per Phipps) dated October 2, 1969. | Addendum |
| 111 | Sperry Rand Daily Log (per Phipps) dated October 3, 1969. | Addendum |
| 123 | Memo by Haywood, APSA, dated October 21, 1969. | Addendum |
| 124 | Letter dated December 15, 1969 from APSA to CO, LAAP. | Addendum |
| 125 | tt dated December 22, 1969 from APSA to CO, LAAP. | Addendum |
| 129 | Memo from Smith to Fuqua. | Addendum |
| 131 | Fairburn report dated December 22, 1969 re his trip to LAAP on December 16–19, 1969. | Addendum |
| 212B | SQCP No. 259—Standing Quality Control Procedure for Loading Assembling and Packing of Projectile, 155 mm, HE, M107 (July 25, 1968). | Chandler deposition |
| 212F | SQCP No. 259—Standing Quality Control Procedures for Loading, Assembling and Packing of Projectile, 155 mm HE M107 (March 16, 1970). | Chandler deposition |
| 212G | SQCP No. 59—Standing Quality Control Procedures for Loading, | Chandler deposition |

### Exhibits

| EXHIBIT NO. | DESCRIPTION | LOCATION |
|---|---|---|
| | Assembling and Packing of Projectile, 155 mm HE M107 (October 7, 1970). | |
| 219 | Fox-Chesarek Letter of March 31, 1970. | Krohn deposition |
| 220 | Memo (undated) by Krohn re Krohn and Porter briefing of Fox. | Krohn deposition |
| 226 | Original of which Exhibit 220 is a copy. | Krohn deposition |
| 227 | Memo by Schweizer, APSA, dated December 30, 1969 re Krohn briefings of Fox on December 19, 1969. | Krohn deposition |
| 243 | Memo by defendant's counsel dated April 24, 1974 and correspondence between him and APSA relative thereto. | Krohn deposition |
| 247 | File (and contents) labeled "508–24 Defense Metal Projects (72) BB." | Krohn deposition |
| 260 | Hinzman's report dated September 15, 1969 re his trip to New Bedford, Massachusetts during September 8–11, 1969. | Hinzman March 20, 1975 deposition |
| 261 | tt dated September 4, 1969 from Free to Haywood, APSA. | Hinzman deposition |
| 275 | Memo by D. Dau to AMC (see note 56 for date). | Free deposition |
| 278 | Letter dated August 4, 1970 from French to Free. | Free deposition |
| 291 | Free report dated August 27, 1969 re his trip to defendant's facility. | Free deposition |

———◆———

### FINAL JUDGMENT

For the reasons contained in the Memorandum of Decision this day entered, it is the judgment of this court that the defendant is entitled to summary judgment in its favor.

It is, therefore, ordered, adjudged and decreed that the plaintiff have and recover nothing of the defendant. Costs of court herein are taxed against plaintiff.